**FILED**

MAR 1 3 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES FEDERAL DISTRICT COURT
IN THE DISTRICT OF COLUMBIA

Rev. Fr. PRISCO E. ENITNES, an individual, )
419 N. Mountain View Ave. #207
Los Angeles, California 90026                    )
Tel. (213) 675-9092 / (323) 527-2071
Email: Frentines@hotmail.com

                    Plaintiff

    V.

THE UNITED STATES OF AMERICA,
                                                            )
                                                            )
                                                            )
                    Defendant.                     )

CASE NUMBER   1:06CV00477

JUDGE: Rosemary M. Collyer

DECK TYPE: Pro se General Civil

DATE STAMP: 03/13/2006

## COMPLAINT

Plaintiff Filipino Rev. Fr. PRISCO ESPERANZATE ENTINES, for his complaint

against Defendant United States of America, states as follows:

### JURISDICTION

1. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. Section 1331 in that a

declaration is sought whether upon Cession of the Philippine Islands by Spain to and upon

acquisition, complete rule and sovereignty of the United States over the newly acquired U.S.

Territory, Citizenship by Naturalization and by birth within the "English" Common law doctrine

was automatically acquired by the Natives of the Philippine Islands, at least, from 11 April 1899

to 4 July 1946 per 31 Stat, 1881, Treaty Series 344.

2. Specifically, a declaration is sought whether granting but not admitting for the sake of

argument that if Filipinos, were Aliens (not U.S. Nationals per Section 104 of October 14, 1940

Act) yet were Conscripted to World War II as Aliens residing in a U.S. Colony under the 1918

-1-

Selective Training and Service Act, then under the age-old 1864 Federal Policy re-enacted by

Section 303 of the above-mentioned October 14, 1940 Act, they (the U.S. National-Filipino

soldiers conscripted to World War II) had an inherently-earned right to, at the very least,

Naturalized U.S. Citizenship immediately before or after their Honorable Discharge from the

Federal World War II service. And NOT in 1990 per Section 405 of 1990 Act. It is submitted

that under the English Common Law doctrine, by "birth in the dominion and allegiance of the

King" every U.S. National-Filipino Conscripted to World War II was and is an Instant American

upon induction to the Federal War service and a War-Hero Veteran. (See Petition of Sproule

(D.C. Cal. 1937) 19 F. Supp. 995). A million times more than Jacinto A. Sabangan, Jr., who, is

granted Instant or automatic Native-born U.S. Citizenship just by being born in the

Commonwealth of Northern Mariana Islands while a mere U.S. Protectorate in 1978. (See

Jacinto A. Sabangan, Jr. et als v. Colin Powell – CV-03-16426 – D.C. # 02-CV-00039 – July 1,

2004 – 9th Circuit Court of Appeals Decision). It is also pointed out that per Section 322 of the

same mentioned October 14, 1940 Act supra, a Child born in Puerto Rico of Alien Parents is

vested with same Instant Native-born U.S. Citizenship. Of very important and serious note is

another fact that U.S. National-reduced Filipinos by War-Conscription were punishable with

death by musketry for any desertion under Articles of War #58. It furthermore carries with it

(desertion) Court Martial proceedings that might include indictment on forfeiture of right to U.S.

Citizenship, even possible deportation, perpetual disqualification from public office, and/or loss

of government benefits and many others that the Court Martial and other Civil courts may

impose.

3. The Court's original jurisdiction under the same 28 U.S.C. Section 1331 is invoked in

that a declaration is sought that U.S. National-non-Citizen status is unconstitutional as a direct

violation of the Constitution in its prohibition in creating "a class of nobility" and the "uniform"
rule on Immigration. Corollary to this is the direct violation of the 5th Amendment's "due
process" and 14th Amendment's "equal protection clause" on the divestiture of a very precious
and fundamental right of Native-born U.S. Citizenship acquired inherently by birth and
especially by War-conscripted service, which (the latter) the highest form of the most valuable
tax and the last and most extreme test of obeisance and loyalty to a country. Hence, even an
Alien-enlistee is awarded with a very precious right to, at the very least, Naturalized U.S.
Citizenship and the consequent full and equal War benefits, rights, privileges and immunities
under International, Constitutional and Statutory laws on War Conscription.

4.  This Court's jurisdiction is, likewise, invoked in that a declaration is sought that
Section One (1) of the Philippine Government Act of 1902 was unconstitutional as an "Ex Post
Facto" law because it directly violated the 5th, 9th, 10th, 13th and 14th Amendments' respective
provisions of the U.S. Constitution. (See Carmel v. Texas (May 1, 2000). Not to mention of the
direct contempt of 16th American Jurisprudence 2nd Edition, Section 177 and 16A C.J.S. 320 and
the landmark Court decisions specifically in Kawakita v. U.S. (1980); Afroyim v. Rusk (1967)
Reid v. Covert (1956); Cincinnati Soap Co. v. U.S. (1937); Wong Kim Ark (1898) Yick Wo v.
Hopkins (1897); In Re Rodriguez (1897) and Madbury v. Madison (1804) to cite a few.

5.  Jurisdiction is also proper under the Declaratory Judgment Act, 28 U.S.C. Sections
2201 and 2202.

6.  Venue is proper in this judicial district pursuant to 28 U.S.C. Section 1391 (b) is that
Plaintiff resided in Washington, D.C. since 1986 and was Naturalized as U.S. Citizen at
Arlington, Virginia sometime in December of 1992.

**THE PARTIES**

7. Plaintiff is the seventh (7th) Child and Orphan of a **_U.S. National_**-reduced Pilipino-Veteran-Casualty as World War II Conscriptee and a former member of the 1901 European-patterned, elite U.S. Army group, commonly known as U.S. Constabulary and as an U.S. Insular Force in the Philippine Islands was famously-remembered as Philippine Constabulary (hereinafter "PC"). The herein Plaintiff appears *in pro per.*

8. Defendant is the United States of America.

## FACTS OF THE CASE

9. Pursuant to the Treaty of Paris, 30 Stat. 1754, 1759, dated December 10, 1898 Spain ceded the Philippines to the United States of America, for $20,100,000.00. It is pointed out and must be very importantly noted that when the Treaty took effect on 11 April 1899 and the Philippines was ruled by the United States as a colonial possession, by virtue of 31 Statute, 1881, Treaty Series 344, U.S. National status was imposed on Native-Filipinos. Instead of Mass Naturalization and Citizenship by birth. (See, also, Section 204, October 14, 1940 Act (54 Stat. 1168; U.S.C. Title 8) and 7 Foreign Affairs Manual 1146 - 49 (7 FAM 1146-49) of the State Department of the United States).

10. By the July 1902 Organic Act's Section 1, Congress intentionally abridged the application of Section 1891 of the 1874 Revised Statutes singly and specifically to the Philippines ONLY. Meaning the U.S. Constitution and U.S. laws would not apply to the Philippines, in a very particular, singular and unique way. Short of saying that by reason of race Native-Filipinos were ineligible or racially disqualified from U.S. Citizenship. Although entitled to some United States' protection.. Thus U.S. National-non-Citizen status was created and judicially justified and imposed two (2) more time in 1912 and 1916. Instead of "Mass Naturalization" that was done in the acquired U.S. Territories like Alaska, Oregon, Florida,

Mexico, Virgin Islands, New Orleans, Hawaii and Puerto Rico. To mention a few. Ironically and an appalling inconsistency, if not as inherent racial bias, by the same July 1902 Act the dual status of "Philippine" or "State" Citizenship was, also, imposed on Native Filipinos. And the One and ONLY purpose was to racially exclude them both from Naturalized and Native-born U.S. Citizenship under the "English" Common law doctrine. And this was done by a double jeopardy scheme of 1912 and 1916 Acts, respectively. (See Foreign Affairs Manual supra).

11. In June 29, 1906 Act in its Seventh subdivision of Section 4, the U. S. Naturalization right was conferred on the Natives. But this was not made known. And very ironically, "In Re Ayson et al." (D.C., N. D. Illinois (1936) 14 F. Supp. 488) when a certain Baldomero Britanico Ayson because of his service with the U.S. Navy, filed his application for Naturalization as a U.S. Citizen, it was made very clear in his particular case that despite the 1906 Act, the ONE and ONLY way a Pilipino, who by reason of race is ineligible even to be a Naturalized Citizen being a "Non-white" and "not of African descent" enlistment in the U.S. Military Service was the ONE and ONLY way. Although this was already provided for in Section 72.2 (k) of the same Act as the extension of the 1873 age-old federal policy of rewarding Aliens with Naturalized U.S. Citizenship if they serve in the U.S. Armed Forces even in time of peace.

12. On February 5, 1917 a law was passed (P. L. 301 (H.R. 10384) that clearly defined the meaning of the "United States" as " the United States, and any waters, territory, or other place subject to the jurisdiction thereof".... (Op. Cit.). Specifically and among other things it defined what an "Alien" was lucidly qualifying Filipinos as NOT aliens with the specific provision that the law fully applied to the Philippines.

13. As a legal effect of the above-cited law, in 1918 United States Congress granted U.S. Citizenship to Puerto Ricans, who, were similarly imposed upon with U.S. Nationality

status, like the Filipinos. It is, then, very important to point out that Filipinos ONLY were intentionally and racially excluded from U.S. Citizenship that was granted to other Natives of all Territories acquired by the United States of America supra either from Russia, like Alaska; New Orleans from France; Virgin Islands from Denmark the Spanish colonies, like Puerto Rico, Guam. Cuba, Panama and Hawaii, to cite a few.

14. By virtue of the 1918 Selective Training and Service Act as amended, all 21 year old male – U.S. Citizens and even Resident Aliens - were under compulsion to undergo basic Military Training as previously mentioned. Refusal would be meted out with perpetual disqualification from public office for Native-born U.S. Citizens; probable denaturalization and deportation even of Naturalized U.S. Citizens; and disqualification from Naturalized U.S. Citizenship and deportation for Immigrants. On this legal compulsion at the age of 18 one is obliged to register. Then at age 21 a basic or cadre training with $21.00 monthly pay for the first four (4) months and $30.00 for the succeeding months. Then the reserved status and probable reserve officers training for those qualified.

15. On January 26, 1918 a law was approved by U.S. Congress 65th Session – P. L. 97 (H.R. 7697) Chapter 11, Page 432 – providing among other things the authority to call "into the service of the United States the militia and other locally created forces in the Philippine Islands … providing further "that the pay ad allowances of officers and men of the Philippine Militia and other locally created armed forces in the Philippine Islands called into the service of the United States under the provision of this Act, when serving in the Philippine Islands shall in no way exceed the pay and allowances for corresponding grades of the Philippine Scouts. It is, hereby, noted and submitted that the Philippine Scouts pay from 1901period till October 1944 was $9.00 for a Private (Pvt.) till October 1944 when it was raised to $50.00. However, this was reduced to

-6-

$25.00 for those who did not pass the screening or disqualifying test given by the U.S. Army. And those who were in the retirement age of more than 20 or 30 years were retired at that rate. While those who passed enjoyed the higher pay and were retired on a higher rate. It is worth to importantly note that sometime in 1987 no less than the former Congressman and President Clinton's Chief of Staff – the Honorable Leon Panetta – successfully filed a bill that obliged a research on the unequal pay and retirement benefits of the Old Philippine Scouts, who, were ever since considered as regular members of the U.S. Army and were allegedly receiving full and equal Pay and Benefits like any regular Anglo-American soldier and/or War-Veteran. The survey-study revealed the great difference in pay and retirement benefits. It is submitted that an honest, full-dress and wider probe would be indispensable for true justice for the proper revelation of massive pay disparities. The iceberg's tip of flagrant fraud in the Military Base Pay, Allowances, Retirement VA and Social Security benefits of Instant American-War-Conscripted Filipino Veterans, at that, demand a judicial discovery and very strict scrutiny that definitely and effectively would bar and destroy the "Statute of Limitations" defense and rationalization for the justified grant of "Motion for Dismissal". It is pointed out that the arbitrary and unjust dismissal was a judicial strategy resorted to by both the Federal Claims Court and the Federal Circuit Court of Appeals that smacks of collusion in perpetuating the racial discrimination and deprivation of War-earned "property-benefits" of Instant American-War Veterans at that. And aggravating it by unethically, if not illegally advising Plaintiff that the legislative measure-solution in the pending bills by U.S. Congress is the Only proper, remedial solution. Purposely therefore, the U.S. Federal Court of Claims dispensed with the Selective Training and Service Act's Briefing as this will bar and destroy effectively the government's Motion for Dismissal argument. Briefly put substantive justice was not served with the proper and just "due process"

that ought to have discovered the concealed fact that "discrimination" by reason of race and

origin despite its clear prohibition in Section 4 (1) of September 17, 1940 Act, was brazenly

undermined and consciously violated.

16.   On July 17, 1927 Plaintiff's father – Enrique Hapa Entines (hereinafter "Enrique")

reported for basic cadre training imposed upon him by the mentioned 1918 Selective Training

and Service Act. He was, then a "de facto" U.S. National and resident of the U.S. Colony-

Philippines. He was attached to the Europe-patterned and 1901 U.S. organized Insular Force

known as Philippine Constabulary (hereinafter "PC"). As was already mentioned before Pvt.

Enrique, was paid $7.00 instead of his authorized Base Pay of $21.00 per month, for the first

four (4) months. A differential of $14.00. His fifth (5th) month authorized pay and in the

succeeding months of $30.00. Yet he was paid the same $7.00. A bigger differential  now of

$23.00 monthly pay. And this was his pay till he died on 25 March 1945, despite the fact that on

October 1944 his monthly was supposedly increased to $50.00. Hence, he had a much bigger

defrauded differential of $43.00. But very sadly, to the time of his death, he never knew he was

or was never informed of his basic pay, allowances and worse of all of his right to Naturalization

under three Acts of  Congress, namely: June 29, 1906, 1918 and 1940 Acts, respectively.

Adding insult to slavery, he was never informed of the Pension given to anybody and his

dependent parents and/or family, after serving, at lease three (3) years in the U.S. Military even

during time of peace as may be mentioned somewhere.  So he, his parents and dependent family

members should have been a VA pensioner with, at least, $30.00 per month for life from 1930

when he was honorably discharged from the Philippine Constabulary after his PC service in the

southern part of the Philippines or Mindanao for the alleged Muslim pacification campaign.

This does not include his longevity pay and allowances. Plus his incentive pay due to his re-

enlistment and integration into the Philippine Commonwealth Army still as a PC; his War-Conscripted Federal service both in the USAFFE from 26 July 1941 and his Guerrilla service with the liberation force from November 1944 till his War-service-connected death on March 25, 1945.

17.   On March 1934 the Philippines by Act of Congress known as "Tydings-McDuffie law elevated the Philippine-U.S. colonial and political status to a Commonwealth of the United States of America till July 4, 1946. Very inconsistently, if not egregiously, however, its specific Section 8, racially and with extreme discrimination, if not inherent nativism, divested all Filipinos of their U.S. Nationality status imposed since 11 April 1899 and made them ALIENS for purposes of Immigration. And extremely degrading and tyrannical is that they were ordered to emigrate and subjected to deportation under Sections 30.1 – 30.14 of Chapter 8. However the landmark 1937 Cincinnati Soap Co. v. U. S. saved them from deportation and instead granted them "Parity" rights in the indirect repeal of the mentioned 1934 Section 8 with SECTION 2(d) of August 7, 1939 Act. But all these remained deliberately concealed that rationalized the Section 204 U.S. National re-imposed status yet still with only a NATURALIZATION right to U.S. Citizenship per SECTION 303 of October 14, 1940 Act. Even as U.S. Nationals and World War II-conscripted with Articles of War #58 – Death Penalty supra. Hence, the grandiose FRAUD that must pass through a very strict, judicial and constitutional scrutiny as a very crucial, second  (2nd) element (to the first (Ist) element of deliberate concealment of facts) that should have tolled the mentioned "Statute of Limitations" that rationalized with bias and deliberate intent the wrongful dismissal of the case. Not to mention of the third (3rd) important element of "inherent unknowability" since up to this time all U.S. National-reduced Filipinos, especially the War-Conscripted soldiers under penalty of death, are misled to believe that they

-9-

have no constitutional right to Native-born U.S. Citizenship despite the U.S. National status from

11 April 1899. Hence, the "sine qua non" on the judicial discovery on the issues of the

enumerated elements of concealed facts, the grandiose fraud and inherent unknowability

elements would demand is as very fundamental and substantive due process with the needed jury

trial for every contentious fact and issue, that more likely should warrant it.

   18.   July 26, 1941, then, when the President of the United States, Franklin Delano

Roosevelt, issued Executive Order 6 Fed. Reg. 3825 (hereinafter "President Roosevelt's 1941

Executive Order"), which called into the FEDERAL service of the United States Armed Forces,

all military forces of the commonwealth government of the Philippines. On December 7, 1941,

the Japanese attacked Pearl Harbor; forcing the United States to declare War with Japan, putting

under the "#58 Articles of War's Death Penalty - all enlisted and 21 year old U.S. National-

Filipinos. It is submitted that upon induction and taking the "Oath of Allegiance" to the U.S. flag

under the USAFFE, all U.S. National-Filipinos, conscripted to World War ll (hereinafter WW2)

became technically, INSTANT or "Nunc pro Tunc" American Citizens. More than Child of

Alien Parents born in Puerto Rico, who, granted "automatic" Native-born U.S. Citizenship per

Section 322 of the same October 14, 1940 Act. For it would not only be an appalling and

egregious, if not preposterous and extremely inconsistent federal policy that a U.S. National-

Filipino per Section 204 of same October 14, 1940 Act and conscripted under death penalty to

World War II would only be a Naturalized U.S. Citizen per Section 303 of the very same

October 14, 1940 Act, while the aforementioned Child of Alien parentage by just being born in

Puerto Rico that is "in pari materia" a U.S. possession like the Philippines would be entitled to

Instant Native-born U.S. Citizenship (per the mentioned October 14, 1940 Act's Section 322).

19. Sometime in August 1941 in accord with President Roosevelt's 1941 Executive Order, the United States commenced to integrate the Insular Philippine military into its armed forces in increments. Accordingly, after the Pearl Harbor bombing, when the United States, officially, declared War with Japan, under the Articles of War #58's "Death Penalty" all members of the Philippine military not in service were conscripted to War Federal Active duty into the United States Armed Forces in the Far East (USAFFE) supra by virtue of the publication of USAFFE GO 46, a copy of which is by reference incorporated herein and attached hereto as "Annex A." Upon their induction into the USAFFE, the members of the Philippine military, especially, the Philippine Constabulary automatically and mandatorily – became members of the United States FEDERAL Armed Forces as War-conscripted U.S. Nationals.

20. During World War II, soldiers generally were subject to certain liabilities, obligations and benefits including the Articles of War, foremost of which were the 58th and 61st articles governing Desertion and Absence without Leave–the former being punishable by death; and pay and allowances. At the time, the authorized pay and allowances due enlisted men serving in the United States Armed Forces were defined in P. L. 76-783, 54 Stat. 885 (1940), as amended by an Act of December 20, 1941, 55 Stat. 844, then, known as the Selective Training and Service Act of 1940. No provision seems to exist which allow different pay scales for soldiers depending on their race, color or creed. Rather, any difference in wage and allowance was based on one factor: rank. See Section 4 (1) of said 17 September 1940 Act..

21. On October 18, 1944, then "de facto" Philippine Commonwealth President Sergio Osmena, advised wrongly, if not maliciously, issued the Executive Orders Nos. 21 and 22. The former declared recognized guerilla units to be in the active service of the Philippine Army, as if it were an "Allied Army" and the latter raised the pay scale of the Philippine Army, including

-11-

members of such duly recognized guerilla units, to a level that was equal to and on par with the other members of the United States military.  Said orders were published in Headquarters, United States Armed Forces in the Far East Circular No. 100 on November 17, 1944.  Copies of the same are by reference herein incorporated and attached hereto as "Annex B."  There has been no indication by either the Philippine or United States governments that the aforementioned Executive Orders were anything other than valid regulations of an executive department which not only gave duly recognized resistance units official status in the Philippine army, but also mandated the raise and eventual equalization of the pay of all members thereof.

22.  Additionally, the Secretary of War authorized percentage increases in Philippine Army pay that was proportionate to that received by other personnel in the United States Armed Forces during the war.  (See *supra* OCMH Study, at 40.)

23.  Furthermore, 38 U.S.C. §101(2) conferred to any and all persons who render(ed) active military service for a minimum period of time and who were honorably discharged from the armed forces, an array of comprehensive veterans benefits including , but not limited to, educational benefits under the 1944 GI Bill of Rights.  Entitlement to those benefits has but ONE legal criterion ONLY – "Active" service with ONE (1) day ONLY service in War. And the law has recognized active military service during World War II as such.  There has been no indication by the United States government that the aforementioned provision did not apply to members of the USAFFE such as Plaintiff's father – Enrique, due to their Philippine descent. Especially that on July 17, 1927 he was originally drafted into the 1901 U.S. regular Insular Troop organized as Philippine Constabulary (PC) that co-existed with the Old Philippine Scouts (hereinafter "OPS")

24.  Plaintiff's father – Enrique - was born in Gubat, Sorsogon, Philippines, United States of America (hereinafter "U.S.A.") on July 17, 1905, during which date and period that the Philippines were a United States Colony. As an inarguable mentioned fact on July 14, 1927 in Sorsogon, Philippines, U. S. A., he was drafted into the (PC). As Constable Private, he was assigned to Kingking, Davao, Mindanao, U.S.A. with the 88th PC Company under a certain Alfonso Torillo, as his Commanding Officer. That was the time of U. S. A. 's Muslim pacification campaign. The PC played a very significant role in this campaign. And this can be fully documented. Before his honorable discharge on 13th of July 1930, he was operated of appendicitis while on active duty. Upon his 1930 discharge he was assigned to Reserve active till November 1935 when he was re-activated and integrated into the Philippine Commonwealth Army (hereinafter "PCA") the insular militia of the United States in the Philippines as a Commonwealth of U.S.A. From July 1927 till 25 March 1945 would constitute Eighteen (18) years of Military service with a World War ll Conscripted Federal service from 26 July 1941 till his death on same 25 March 1945. And within this period of service he should have been, at the very least, a Naturalized U.S. Citizen per 1863 age-old law, (if he were an Alien and not a U.S. National) that was constitutionally guaranteed by SECTION 303 of October 14, 1940 Act as an unforfeitable substantive, fundamental and constitutional right. It must be pointed out very clearly that he was not properly promoted to just a mere Private First Class for a span of 18 years of service with the Muslim War service in 1927 to 1930 and World War II conscripted Federal service as a U.S. National. More appalling and racially-degrading

is the brazen inconsistency of his service to have been only from 9 November 1944 till March 1945. Barely five (5) months ONLY. Very ironically there were some 116,000 Aliens from the 66 Allied countries, who, volunteered (not Conscripted) with the U.S. Forces during World War

-13-

2. Their service is considered "Active". But not the War-conscripted service of U.S. Nationals. The same aliens were paid fully and equally. Not the U.S. National War-conscripted Filipinos. by virtue of the July 26, 1941 Order of President Roosevelt.(See 19 September 1966 Congressional Records – Speech of Congressman Saylor from Pennsylvania).

25.    The contributions of Filipino soldiers to the United States during World War II – to wit that they served in the United States military with valor, gallantry and courage – have never been disputed. In fact, history itself has already credited them with cutting short that war thereby saving American lives, resources and billions of Dollar money.

## COUNT I

26.    Plaintiff re-alleges and incorporates herein by this reference, Paragraphs 1 through 26, inclusive of its Complaint as if fully set forth herein. As a drafted Trainee on July 14, 1927 with the PC  by virtue of the Selective Training and Service Act of 1918, and, at least as a U.S. National, he was entitled to full and equal pay like any Anglo American. And arguendo he were an ALIEN not a U.S. National, still, the 14th Amendment's equal protection clause and the 5th Amendment's "due process and "takings clauses" ought to have legally entitled him to full and equal Base Pay and Allowances and Three (3) year service pension incentive as a single or unmarried soldier then, with his parents as his beneficiary of some dependency and subsistence allowance. But this was deliberately concealed till his death.

27.    Again as a direct result of President Roosevelt's 1941 Executive Order as described in Paragraph 5 herein-above, Defendant United States assumed a responsibility to pay all soldiers the prevailing wages and allowances according to rank and not race, creed, color or descent. Despite his initial compulsory draft in 1927 and later his World War II Federal War service conscription under "death penalty" per Articles of War #58 supra into the United States Armed

-14-

Forces in the Far East (USAFFE supra), Plaintiff's War-Hero father – Enrique - however, as was previously noted that he was, illegally and unjustly paid $7.00 00 in October 1944. Instead of $50.00 still as a Private with the bigger, defrauded amount of $43.00. A rate equivalent to twenty-three (23%) percent of what was earned by other personnel serving in the United States Armed Forces, including but not limited to the 116,000 Aliens from the 66 Allied countries, who, volunteered (not conscripted) in the U.S. WW2 Forces in Europe . See Office for the Center of Military History, the Status of Members of Philippine Military Forces During World War II (June 1973), Page 33 (an unpublished manuscript prepared for the government's use in FAVADA v. United States, 391 F. Supp. 1314 (1974) Table II at 33, hereinafter "OCMH Study" and the September 19, 1966 Congressional Records, pages 22205 – 22213). Not to mention of his family subsistence allowance and other allowances that were never known and given.

28.   Plaintiff's father - Enrique, who served as a soldier of the United States Armed Forces in both the 1901 established PC and as a Conscripted U.S. National-Filipino in World War II in the manner described previously, is entitled to back pay in an amount represented by the difference in the pay he actually received and that pay which he should have received as a member of the United States military, as mandated by the primary basic pay statute then in force.

### COUNT II

29.   Plaintiff re-alleges and incorporates herein by this reference, Paragraphs 1 through 29, inclusive of its Complaint as if fully set forth herein.

30.   Also as a direct result of those Executive Orders Nos. 21 and 22 as described in Paragraph 8 herein-above, members of guerilla units which were duly recognized by the United States were entitled to pay equal to that received by other members of the United State military.

31. During World War II, Plaintiff's father – Enrique, in fact, initially served as a PC member of the USAFEE and later in one such recognized guerilla unit during the entire period of War till his death in line of service on March 25, 1945, while the Philippines was a U.S. Commonwealth and under the full, military and emergency War powers of the U.S. President till its Independence on July 4, 1946.

32. Accordingly, Plaintiff's father – Enrique - is entitled to back pay amounting to the difference between the actual pay and allowances he actually received, and the pay and allowances for his different ranks, equal to that received by members of the United States Armed Forces who were not of Philippine descent.

## COUNT III

33. Plaintiff Prisco re-alleges and incorporates herein by this reference, Paragraphs 1 through 33, inclusive of its Complaint as if fully set forth herein.

34. As a direct result of that authorization by the Secretary of War serving during World War II to pay percentage increases in Philippine Army pay that was proportionate to that received by other members of the United States Armed Forces during that time, Plaintiff's father – Enrique - being a member of the Philippine Constabulary-Army, USAFFE and Recognized Guerrilla during that period, was entitled to such percentage increases since 1927.

35. Plaintiff's father – Enrique - was not paid any percentage increases during the War till his war-conscripted death on March 25, 1945 supra and without any promotion.

36. Accordingly, Plaintiff's father – Enrique - is entitled to back pay representing the full equivalent of proportionate percentage increases since July 1927 till his death on 25 March 1945.

## COUNT IV

-16-

37.  Plaintiff Prisco re-alleges and incorporates herein by this reference, Paragraphs 1 through 37, inclusive of its Complaint as if fully set forth herein.

38.  As a direct result of the laws and policy concerning veterans' comprehensive benefits (see Paragraph 12 herein-above), Plaintiff's father – Enrique - being a U.S. National, conscripted PC, USAFFE soldier and a recognized Philippine Guerilla during the entire World War II, till his Service-connected death on 25 March 1945, (he) was then and remained entitled to those benefits available to any and all persons who rendered active military service during that period.

39.  Further, anyone who becomes a member of the United States Armed Forces, since 1873, even during "Peace time" has more than a unilateral expectation of veterans benefits – he or she has a legitimate claim of entitlement to them.  It follows that entitlement to government benefits arising from law or contract is property interest in the nature of private property, the taking of which for public use without just compensation is forbidden by the Takings Clause of the Fifth Amendment and also the 14th Amendment "Equal Protection" clause of the United States Constitution.

40.  On February 18, 1946, Congress, surreptitiously, inserted a rider-provision on a legislation passed as the First Supplement Surplus Appropriations Rescission Act, P. L. 79-301, 60 Stat. 14, which provided that "...service...in the organized military forces of the...Commonwealth of the Philippines while such forces were in the service of the Armed Forces of the United States...shall not be deemed to have been active military, naval or air service for purposes of any law...conferring rights, privileges or benefits..." (Emphasis added).  This rider is now codified in 38 U.S.C. §107, (a) and (b) which, likewise, provides for allowable compensation at a rate of $0.50 for each dollar.  Yet, the same military service performed in the

-17-

Philippine Army while it was still part of the United States Armed Forces, is now considered to be an honorable service in active-duty status in the military, air or naval forces of the United States for purposes of naturalization, Title 38 U.S.C. §1440, as amended by Section 405 of the Immigration Act of 1990, if they were Aliens NOT conscripted U.S. NATIONALS.

41.    The effect of this 1946 legislation was to deprive Plaintiff's father – Enrique - and all other Conscripted U.S. National-Filipino soldier-Veterans of the United States Armed Forces in the World War II, as well as all their dependents and survivors, of all veterans' benefits – save for certain "service-connected" deaths and disabilities. But still if the circumstances are right. It was as if the statement being made was that although Filipino solders were fit enough to be called into service and fight "under the American flag", they did not deserve to enjoy the same veterans' benefits as the American soldiers with whom they fought and shared a battlefield – side by side and under one command – where all equally risked limbs, blood and lives. As mentioned before there were 116,00 Non-American veterans from some sixty-six other nationalities who, volunteered service in the United States Armed Forces during World War II, all of whom enjoy full and equal veterans' benefits. And their checks are regularly sent them by VA anywhere they may be in the world.  Only these U.S. National and Conscripted Filipino soldiers and veterans are defrauded of the same benefits.  Ironically and sadly to enjoy whatever benefits due them, they, first, have to actually die or get maimed, and even then benefits are available only when the circumstances are again right.  Plaintiff's father – Enrique, his widow and 7 children were deprived of private property – in the form of their legitimate entitlements to Death Indemnity Compensation, Educational and other veterans' benefits – for public use without just compensation.

-18-

42. Accordingly, Plaintiff's father – Enrique - is entitled to just compensation as mandated by the Takings Clause of the Fifth Amendment and the 14th Amendment "Equal Protection clause" of the United States Constitution, and as described in this

Count IV.

43. More specifically, sometime in March 1947, *still within the regulatory period for filing claims,* Plaintiff's mother – Cristeta Esperanzate Entines, as the legal widow of the late Veteran, filed a Service-Connected Claim with the U.S. Veterans Administration in Manila, Philippines. Very sadly and traumatically it was unduly delayed and granted without the accrued arrears. Unilaterally and arbitrarily without any substantive due process, her DIC as a widow of $112.00 was reduced to $56.00 ONLY. Her seven (7) children's DIC was $17.50 Only instead of $35.00. The Educational VA benefit was also $17.50, instead of $35.00 that was later raised to $75.00. Aggravating the enslaving policy, the college fees of more than seven (7) years of the plaintiff was denied with the alleged reason that the school is not VA-approved. It is submitted that the school institution predated the Philippine Independence not to be duly recognized. Or is it a mere racially-biased and arbitrary policy. Besides, it is submitted that the vulgar desecration of the 5th, 9th, 10th, and 14th *Amendments of the U.S. Constitution and the "Ex Post Facto"* element of the cited Section 107, 38 U.S.C. supra. (See Carmel v. Texas 98-7540, May 1, 2000) *render the infamously-treacherous rider-provision, at its face, extremely illegal, unjust, if not* criminal, thus, patently UNCONSTITUTIONAL. See 16 American Jurisprudence, 2nd Edition, Section 177 and 16A C.J.S. 320, respectively, for judicial guidance for the honest and competent decision. It is made of official record and notice that the deliberate delay of the VA benefits claimed caused the late Veteran's widow to get married for the protective security and support of his war-orphaned family and VA unjust and illegal stoppage and forfeiture of her VA DIC

-19-

benefits, being unilaterally arbitrary and grossly violative of the 5th and 14th Amendments without the needed substantive "due process" and the needed legal counsel assistance constitute a violation of Sections 241 and 242 of 42 U.S.C. Chapter 13, Part I. Hence, another demand for judicial strict scrutiny on grave and blatant abuse of authority by the VA employees on Claims filed by U.S. National-War-Conscripted Filipinos, technically INSTANT American War-Hero Veterans. Not to mention of the anomalous and erroneous determination of the Board of Veterans Appeals for the denial of accrued benefits and the non-payment of National Life Insurance of $5,000.00 since 1945 to this day.

44. Plaintiff Prisco was forced to resign from his priestly assignment since July 1985 to pursue the claims for full and equal VA Benefits based on the Instant U.S. Citizenship of his U.S. National-reduced father due to inherent and rabid Racism that is the One and ONLY reason for their late Veteran-father's unequal pay and full and equal VA Benefits' degrading reduction/deprivation.

## COUNT V

45. Plaintiff Prisco re-alleges and incorporates herein by this reference, Paragraphs 1 through 45, inclusive of its Complaint as if fully set forth herein.

46. In a message dated February 22, 1942, General MacArthur duly recommended equalization of Philippine Army pay scales to the United States army, Radio RN-e, MacArthur to War Department, OPD WD File, OPD 240 (3-25-42), National Archives, copy thereof is likewise hereto attached as Annex "C." A similar recommendation is contained in a subsequent message, Radio No. 453, MacArthur to AGO WD, March 9, 1942, OPD WD File 240, copy thereof is likewise attached as "Annex E." This resulted in an untitled memorandum from then Army Chief of Staff General Marshall dated March 10, 1942, referring to the latter message, to

-20-

then President Roosevelt adopting the recommendations, copy of said memorandum is likewise attached as "Annex E." Records show that the then Commander-in-Chief of the United States Armed Forces approved the same on March 11, 1942. As a result, the War Department sponsored legislation introduced as S.2387 equalizing the pay of these soldiers to that of all the rest in the United States Army (and Navy) which passed the Senate on March 30, 1942, and reported out favorably by the House Military Affairs Committee on May 7, 1942. The introduction of this legislation was given much publicity, and Filipino soldiers of the United States Armed Forces took great heart and strength from such news that in the face of almost impossible odds, they were able to accomplish their mission for that war. From all these agency actions and conduct can be inferred the intent of Defendant United States of America to pay these soldiers at a rate equal to that of the other members of the United States Armed Forces who are not of Philippine descent.

47. However, in the weeks following the loss of a great many lives in the falls of Bataan and Corregidor, Defendant United States of America breached this contract when it determined, in a government memorandum dated July 30, 1942, that there was no longer a "...need...from a strategic or economic consideration...to equalize the pay and allowances of...the Philippine Army with that of the Army of the United States...," making a recommendation to Congress that the equalization of pay bill was not necessary anymore. A copy of the referred to government memorandum is by reference incorporated herein and attached hereto as "Annex F." No official act occurred, and government documents dated August 8, 1942, copies of which are by reference herein incorporated and attached hereto as "Annex G," refer to a decision against any formal withdrawal of the bill because although request for such legislation was "...made at a time when the Philippine Army was in actual combat and this Army has since been destroyed, the bill was

-21-

so thoroughly publicized that to withdraw it now would be blow to Philippine anticipations.

Enemy propaganda agencies would charge breach of faith after usefulness of Filipino troops

have been utilized to destruction." The same official records elaborate further by explaining that

"...it dare not be withdrawn without a severe blow to all the hopes of the Filipinos to be regarded

in equality with the white race." Thus, no further action was taken on the said bill which was

simply left to die a natural death. These declassified government files show that as early as mid-

1942–after Bataan and Corregidor had fallen and the Filipino component of the America armed

forces had been rendered useless in the eyes of the military commanders because it was

practically decimated–it was decided that Defendant United States of America would never

given them their due. Yet, the Filipinos were never informed of this decision, and the bill

merely lapsed into oblivion.

48. Defendant United States of America has failed to honor the terms of this contract, in

fact, blatantly breached the terms thereof by continuing to deny these soldiers the prevailing

wages of members of the United States Armed Forces mandated then by the primary basic pay

statute as well as depriving them and their dependents/survivors of the veteran's benefits they

should be entitled to.

49. As for the veteran's benefits that are due Plaintiff's father and his family, the

defendant herein, in passing above-cited legislation now codified as Title 8 U.S.C. §107,

unilaterally changed the term of this contract so flagrantly that it became an act of the nature

prohibited by the non-impairment of contrasts clause in Article I, Section 10 of the United States

Constitution, made applicable to the federal government under the due process clause of the Fifth

Amendment thereto. In the more than half a century that has gone past since the end of World

War II, a number of bills intended to restore benefits denied to members of the Philippine

-22-

military inducted into the United Sates Armed Forces have been sporadically introduced in the United States Congress, but none has ever borne fruit. Continued legislative inaction on the matter can be expected. It is submitted that legislation for such restoration of benefits is not necessary. The constitutional infirmity is fatal, rendering the denial by said statute of veterans' benefits to these Filipino soldiers without any force and effect.

50. The original terms of this contract should be enforced against Defendant United States of America so that Plaintiff's father  - Enrique - being a soldier and veteran of the United States Armed Forces, who, along with his family, get their due and are paid full pay, allowances and benefits in accordance with the existing terms then applicable to all the other soldiers and veterans of the United States Armed Forces and their families.

## COUNT VI

51. Plaintiff Prisco re-alleges and incorporates herein by this reference, Paragraphs 1 through 51, inclusive of its Complaint as if fully set forth herein.

52. That, as discussed in Paragraph 10 herein-above , the Philippine Islands were a United States possession from December 10, 1898 to July 4, 1946.

53. That, accordingly, any person born in the Philippine Islands between April 11, 1899 and July 4, 1946, and while those islands were United States possessions, should be deemed a United States Citizen by birth, pursuant to Section 107-38 of the U.S. Code of Federal Policy.

54. That Plaintiff's father – Enrique – was, many times,  defrauded, first of Native-Born citizenship by virtue of his birth in the Philippines as a U.S. Colony. Definitely more than JACINTO A. SABANGAN, JR. et als v. COLIN POWELL (See July 2004 9th Circuit Court of Appeals decision – No. 03-16426, D.C. No. CV – 02-00039) and the October 14, 1940 Act's Section 322 Child born in Puerto Rico, of Alien Parents, who, the latter is granted Instant or

-23-

"automatic" Native-born U.S. Citizenship. Second and, ironically, even of his 7th subdivision.
Section 4, June 29 1906, previously mentioned, supposedly in 1930, in 1934, and in 1941 with
the final chance on 9 November 1944 when inducted to the Masbate Guerrilla liberation force by
virtue of Section 303, October 14, 1940 Act that guaranteed his unforfeitable Naturalized U.S.
Citizenship right even if he were an Alien. But more so that he was a U.S. National –technically
- an Instant American-World War II Hero Veteran, if not for inherent racism that has been
perpetuated with heartlessness.

     55. That Plaintiff Prisco, got a response from the Immigration Commissioner thru
Congresswoman Norton of Washington, D.C. about his inquiry on his father's Native-born or
"Posthumous" Citizenship. Supplemental "Annex A". Despite that he was misled to be
Naturalized and sworn in alone by no less than the I.N.S. Director at Virginia. Later he filed for a
Replacement of the N-400 Naturalization Certificate with an N-600 Certificate of Citizenship at
the same Virginia I.N.S. Regional Office. It was denied as beyond the jurisdiction of the
Director's authority. Hence this final and permanent judicial determination very crucial to the
claimed War-earned benefits either inherently or derivatively.

     WHEREFORE, Plaintiff Rev. Fr. PRISCO E. ENTINES, respectfully prays that:

     1. A final, permanent and genuine interpretation and declaration that "English"
Common Law doctrine on U.S. Citizenship, confirmed by the mysteriously ratified 14th
amendment Citizenship clause that has been erroneously and with bias interpreted differently
was applicable to the Natives of the Philippines, especially the U. National-reduced Filipino
soldiers conscripted to World War II service during the whole period of American occupation of
the Philippines that became a Commonwealth of the United States when it was involved in the
U.S. Federal War with Japan and with an under duress death penalty order by Articles of War

-24-

#58. Hence, U.S. Native-born Citizenship became an unforfeitable, inherent right by birth and by War-Conscripted Service.

2.  A final declaration be made that U.S. National-non-Citizen status is a racist, legal fiction and unconstitutional as a direct contradiction of U.S. Citizenship valid and existing provision before and after the 14th Amendment's mysterious ratification.

3.  A decisively final declaration that Section 1 of the Philippine Organic Act of 1902 was unconstitutional because it arbitrarily abridged the Native-born U.S. Citizenship granted by the U.S. Constitution automatically as acquired as previously mentioned by both  Jacinto A. Sabangan, Jr., by his birth in the U.S. Protectorate of Northern Mariana Islands and by the Child of Alien Parents, born in Puerto Rico by virtue of Section 322 of  October 14, 1940 Act supra.

4.  A final and official declaration that Native-born U.S. Citizenship under the "English" Common Law of "birth within the allegiance and dominion of the King" fully and equally applied to the U.S. Colony-Philippines, especially to the War-Conscripted U.S. National-Filipino soldiers like the Plaintiff's father – Enrique Hapa Entines – and all bonafide Filipino soldiers of the same similar category and situation.

5.  That the Court order the concerned Agencies to issue N-600 Citizenship Certificates to the Plaintiff's father – Enrique; his war-widow – Cristeta and their seven (7) children including but not limited to the herein Plaintiff.

6.  Judgment be rendered ordering Defendant United States of America to pay Plaintiff's father – Enrique - his back pay in the amount representing the difference between the pay and allowances that he actually received as PC soldier since July 17, 1927 and during World War II, and the same as mandated by the primary basic pay statute in existence at the time of their

-25-

induction into the United States Armed Forces till his death. Plus his and his parents' pension till their respective deaths.

    7.  Judgment be otherwise rendered ordering Defendant United States of America to pay Plaintiff's father – Enrique's back pay representing the same differential by virtue of a valid regulation of an executive department, Executive Order No. 22 dated October 28, 1944 and issued b the then Philippine Commonwealth President Sergio Osmena according to his corresponding rank.

    8.  Judgment be rendered ordering defendant to implement the order of then Secretary of War authorizing percentage increases in the pay of the Philippine Commonwealth Army soldiers proportionate to those enjoyed by United States Army personnel during World War II and pay Plaintiff's father – Enrique - his back pay in the amount described by such proportionate percentage pay increases as ordered.

    9.  Further, that judgment be rendered ordering Defendant United States of America to pay Plaintiff's mother - CRISTETA and her SEVEN (7) children full and equal, dollar to dollar Death Indemnity Compensation (DIC) and other VA benefits for the taking of Plaintiff's mother and her children's private property for public use resulting from legislation, now codified as Title 8 USC §107, denying full veterans' benefits to plaintiff's mother till her death, at least, and her children. It is submitted that said Section 107, 38 U.S. Code is a direct contradiction of the "Ex Post Facto" constitutional provision as very clearly decided in CARMEL V. TEXAS case recently decided in May 2000 – a decision made after the 1999 dismissal of the Federal Claims Court Case No. 96-740C filed as a Class Action with the herein Plaintiff as a member. Hence, this amended and re-filed instant case for a "de novo" review of the case with a very extraordinary demand for determination on the Instant U.S. Citizenship of the Plaintiff's father

and his whole family members as U.S. Nationals-reduced that is very vital and crucial in the determination of full and equal War Base Pay, Allowances, VA benefits and other privileges and immunities that were all deprived and divested the Plaintiff's father, mother and all the family members.

10.    That judgment be rendered enforcing the terms of enlistment contracts, express or implied-in-fact, and ordering the defendant herein to comply with the terms of such contacts entered into by Defendant with those Filipino soldiers and veterans for military services in World War II by paying Plaintiff full pay, allowances and benefits that any and all members of the United States Armed Forces in World War II were, and are, entitled to.

11.    Further, that Defendant herein be ordered to pay Plaintiff's mother – Cristeta - the corresponding VA Death Indemnity Compensation (DIC) benefits, its differential with accrued interest, at least, from March 25, 1945 till her death on March 26, 1993; also the DIC and Educational Benefits' with its corresponding differentials and arrears with accrued interest for the seven (7) children, to their applicable and allowable period.

12.    That Defendant pay the $5,000.00 National Life Insurance and its Accrued interest arbitrarily denied by the VA Board of Veterans Appeals since 1956.

13.    Additionally, that Defendant pay Plaintiff's attorneys' fees, as well as, other costs and expenses of this suit, including but not limited to exemplary, punitive, and other damages that caused the great degree of PTSD caused by anguish, anxiety, mental and emotional torture in the delays and denials by Social Security, the former INS now B.C.I. S., the State Department, the Courts but very especially the VA in its harassment and retaliatory tactics done to the plaintiff since 1985 to present and very specifically in Manila Regional VA Office during the

-27-

custodial interrogation sometime in 2001 whose report he has been denied access in the interest

of fairness and equal justice under the law.

      14.   Finally, that Plaintiff, herein, be awarded such other relief and remedies as the

Honorable  Court deems proper.

Date: <u>7 March 2006</u>

Respectfully submitted,

By: _____
                Rev/Fr. PRISCO E. ENTINES
                Appearing *in pro per*

<u>Mailing Address:</u>

419 N. Mountain View Ave. #207
Los Angeles, CA. 90026
Tel. (213) 675-9092 or (323) 527-2071
Email: <u>Frentines@hotmail.com</u>