## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PRISCO E. ENTINES,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-477 (RMC) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S MOTION TO DISMISS

Pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure, defendant respectfully moves for dismissal of this case. In short, the Court lacks subject matter jurisdiction over plaintiff's claims for monetary and declaratory relief, as well as citizenship. The Complaint otherwise fails to state a claim upon which relief can be granted.

A memorandum of points and authorities and a proposed order are attached for the Court's consideration.

Dated: December 4, 2006.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

---

[1] The caption on the Complaint appears to contain a typographical error in Plaintiff's name. Defendant is using what it believes to be the correct spelling based on the references throughout the complaint and reported decisions.

/s/_____

RUDOLPH CONTRERAS, D.C. BAR # 434122

Assistant United States Attorney


/s/_____

JANE M. LYONS, D.C. BAR # 451737

Assistant United States Attorney

Civil Division

555 4th Street, N.W. - Room E4822

Washington, D.C.  20530

(202) 514-7161

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PRISCO E. ENTINES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-477 (RMC) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES**
<u>**IN SUPPORT OF MOTION TO DISMISS**</u>

<u>**INTRODUCTION**</u>

A decade after bringing claims arising out of his father's service in the Philippine

Commonwealth Army during World War II in the Court of Federal Claims and having them

soundly rejected, plaintiff now comes into this Court again seeking redress for the same alleged

injury.  Shortly before filing the instant action, Plaintiff also renewed the battle in the Court of

Federal Claims.  <u>See</u> Civil Action Complaint for Docket No. 06-193 (TCW) (filed on March 10,

2006 and attached as Exhibit 5).  In the complaint filed in this Court, plaintiff asserts generally

that he is entitled to relief based on the alleged denial of his father's veteran's benefits and lower

wages paid to Philippine service members who fought with U.S. soldiers during World War II.

Compl. ¶¶ 28, 32, 36.  Plaintiff alleges that payments his father received violated his enlistment

contract (Compl. ¶ 47), as well as the Takings Clause of the Fifth Amendment and the Equal

Protection Clause of the Fourteenth Amendment of the Constitution.  Compl., ¶ 39.  Plaintiff also

seeks to challenge the veterans' benefits his mother received based on her husband's military

service.  Compl. ¶ 43. In addition, plaintiff makes a vague allegation that the United States has wrongfully refused to confer or recognize citizenship status for his deceased father.  Compl., ¶¶ 53-55.

For relief, plaintiff requests U.S. citizenship for himself, his deceased parents, and his siblings.  Compl. Prayer for Relief, ¶ 5.  Plaintiff also requests that this Court order the United States to pay him and his mother the difference in back pay and other benefits between the amount of pay his father actually received and amount paid to U.S. service members during World War II or otherwise wrongfully denied under government regulations or his father's enlistment contract.  Compl. Prayer for Relief, ¶¶ 6-10.  He also asks this Court order the United States to pay on a life insurance policy, attorney's fees, exemplary, punitive and other damages. Compl. Prayer for Relief, ¶¶ 12-13.

For the below reasons, however, the Court should dismiss plaintiff's complaint since, among other things, all of his claims are precluded by the prior lawsuit, the applicable statutes of limitation, and the absence of a valid waiver of sovereign immunity.

## BACKGROUND

### A.    Historical Summary

To place plaintiff's allegations in some historical perspective, defendant provides the following background information.  The Philippine Islands were ceded by Spain to, and became a territory of, the United States under the 1898 Treaty of Paris.  Filipino American Veterans & Dependents Ass'n v. United States, 391 F. Supp. 1314, 1316 (N.D. Cal. 1974).  On March 24, 1934, Congress passed the Philippine Independence Act, Public Law 73-127, 48 Stat. 456 (hereinafter "the Act of 1934 "), providing for eventual Philippine independence and creating,

meanwhile, a Commonwealth of the Philippines vested with certain powers over its own internal affairs.  It was not until July 4, 1946, however, that this interim Philippine Commonwealth received its grant of independence by a Presidential Proclamation of that date in fulfillment of the promise contained in the Act of 1934.  Id.

During the 12-year interval between the Act of 1934 and final independence in 1946, the Philippines were in what has been described as a "unique" status.  Although not in all respects a "foreign" territory, the Philippines were treated by the Act of 1934 as a foreign country for many purposes, e.g., Filipino citizens were treated as aliens for immigration purposes; also foreign service officers assigned to the Philippines were treated as if stationed in a foreign country; also the Act of 1934 defined "United States" as excluding the Philippines.  See Hooven v. Evatt, 324 U.S. 652, 677-78, 692 (1945).  Nevertheless, the United States retained plenary and unrestricted power over the Philippines until its sovereignty over them was formally withdrawn in 1946. (Id. at 692).  Among other things, the Act of 1934 reserved to the United States the power to maintain military bases and armed forces in the Philippines and, upon order of the President of the United States, the right "to call into the service of such armed forces all military organized by the Philippine government."  Filipino, 391 F. Supp. at 1317.

On April 26, 1941, by Executive Order, President Roosevelt called "into the service of the armed forces of the United States all military organized by the Philippine government" for the period of the imminent World War II emergency and placed that military under the command of general officers and commandants of the United States Army and Navy.  Id.  From April, 1941, the United States assumed the responsibility for payment of the Philippine servicemen's army pay as previously established by the Philippine Commonwealth.  That scale of service pay

was less than the rate of pay for regular United States enlistees or inductees.  Legislation was

introduced in the United States Congress to increase the Filipino service pay scale to United

States Army levels *but no such legislation was ever enacted*.[1]

**B.      Relevant Legislative History**

    1.  <u>Post World War II Legislative Actions.</u>

In October, 1945, after the end of World War II and while Congress was considering a

$200 million appropriation for the support of the Philippine Army in accordance with its practice

during the War, the Chairman of the SubCommittee of the Senate Committee on Appropriations

sent a letter to the Director of the Veterans Administration (General Bradley), requesting

---

[1]  United States officers were largely responsible for training the Philippine Army after it had been called into the service of our armed forces, and the United States paid the costs of training and mobilization.  <u>See</u> Office of the Center for Military History, The Status of Members of Philippine Military Forces During World War II, at 11-12 (June 1973) (unpublished manuscript prepared for the government's use in <u>Filipino American Veterans & Dependents Ass'n v. United States</u>, 391 F. Supp. 1314 (N.D. Cal. 1974) (three-judge court)) (hereinafter, "OCMH Study" and attached as Exhibit 6); <u>see also</u> Compl. ¶ 22, 27 (citing the OCMH Study).

After the outbreak of war, Congress authorized $269 million to mobilize, train, equip, and pay the Philippine Army, and it gave General MacArthur, commander of the United States Armed Forces in the Far East ("USAFFE"), authority to allocate expenditures.  <u>See</u> OCMH Study at 12-13.  Filipinos, however, were never paid wages equal to those that Americans received, despite General MacArthur's recommendations and some early support by the War Department for pay equality.  The Philippines did, without American opposition, raise pay for Philippine Army enlisted personnel to the higher level enjoyed by Philippine Scouts, but both groups received only a fraction of the pay that American enlisted personnel received.  <u>See</u> OCMH Study at 34-35.  Just after American reentry to the Philippines in October 1944, the Philippine president attempted to raise pay rates for Philippine enlisted soldiers to the U.S. Army level, apparently with MacArthur's concurrence.  By that time, however, the War Department resisted.  The Department cited not just the consequences to the United States treasury, but also the lower cost and standard of living in the Philippines, the inflationary consequences of paying Philippine soldiers wages that vastly exceeded those of most Philippine workers and government officials, and the Philippine government's likely inability to continue the higher rates of pay after independence.  <u>See</u> OCMH Study at 37-41.

information concerning the status of the Filipino servicemen.  He specifically inquired as to the potential cost of their veteran benefit coverage.  Filipino, 391 F. Supp. at 1318.

The Director of the Veterans Administration responded by expressing the administrative view that "those who served in the active military or naval forces of the United States," did include "persons who were a part of the organized forces of the government of the Commonwealth of the Philippines called into service of the Armed Forces of the United States pursuant to military order of the President of the United States, July 26, 1941."  Id.  In his same 1945 letter, the Director gave to the subcommittee his estimate that the total cost of paying veterans' benefits to members of the Philippine Commonwealth Army and their dependents, under then existing veterans' laws, would amount in the long run to about three billion dollars. Id.

After receiving this response, the Chairman of the Senate SubCommittee made several important conclusions, which defendant sets forth as a note because of its length.[2]  The Congress

_____

[2]  Said the Chairman of the SubCommittee:

Three billion dollars is a substantial sum of money, and if Filipinos were eligible to receive it, there would be good reason to reduce or eliminate other proposed expenditures by the United States for their benefit.  But no one could be found who would assert that it was ever the clear intention of Congress that such benefits as are granted under the Servicemen's Readjustment Act of 1940, as amended -- the GI Bill of Rights -- should be extended to the soldiers of the Philippine Army.  There is nothing in the text of any of the laws enacted by Congress for the benefit of veterans to indicate such intent.

The real question in the case of the soldiers of the Philippine Army is whether they have served 'in the active military or naval service of the United States.'  There is nothing to indicate that there was any discussion of the meaning of that term, probably because it is generally well recognized and has been used in many statutes having to do with members or former members of the American armed forces.  It would normally be construed to include persons regularly enlisted or

inducted in the regular manner in the military and naval service of the United States. There is no suggestion that Congress had in mind covering under the GI Bill of Rights any classes not theretofore understood to be included within the meaning of the words 'in the active military or naval service of the United States,' which is the primary basis for entitlement to its benefits.  It is certainly unthinkable that the Congress would extend the normal meaning of the term to cover the large number of Filipinos to whom it has been suggested that the Servicemen's Readjustment Act of 1940 applies, at a cost running into billions of dollars, aside from other considerations, without some reference to it either in the debates in Congress or in the committee reports.

Upon the principle that the Philippine Army was serving with our Army but was not a part of the armed forces of the United States, the War Department took prompt action to disapprove the proposal to extend the American pay rates to soldiers serving in the Philippine Army and requested that the proclamation making such a promise be rescinded.  Members of the Philippine Army did not actually receive the pay of an American soldier, which has a direct bearing upon the question as to whether that army is a part of the armed forces of the United States.

It was, therefore, decided that the legal situation must be promptly clarified and that the best way to accomplish it was by way of an amendment to the surplus appropriation rescission bill, H.R. 4407, then under consideration by this committee, and which was to provide for an appropriation of $200,000,000 for the Army of the Philippines.  Senator McKellar, as acting chairman, appointed me to serve on a subcommittee along with Senator Russell of Georgia, and Senator Brooks of Illinois.  We are the authors of the following amendment, which finally became a law on February 18, 1946, as Public Law 301, Seventy-ninth Congress: (here is set forth the 1946 legislation here in question).

The first effect of the amendment from the point of view of the United States Treasury was to reduce a liability for veterans' benefits from $3,000,000,000 to $500,000,000, both of these amounts being based upon estimates made by the Veterans Administration.  This was accomplished by limiting such benefits to pensions on account of service-connected disability or death and by further providing that, when allowed, such pensions shall be paid at the rate of one Philippine peso for each dollar otherwise authorized.

Provision was not made for hospital and medical care, because the committee was advised that there are 10,000 surplus hospital beds and other hospital equipment in the Philippine Islands which will be transferred to the Philippine government under the provisions of the Tydings bill, S. 1610.  That bill also contains a

then enacted the 1946 legislation above set forth, appropriating $200 million for the support of the Philippine Army, but adding as a rider the 1946 legislation that limited U.S. benefits for World War II Philippine veterans.

When the appropriation, bearing this rider, came to President Truman, he approved it.  He embraced the idea that the United States had a moral obligation to provide for the Philippine veterans who fought alongside U.S. service members during the war, but recognized that there were certain "practical difficulties in making payments to Philippine Army veterans under the GI Bill of Rights" and that he was "preparing a plan to meet such practical difficulties and expected to request Congress to implement a plan when it is evolved."  Filipino, 391 F. Supp. at 1319. Upon receipt of President Truman's message, the Chairman of the SubCommittee made another important statement bearing on the Congressional rationale for the 1946 legislation.[3]

---

provision which authorizes the United States Public Health Service to cooperate with the Philippine government in hospital activities.

Filipino, 391 F. Supp. at 1318.

[3]  That statement also helps form the justification for the statute:

There is merit in President Truman's assertion that there is 'a moral obligation of the United States to look after the welfare of Philippine Army veterans,' but his statement recognized 'that certain practical difficulties exist in applying the GI Bill of Rights to the Philippines.'  It was the view of the Congress that immediate action was required, that facts were not available upon which to base a proper solution to these 'practical difficulties.'  Consequently it was decided that, except for pensions based upon service-connected disability or death, the best way to proceed was to wipe the slate clean.

The GI Bill of Rights is intended to benefit an American who served in the armed forces and who, upon his discharge from the service, returns to civil life in the United States, where American standards of living prevail.  A peso in the Philippines will go as far as a dollar in the United States.  A Filipino veteran does not need 150 pesos a week as unemployment compensation. Neither is he justified

2.  The Modern Codification.

Title 38, Section 107 of the United States Code is merely a modern codification of the

1946 rider discussed above (specifically Title II of Public Law 301, 79th Congress, 60 Stat. 14,

entitled First Supplemental Recision Act of 1946 (as to sub. (a)) and (as to sub. (b)) Public Law

391, 79th Congress, 60 Stat. 223, entitled Second Supplemental Rescission Act of 1946).  38

U.S.C. § 107, provides (sub. (a)) that "service before July 1, 1946, in the organized military

forces of the government of the Commonwealth of the Philippines while such forces were in the

service of the Armed Forces of the United States pursuant to the military order of the President,

dated July 26, 1941 . . . shall not be deemed to have been active military, naval or air service for

the purposes of any law of the United States conferring rights, privileges, or benefits upon any

---

in asking for a loan of 8,000 pesos to buy a farm or to go into business. Whenever
any part of the GI Bill of Rights is extended to Filipino veterans, the cost of living
in the Philippines and other economic factors must be given careful consideration.

The first effect of the amendment from the point of view of the United States
Treasury was to reduce a liability for veterans' benefits from $3,000,000,000 to
$500,000,000, both of these amounts being based upon estimates made by the
Veterans Administration.  This was accomplished by limiting such benefits to
pensions on account of service-connected disability or death and by further
providing that, when allowed, such pensions shall be paid at the rate of one
Philippine peso for each dollar otherwise authorized.

As I see it, the best thing the American government can do is to help the Filipino
people to help themselves.  Where there was a choice between expenditures for
the rehabilitation of the economy of the Philippine Islands and payments in cash
to Filipino veterans, I am sure it is better to spend any equal sum of money, for
example, on improving the roads and port facilities.  What the Filipino veteran
needs is steady employment rather than to depend for his living upon a monthly
payment sent from the United States . . . .

Filipino, 391 F. Supp. at 1319.

person by reason of the service of such person or the service of any other person in the Armed

Forces except benefits under" Chap. 11 (compensation for service-connected disability or death);

except Sec. 412(a), Chap. 13 (compensation for dependents for service-connected disability or

death); and Chap. 23 (burial benefits); also excepted were benefits under pre-1946 National Life

Insurance contracts.  The statute also provides that payments of the allowed compensation for

service-connected disability or death "shall be made at a rate in pesos as is equivalent to 0.50 for

each dollar otherwise authorized."  Id.

C.    **Status of Philippine World War II Veterans**

For purposes of analyzing cited and related case law, Philippine World War II veterans

are divided among four groups:  the Old Philippine Scouts, the Philippine Army, the New

Philippine Scouts, and the Philippine guerrilla fighters.  See OCMH Study at 48-58; Quiban v.

Veterans Admin., 928 F.2d 1154, 1157 (D.C. Cir. 1991).  For historical reasons, the first group

has always been considered a United States Army unit, and has always received full veterans

benefits.  Quiban, 928 F.2d at 1156.  Because of the 1946 legislation, however, the latter groups

have not been accorded equally advantageous treatment.

D.    **Plaintiff's Prior Litigation in the Court of Federal Claims**

On November 22, 1996, plaintiff filed a Complaint in the United States Court of Federal

Claims and his case was assigned Civil Docket No. 96-740-C.  See Exhibit 1 ("96-740 CFC

Complaint").  Plaintiff attempted to bring a class action "of Filipino veterans who fought under

the United States Armed Forces during the Second World War as members of the Philippine

Commonwealth Army called into service by the United States government on July 26, 1941, as

well as members of guerilla resistance units organized in the Philippines. . . [and] survivors and

- 9 -

dependents of these veterans." 96-740 CFC Complaint, ¶ 2.  In April, 1997, the United States

moved to dismiss the 96-740 CFC Complaint.  <u>See</u> Exhibit 2 (Defendant's Motion to Dismiss).

On December 16, 1997, the Court of Federal Claims granted defendant's motion and dismissed

the case because it found that all of the claims asserted were barred by the applicable statute of

limitations.  <u>See</u> 39 Fed. Cl. 673 (Fed. C. 1997) (copy attached as Exhibit 3).  On January 14,

1999, the United States Court of Appeals for the Federal Circuit affirmed the decision.  <u>See</u>

<u>Entines v. U.S.,</u> 185 F.3d 881 (Fed.Cir. Jan 14, 1999) (table) (copy attached as Exhibit 4 and

available at No. 98-5081, 1999 WL 133052).  On May 17, 1999, the United States Supreme

Court denied a petition for a writ of certiorari.  <u>See</u> <u>Entines v. U.S.,</u> 526 U.S. 1117 (May 17,

1999) (table).[4]

**E.    Plaintiff's Current Litigation in the Court of Federal Claims**

Plaintiff filed this case on March 13, 2006.  <u>See</u> Docket Entry No. 1.  Three days before

that, he filed a Complaint in the United States Court of Federal Claims.  A copy of that

Complaint is attached as Exhibit 5.  Other than statements for jurisdiction and venue, the

Complaint in the Court of Federal Claims is substantially identical to the Complaint filed in this

case.  <u>Compare</u> Exhibit 5 (CFC Complaint), ¶¶ 2-50, <u>with</u> Complaint, ¶¶ 7-55.

---

[4]  Where a defendant attaches certain exhibits solely to demonstrate that the Court lacks
jurisdiction over the portion of plaintiff's complaint pertaining to it, those attached documents do
not warrant treating the motion as one for summary judgment.  <u>See, e.g.,</u> <u>Land v. Dollar</u>, 330
U.S. 731, 735 n.4 (1947); <u>Herbert v. National Academy of Sciences</u>, 974 F.2d 192, 197-98 (D.C.
Cir. 1992); <u>Bonterra America, Inc. v. Bestmann</u>, 907 F. Supp. 4, 5 n.1 (D.D.C. 1995).

# ARGUMENT

## I.    Standard of Review for Dismissal

A Rule 12(b)(1) or 12(b)(6) motion "tests the legal sufficiency of the complaint." ACLU Foundation of Southern Calif. v. Barr, 952 F.2d 457, 472 (D.C. Cir. 1991). While *pro se* litigants are generally held to a lower standard in pleading and proving the existence of subject matter jurisdiction, Hughes v. Rowe, 449 U.S. 5, 9 (1980), federal court jurisdiction cannot be presumed, but must be affirmatively and distinctly plead in the complaint. Norton v. Larney, 266 U.S. 511, 515-16 (1925). The "United States, as sovereign, is immune from suit save as it consents to be sued, . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Sherwood, 312 U.S. 584, 586 (1941); see also United States v. Mitchell, 445 U.S. 535, 538 (1980). Waivers of sovereign immunity cannot be implied, but must be unequivocally expressed. Mitchell, 445 U.S. at 538 (quoting United States v. King, 395 U.S. 1, 4 (1969)). In addition, such statutory waivers "are to be construed strictly in favor of the sovereign." McMahon v. United States, 342 U.S. 25, 27 (1951)(footnote omitted).

"In reviewing a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor." Thompson v. Capitol Police Board, 120 F. Supp. 2d 78, 81 (D.D.C. 2000) (citations omitted). "The court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." Rann v. Chao, 154 F. Supp. 2d 61, 64 (D.D.C. 2001) (citing Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)). Similarly, a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) may be granted if it is beyond doubt that the

plaintiff can demonstrate no set of facts that support a claim entitling him to relief.  See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1117 (D.C. Cir. 2000).  The Court is to treat the complaint's factual allegations as true, see Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993), and must grant Plaintiff "the benefit of all inferences that can be derived from the facts alleged," Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979).  While parties proceeding without legal representation are entitled to have their pleadings liberally construed, Hughes v. Rowe, 449 U.S. 5, 9-10 (1980) (per curiam), they are not entitled to pursue actions without legal merit.  See Jones v. Community Redevelopment Agency, 733 F.2d 646, 649 (9th Cir. 1984) (dismissing pro se plaintiff's proposed second amended complaint because its conclusory allegations were unsupported by any facts).  In particular, "the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by the facts alleged in the complaint, nor must the Court accept the plaintiff's legal conclusions."  National Treasury Employees Union v. United States, 101 F.3d 1423, 1430 (D.C. Cir. 1996); Kowal v. MCI Communication Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## II.   Collateral Estoppel Bars Adjudication of All Claims

Plaintiff's claims against the United States must be dismissed because the issue of subject matter jurisdiction has already been litigated in a case to which Plaintiff was a party.  "Generally, collateral estoppel, or issue preclusion, bars relitigation of issues that actually and fairly have been decided in a prior action." Staffer v. Bouchard Transp. Co., Inc., 878 F.2d 638, 644 (2d Cir. 1989); Bulloch v. Pearson, 768 F.2d 1191, 1192 (10th Cir. 1985) ("Issue preclusion refers to the principle that 'a litigant in one lawsuit may not, in a later lawsuit, assert the contrary of issues

actually decided in and necessary to the judgment of the first suit.'"). The requirements of issue preclusion are that the same issue have been actually litigated and necessarily decided in a prior action, and that the party against whom preclusion is asserted was a party to the prior action. Garza v. Henderson, 779 F.2d 390, 393 (7th Cir. 1985).

Collateral estoppel applies to findings of jurisdiction. Kasap v. Folger Nolan Fleming & Douglas, Inc., 166 F.3d 1243, 1248 (D.C. Cir. 1999) ("In fact, under principles of issue preclusion, even a case dismissed *without* prejudice has preclusive effect on the jurisdictional issue litigated.") (emphasis supplied); Dozier v. Ford Motor Co., 702 F.2d 1189, 1198 (D.C. Cir. 1983).[5] Thus, "the party alleging jurisdiction in a second action will be precluded from relitigating any issue of fact or law determined against it in the first action which it had full opportunity to litigate." GAF Corp. v. United States, 818 F.2d 901, 913 (D.C. Cir. 1987). The only exception to collateral estoppel with respect to jurisdiction is where the jurisdictional shortcoming is cured by a change in circumstances. Dozier, 702 F.2d at 1198 ("[W]here a jurisdictional defect is cured or otherwise loses its controlling force, a second action may be brought under the same jurisdiction.").

---

[5] The expiration of the limitations period is typically an affirmative defense and not a bar to jurisdiction. See, e.g., Gordon v. Nat'l Youth Work Alliance, 675 F.2d 356, 360 (D.C. Cir.1982); see also 5 Wright & Miller, Federal Practice and Procedure § 1277 (2004). However, the sovereign immunity of the United States requires plaintiff to demonstrate that it meets all conditions imposed by Congress for establishing jurisdiction, including initiating the action within the applicable limitations period, and thus renders it jurisdictional. See United States v. Mitchell, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); Kendall v. Army Board for Correction of Military Records, 996 F.2d 362, 366 (D.C. Cir. 1993) (affirming the dismissal of a case for lack of jurisdiction given the expiration of the limitations period and holding that the statute of limitations embodied in § 2401(a) is "a condition of federal court jurisdiction").

Subject matter jurisdiction cannot exist over this case because the jurisdiction issue has already been litigated and finally determined adversely to Plaintiff.  *Res judicata* generally applies to claims that have been brought <u>or could have been brought</u> in previous litigation between the same parties.  In this regard, this Court has held:  "[u]nder res judicata, or claim preclusion, 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'"  <u>Carter v. Rubin</u>, 14 F. Supp.2d 22, 34 (D.D.C. 1998) (citing <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980)).  In order for the concept to apply, four factors must be present:  (1) an identity of parties in both suits; (2) a judgment rendered by a court of competent jurisdiction; (3) a final judgment on the merits; and (4) an identity of the cause of action in both suits.  <u>Paley v. Estate of Ogus</u>, 20 F. Supp.2d 83, 86 (D.D.C. 1998) (citing <u>Brannock Assocs., Inc. v. Capitol 801 Corp.</u>, 807 F. Supp. 127, 134 (D.D.C. 1992)).

The District of Columbia Circuit addresses issues of claim preclusion using the transactional approach, under which a cause of action comprises all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.  <u>See</u> <u>Stanton</u>, 127 F.3d. at 75.  "What factual grouping constitutes a 'transaction' and what groupings constitute a 'series,' are to be determined pragmatically, considering whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.  <u>See id.</u>, citing, Rest. 2d, Judgments at §24(2).  As this Court recently stated:

> " 'Under the claim preclusion aspect of res judicata, a final judgment on the merits
> in a prior suit involving the same parties or their privies bars subsequent suits

based on the same cause of action.' " Claim preclusion prevents parties from relitigating issues they raised or could have raised in a prior action on the same claim." NextWave Personal Communications Inc. v. FCC, 254 F.3d 130, 143 (D.C. Cir.2001) (citation omitted). The three elements of *res judicata* are: (i) a final judgment on the merits in the first action; (ii) the present claim is the same as a claim that was raised or that might have been raised in the first proceeding; and (iii) the party against whom *res judicata* is asserted was a party or in privity with a party in the previous case. See Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

Jacobsen v. Oliver, 201 F. Supp.2d 93, 102-03 (D.D.C. 2002); Century Int'l Arms, Ltd., v. The Fed. State Unitary Enterprise State Corp., 172 F. Supp.2d 79, 95 (D.D.C. 2001); Hanna v. Herman, 121 F.Supp.2d 113, 119 (D.D.C. 2000).

All three elements of *res judicata* have been satisfied in the instant case. Plaintiff filed substantially the same action in 1996. See Exhibit 1. The parties and the claims are the same. Id. The dismissal by the Court of Federal Claims for untimeliness was affirmed on appeal. See Exhibit 4. Accordingly, the 1996 Court of Federal Claims case resulted in a final judgment against plaintiff. Moreover, any of plaintiff's claims in the instant case that were not actually raised in the prior cases surely could have been. Because all of the elements of the doctrine are satisfied, this case should be dismissed.

## III. Even If Not Precluded, Plaintiff's Claims Are Otherwise Barred

### A. Jurisdiction Does Not Exist Under Either the General Jurisdictional Provision or the Declaratory Judgment Act

Federal courts are courts of limited jurisdiction. Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 465 U.S. 694, 701-02 (1982). They are empowered to hear only those cases that are (a) specifically authorized by the Constitution, and (b) the subject of a jurisdictional grant by Congress. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). As explained by the United States Supreme Court in Compagnie des Bauxites: "The

- 15 -

character of controversies over which federal judicial authority may extend are delineated in Art. III, § 2, cl. 1.  Jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction."  Insurance Corp., 456 U.S. at 701.

Plaintiff's Complaint cites 28 U.S.C. § 1331 and 28 U.S.C. § 2201-02 as bases for jurisdiction.  Compl. ¶¶ 1, 5. The former is insufficient because jurisdiction in a case like this, which seeks damages against the United States, also depends on the existence of a waiver of sovereign immunity, and section 1331 itself provides no such waiver.  See Bliss v. England, 208 F. Supp.2d 2, 4 (D.D.C. 2002); Voluntary Purchasing Groups, Inc. v. Reilly, 889 F.2d 1380, 1385 (5th Cir. 1989) (section 1331 does not provide separate waiver of sovereign immunity for suits against the government) (cited in Clopton v. Dep't of Navy, 1996 WL 680189 (D.C. Cir. 1996) (unpublished summary affirmance)).  As to the latter, the Declaratory Judgment Act, 28 U.S.C. § 2101-02, likewise allows suits for declaratory relief only when an independent basis for jurisdiction has been established.  Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72 (1950).  The Declaratory Judgment Act provides no waiver of sovereign immunity for suits against the federal government.  Transport Robert Lee v. INS, 195 F. Supp.2d 136, 139 (D.D.C. 2002); Benvenuti v. Department of Defense, 687 F. Supp. 348, 351 (D.D.C. 1984).

Moreover, generally "[a] party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States." Consolidated Edison v. Department of Energy, 247 F.3d1378, 1385 (Fed. Cir. 2001) (quoting Rogers v. Ink, 766 F.2d 430, 434 (10th Cir. 1985)), cert denied, 534 U.S. 1054 (2001).  "One cannot circumvent exclusive jurisdiction in the Claims Court by suing simply for declaratory or

injunctive relief in a case where such relief would be the equivalent of a judgment for money damages." Con. Ed., 247 F.3d at 1385, quoting A.E. Finley Assoc., Inc. v. United States, 898 F.2d 1165, 1167 (6th Cir. 1990); see also Christopher Village, L.P. v. United States, 360 F.3d 1319 (Fed. Cir. 2004), cert. denied, 543 U.S. 1146 (2005); Spectrum Leasing Corp. v. United States, 764 F.2d 891 (D.C. Cir. 1985).

### B.    Statutes of Limitations Bars Plaintiff's Claims

#### 1.    28 U.S.C. §§ 2401 and 2501

As stated above, this Court is one of limited jurisdiction and its authority to grant relief against the United States is limited by the extent to which the United States has waived its sovereign immunity.  United States v. Testan, 424 U.S. 392, 399 (1976).  Such a waiver "must be unequivocally expressed in the statutory text, and will not be implied." Lane v. Pena, 518 U.S. 187, 192 (1996).  Indeed, the Government's consent to be sued "must be construed strictly in favor of the sovereign." United States v. Nordic Village, Inc., 503 U.S. 30, 33-34 (1992).

With limited exceptions not applicable here, the general statute of limitations states that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401.[6]  Likewise, to the extent Plaintiff would rely on the terms of his father's enlistment contract for the basis of a claim, the Tucker Act's six-year statute of limitations also requires that a plaintiff must file suit within six years of the date that a claim first accrues.  28 U.S.C. § 2501.  Both statutes are express

---

[6]  It is well established that section 2401(a) is not an ordinary statute of limitations but is instead a statute of limitations that serves as a condition upon the Government's waiver of sovereign immunity; that is, it serves as a condition upon the Government's consent to be sued. See, e.g., United States v. Mottaz, 476 U.S. 834, 841 (1986) and Sorriano v. United States, 352 U.S. 270, 276 (1957).

limitations on the Government's waiver of sovereign immunity and cannot be waived. Hart v. United States, 910 F.2d 815, 818-19 (Fed. Cir. 1990). Thus, if a claim is asserted outside of the limitations period, this Court must dismiss the claim for lack of jurisdiction. Cottrell v. United States, 42 Fed. Cl. 144, 154 (1998).

Plaintiff claims that the U.S. Army failed to fully compensate his father and his family for his father's service during World War II. Compl., passim. He also avers that his father was killed on March 25, 1945 while serving in the military. Compl., ¶¶ 16, 35, 38. Because he died over 60 years ago, claims based on his father's military service are barred by the statute of limitations. The statute of limitations is jurisdictional and must be strictly construed to avoid the prosecution of stale claims. Soriano v. United States, 352 U.S. 270, 273-74 (1957); Irwin v. Veterans Administration, 498 U.S. 89 (1991). Compliance with the statute of limitations is a condition of the United States' consent to suit, and thus is also a condition on this Court's jurisdiction. Soriano, 352 U.S. at 273-74.[7]

## 2. Plaintiff's Cause of Action Accrued Long Ago.

A cause of action cognizable in a Tucker Act suit accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, i.e., when "all events have

---

[7] This case is also barred by the equitable doctrine of laches. Laches requires "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." Costello v. United States, 365 U.S. 282 (1961). Where the delay is prolonged, there is less need to search for specific prejudice and a greater burden on the plaintiff to demonstrate lack of prejudice. Blassingame v. Secretary of Navy, 626 F. Supp. 632, 641 (1985), citing Cason v. United States, 471 F.2d 1225, 1229, 200 Cl. Ct. 424 ( 1973). "Laches . . . assures that old grievances will some day be laid to rest, that litigation will be decided on the basis of evidence that remains reasonably accessible and that those against whom claims are presented will not be unduly prejudiced by delay in asserting them." A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1029 (1992).

occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money." Nager Elec. Co. v. United States, 368 F.2d 847, 851 (Ct. Cl. 1966); see Catawba Indian Tribe of S.C. v. United States, 982 F.2d 1564, 1570 (Fed. Cir. 1993); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988). In a military discharge case, this Court and the Federal Circuit have long held that the plaintiff's cause of action for back pay accrues at the time of the plaintiff's discharge. See Bowen v. United States, 292 F.3d 1383, 1386 (Fed. Cir. 2002); Real v. United States, 906 F.2d 1557, 1560 (Fed. Cir. 1990); Williams v. Sec'y of the Navy, 787 F.2d 552, 562 n.15 (Fed. Cir. 1986); Bray v. United States, 785 F.2d 989, 994 (Fed. Cir. 1986); Bonen v. United States, 666 F.2d 536, 539 (Ct. Cl. 1981). The same is true for the accrual of a claim for purposes of 28 U.S.C. § 2401.

The service member therefore has the right to sue immediately upon discharge for the funds improperly withheld. Moreover, the courts have made clear that a Tucker Act claim for back pay accrues all at once at the time of discharge; the claim for back pay is not a "continuing claim" that accrues each time a payment would be due throughout the period that the service member would have remained on active duty. See Longhine v. United States, 230 Ct. Cl. 920, 922 (1982); Vincin v. United States, 468 F.2d 930, 933 (Ct. Cl. 1972); Mathis v. United States, 391 F.2d 938, 939 (Ct. Cl. 1968). If the plaintiff does not file suit within the six-year limitation period prescribed in 28 U.S.C. § 2501, the plaintiff loses all rights to sue for the loss of pay stemming from the challenged discharge. That is, the claim accrues "at one time, once and for all," on the date of discharge, even though the asserted obligation to pay the plaintiff, on which the claim is based, continues until the end of the plaintiff's enlistment. Mathis, 391 F.2d at 939.

- 19 -

IV.    **Even If Not Otherwise Barred, Plaintiff's Claims Are Without Merit**

A.    **Plaintiff's Back Pay Claims Are Baseless.**

The Court of Federal Claims also has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007 (Ct. Cl. 1967). Claims in this category, where no payment (or insufficient payment) has been made by the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also Testan, 424 U.S. at 401-02 ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim--whether it be the Constitution, a statute, or a regulation--does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.' " (quoting Eastport S.S., 372 F.2d at 1009)); see also Martinez v. United States, 333 F.3d 1295, 1302-03 (Fed. Cir. 2003), cert. denied, 540 U.S. 1177 (2004).

It is this category of claims that plaintiff relies most heavily on to establish the jurisdiction of this Court. However, as stated above, in order to properly invoke Tucker Act jurisdiction concerning a claim for back pay, a plaintiff must point to a substantiative right to money damages against the United States. James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998)(citing Hamlet v. United States, 63 F.3d 1097, 1101 (Fed. Cir. 1995)). This means that a Tucker Act plaintiff must assert a claim under a **separate money-mandating** constitutional

provision, statute, or regulation, the violation of which supports a claim for damages against the United States.  Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir. 1997).

Plaintiff attempts to rely on the "primary basic pay statute in existence at the time" to support his claim for back pay and benefits.  Compl., p. 13, ¶ 1.  However, as discussed below, that pay statute is inapplicable to plaintiff as such benefits were strictly limited by Congress pursuant to 38 U.S.C. § 107, as acknowledged by plaintiff in his complaint.  Compl., ¶¶ 28, 29.  Further, 38 U.S.C. § 107 has been challenged several times by World War II Philippine veterans, but has been upheld repeatedly by various Circuit Courts, including the Federal Circuit.  Talon v. Brown, 999 F.2d 514 (Fed. Cir. 1993)(Court upheld the constitutionality of 38 U.S.C. § 107(a)); see also Quiban v. Veterans Administration, 928 F.2d 1154 (D.C. Cir. 1991)(upholding the constitutionality of §§ 107(a) and (b)), cert. denied, 513 U.S. 918 (1994); Besinga v. United States, 14 F.3d 1356 (9th Cir. 1994)(upheld the constitutionality of 38 U.S.C. § 107(a)), cert. denied, 513 U.S. 864 (1994).  Absent a money-mandating statute, this Court lacks the power to grant any relief and should dismiss the complaint.  Smith v. Sec'y of the Army, 384 F.3d 1288, 1292 (Fed. Cir. 2004); Ont. Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); Sanford v. United States, 32 Fed. Cl. 363, 365 (1994).

Plaintiff fares no better by resorting to a claim under the Takings Clause.  In order to establish a taking under the Fifth Amendment, plaintiff must first establish a compensable property interest.  Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374 (Fed. Cir. 2000)(stating that under takings analysis, "first, a court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action").  In this connection, the Supreme Court has held that the Constitution does not create property interests. Ruckelshaus v. Monsanto

Co., 467 U.S. 986, 1001 (1984).  Rather, property interests "are created and their dimensions are

defined by existing rules or understandings that stem from an independent source."  Id. (citing

Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980); Bd. of Regents v.

Roth, 408 U.S. 564, 577 (1972)).  With respect to military benefits, case law provides that those

benefits are defined by statute.  "A soldier's entitlement to pay is dependent upon statutory

right."  Wyatt v. United States, 2 F.3d 398, 400 (Fed. Cir. 1993)(quoting Bell v. United States,

366 U.S. 393, 401 (1961)).[8]

　　　　To the extent that plaintiff believes his father was entitled to more pay or additional

benefits, contractually or otherwise, his subjective beliefs afford him no traction.  Entitlement to

military pay and allowances arises out of statutes and regulation, not the subjective expectations

of members of the armed services, " '[a] soldier's entitlement to pay is dependent upon statutory

right,' and that accordingly the rights of the affected service members must be determined by

reference to the statutes and regulations . . . rather than to ordinary contract principles."  United

States v. Larionoff, 431 U.S. 864, 869 (1971), citing Bell v. United States, 366 U.S.393, 401

(1961).  Military pay depends upon an exercise of legislative grace, not upon principles of

contract.  See Zucker v. United States, 758 F.2d 637, 640 (Fed. Cir. 1985)(explaining that federal

workers' "entitlement to retirement benefits must be determined by reference to the statutes and

---

　　　　[8]　See also Perry v. Sinderman, 408 U.S. 593 (1972); Guerra v. Scruggs, 942 F.2d 270
(4th Cir. 1991); Navas v. Vales, 752 F. 2d 765 (1st Cir. 1985); Woodward v. Marsh, 658 F.2d
989 (5th Cir. 1981), cert. denied, 455 U.S. 1022 (1982); Ampleman v. Schlesinger, 534 F.2d 825
(8th Cir. 1976); Rich v. Secretary of the Army, 735 F.2d 1220 (10th Cir. 1984); Sims v. Fox, 505
F.2d 857, 862 (5th Cir. 1974), cert. denied, 421 U.S. 1011 (1975); Austin v. United States, 206
Ct. Cl. 719, cert. denied, 423 U.S. 911 (1975); Crawford v. Davis, 249 F. Supp. 943 (E.D. Pa.
1966), cert. denied, 383 U.S. 921 (1966).

regulations governing these benefits, rather than to ordinary contract principles"); see also Bell at

401 ("A soldier's entitlement to pay is dependent upon statutory right.").

Therefore, since 38 U.S.C. § 107 is the statute that defines the benefits plaintiff's father

was entitled to receive, and that statute is constitutional, his argument that the denial of benefits

violates the Takings Clause of the Fifth Amendment or the Non-impairment of Contracts Clause

is untenable and must be dismissed.  Gonzalez v. United States, 48 Fed. Cl. 176, 181 (Fed. Cl.

2000)(there is no property interest that can be "taken" by operation of 38 U.S.C. § 107).[9]

Likewise, the equal protection clauses of the constitution are of no help to plaintiff either.

The equal protection component of the Fifth Amendment requires the federal government to treat

similarly situated persons alike.  City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439

(1985); Bolling v. Sharpe, 347 U.S. 497, 499 (1954).  The Constitution, however, "'does not

require things which are different in fact or opinion to be treated in law as though they were the

same.'"  Plyler v. Doe, 457 U.S. 202, 216 (1982) (quoting Tigner v. Texas, 310 U.S. 141, 147

(1940)).  Thus, the key inquiry is whether similarly situated groups have been treated differently

without a logical explanation for doing so.  Gillet v. King, 931 F. Supp. 9, 15 (D.D.C. 1996),

aff'd., 132 F.3d 1481 (D.C. Cir. 1997).  In addition, a claim that government officials have

unlawfully administered a law fair on its face, resulting in its unequal application to those who

are entitled to be treated alike, does not establish an equal protection violation unless the plaintiff

also demonstrates intentional or purposeful discrimination.  Brandon v. District of Columbia Bd.

of Parole, 823 F.2d 644, 650 (D.C. Cir. 1987).  Because the legislative summary at the beginning

---

[9] Plaintiff brings this claim solely in his own capacity and may be unable to establish standing for this claim for an increase to his father's benefits.

of this motion outlines the rational reasons for differences in treatment, and because the clause

does not mandate the payment of money damages by the government, even if violated, Hamburg

v. United States, 1996 U.S. App. LEXIS 9470, *3 (unpublished), plaintiff fails to state any

constitutional claim.  Plaintiff's attempt at unfounded comparisons to people in Puerto Rico or

the Commonwealth of the Northern Mariana Islands are simply of no moment because of the

unique historical relationships between the United States and each of those entities.  See Compl.

¶¶ 2, 10, 18, 54.

### B.    Plaintiff's Citizenship Claim Is Barred.

Plaintiff, who alleges that he was born in the Philippines, appears to assert a claim for

U.S. citizenship based on his father's military service during World War II.  Compl. page 25,

¶ 5.[10]  Jurisdictional problems aside (discussed above), this claim is wholly without merit.  With

Spain's cession of the Philippines to the United States, inhabitants on those islands collectively

became nationalized but not naturalized.  Spanish subjects residing in ceded territory became

---

[10]  As to plaintiff himself, the request for relief in the form of citizenship is curious in
light of the allegation in paragraph 6 of the Complaint that plaintiff was naturalized in December
1992.  Complaint, ¶ 6.  Accordingly, there is no case or controversy concerning plaintiff's
citizenship, and plaintiff fails to state a claim.  Otherwise, plaintiff lacks standing to bring claims
on behalf of others.  His claim about how the United States dealt with the Philippines throughout
history and more specifically during and immediately following World War II presents nothing
more than a generalized grievance which by itself does not warrant the exercise of jurisdiction.
Warth v. Seldin, 422 U.S. 490, 499 (1975); see also Schlesinger v. Reservists Committee to Stop
the War, 418 U.S. 208, 216-17, 227 (1974); Capital Legal Found. v. CCC, 711 F.2d 253, 258
(D.C. Cir. 1983).  As the Supreme Court has cautioned, "[a] federal court . . . is not the proper
forum to press general complaints about the way in which the government goes about its
business."  Allen v. Wright, 468 U.S. 737, 754 (1984) (asserted right to have the government "act
in accordance with law" not sufficient to confer standing); see also Lujan v. Defenders of
Wildlife, 504 U.S. 555, 574-78 (1992) (generalized grievance about proper application of laws
does not support standing); Sargeant v. Dixon, 130 F.3d 1067, 1069 (D.C. Cir. 1997) (same).

nationals of the United States unless it was otherwise provided by treaty.  "Accordingly, it was

realized that while all citizens of the United States were nationals, not all nationals were citizens.

A hybrid status appeared, the so-called 'non-citizen national.' "  Cabebe v. Acheson, 183 F.2d

795 (9th Cir. 1950).

During the 12-year interval between the Philippine Independence Act, Public Law 73-

127, 48 Stat. 456 (the Act of 1934) and final independence in 1946, the Philippines were in what

has been described as a "unique" status.  Although not in all respects a "foreign" territory, the

Philippines were treated by the Act of 1934 as a foreign country for many purposes, e.g., Filipino

citizens were treated as aliens for immigration purposes; also foreign service officers assigned to

the Philippines were treated as if stationed in a foreign country; also the Act of 1934 defined

"United States" as excluding the Philippines.  See Hooven v. Evatt, 324 U.S. 652, 677-8 (1945).

In March 1942, Congress amended the 1940 immigration laws to make American

citizenship more readily available to aliens who served honorably in the United States Armed

Forces during World War II.[11]  Petitions for naturalization, however, had to be filed by December

31, 1946.[12]  In addition to the explicit cutoff date in the amended 1940 Act, Congress in 1948,

adopted a new liberalized citizenship program that *excluded* Filipino servicemen, and specifically

provided that even applications timely filed under the 1940 Act and still pending would be

adjudged under the new provisions.  Act of June 1, 1948, Ch. 360, 62 Stat. 281.  These

---

[11]  The specific act is §§ 701 to 705 of the Nationality Act of 1940, Ch. 876, 54 Stat.
1137, as amended by the Second War Powers Act of 1942, § 1001, Ch. 199, 56 Stat. 182, 8
U.S.C. §§ 1001 to 1005 (1940 ed., Supp. V).

[12]  During this time frame, over 7,000 Filipino soldiers were naturalized as American
citizens.  INS v. Hibi, 475 F.2d 7, rev'd on other grounds, 414 U.S. 5 (1973).

provisions were carried forward into the 1952 Nationality Act, see 66 Stat. 250, 8 U.S.C. § 1440. Finally, in 1961, Congress amended the 1952 Act by adding § 310(e), 8 U.S.C. § 1421(e), which specifies that "any" petition thereafter filed will be adjudged under the requirements of the 1952 Act.

The congressional command here could not be more manifest. Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does any court have the power to confer citizenship in violation of the limitations imposed by Congress pursuant to its naturalization power under Article I, Section 8, clause 4 of the Constitution. INS v. Pangilinan, 486 U.S. 875 (1988). Or as the Supreme Court has stated, " 'Once it has been determined that a person does not qualify for citizenship, . . . the district court has no discretion to ignore the defect and grant citizenship.' " Fedorenko v. United States, 449 U.S. 490 (1981) (citation omitted). Thus, even if the Court deems it has jurisdiction on this issue, which defendant disputes, the Court cannot grant plaintiff citizenship regardless.

Because there is no merit to plaintiff's arguments that he is entitled to citizenship based on his birth in the Philippines, this claim should be dismissed for lack of jurisdiction.

**C.    38 U.S.C. § 107 Prohibits the Award of Veteran's Benefits to Plaintiff.**

As previously stated, the decision by Congress to limit and/or deny various veteran's benefits to individual Philippine service members following World War II has been held to be constitutional by the D.C. Circuit as well as other courts. Quiban v. Veterans Admin., 928 F.2d 1154 289 U.S. App. D.C. 62 (D.C. Cir. 1991)(upholding the constitutionality of §§ 107(a) and (b)); Talon v. Brown, 999 F.2d 514 (Fed. Cir. 1993)(Court upheld the constitutionality of 38

U.S.C. § 107(a)); <u>Besinga v. United States</u>, 14 F.3d 1356 (9th Cir. 1994)(upholding the

constitutionality of 38 U.S.C. § 107(a)).

In <u>Quiban</u>, the D.C. Circuit concluded, relying on the Supreme Court's decisions in

<u>Califano v. Torres</u>, 435 U.S. 1 (1978) (per curiam), and <u>Harris v. Rosario</u>, 446 U.S. 651

(1980)(per curiam), that the proper standard of review when faced with a challenge to 38 U.S.C.

§ 107 is the rational basis test.  <u>Quiban</u>, 928 F.2d at 1159.  Concluding that there was a rational

basis for the statute and that it is constitutional, that court found that three factors were

dispositive:  United States taxes had never been imposed in the Philippines, which had never

contributed to the funding of United States veterans' benefits; the cost of extending full benefits

to veterans of the Philippine Army would approach two billion dollars annually for a substantial

period of time; and the extension of benefits to the Philippine veterans might seriously disrupt

the economy of that country.  <u>Id</u>. at 1161.  As articulated by the Ninth Circuit:

> Under the rational basis standard of review, it is not our place to second-guess
> Congress' motivations.  Whether Congress . . . based on its [decision on the
> understanding that] the payment of benefits would be prohibitively expensive or
> whether Congress acted out of the more enlightened concern that the direct
> payment of benefits to hundreds of thousands of Filipino men and women might
> be perceived as a threat to the sovereignty of the soon-to-be-independent Republic
> of the Philippines is of no moment.  A single rational factor will sustain the
> statute.

<u>Besinga</u>, 14 F.3d at 1362.

In short, plaintiff's challenge to the validity or constitutionality of 38 U.S.C. § 107 merits

no further consideration than has already been afforded in this circuit and others.  That statute

limits the benefits that Philippine World War II veterans can receive.  It has already been

challenged, scrutinized, and upheld, demonstrating clearly the futility of plaintiff's position.

## <u>CONCLUSION</u>

For all of these reasons, defendant respectfully requests that the Court grant this motion and dismiss this case in its entirety.

Dated: December 4, 2006.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


/s/_____
JANE M. LYONS, D.C. BAR # 451737
Assistant United States Attorney
Civil Division
555 4th Street, N.W. - Room E4822
Washington, D.C.  20530
(202) 514-7161

- 28 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of December, 2006, a true and correct copy of the foregoing **DEFENDANT'S MOTION TO DISMISS AND DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS** and proposed order were served upon pro se plaintiff by first class United States mail, postage prepaid marked for delivery to:


Rev. Fr. Prisco E. Entines
419 North Mountain View Ave - #207
Los Angeles, California 90026


/s/
JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. - Room E4822
Washington, D.C.  20530
(202) 514-7161