---Fed.Cl.---  
(Cite as: 1997 WL 780913 (Fed.Cl.))

Page 1

Rev. Fr. Prisco E. ENTINES, Eleazar P. Andoque, and Olympia A. Saarenas,
Plaintiffs,
v.
The UNITED STATES, Defendant.

No. 96-740C.

United States Court of Federal Claims.

Dec. 16, 1997.

Emeterio G. Roa III, Ordoveza Law Offices, Arlington, Virginia, for plaintiffs.

John K. Lapiana, Civil Division, United States Department of Justice, Washington, D.C., for defendant, with whom on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director.

OPINION

MARGOLIS, Judge.

*1 Plaintiffs, Filipino veterans who fought under United States command during World War II or their survivors, have sued the United States for back pay, just compensation under the Fifth Amendment, and breach of express or implied-in-fact contracts. The case is currently before the Court on the government's motion to dismiss plaintiffs' complaint pursuant to Rule of the Court of Federal Claims ("RCFC") 12(b)(1). The government argues that the applicable statute of limitations bars plaintiffs' claims. Plaintiffs respond that the Court should toll the limitations period such that their claims would be timely. In the alternative, plaintiffs argue that the continuing claims doctrine is applicable, which, if true, would rescue some of their claims from the government's motion. The Court concludes that each of plaintiffs' claims accrued more than six years before they filed this suit, that plaintiffs have not established that tolling the statute of limitations is appropriate, and that the continuing claims doctrine is not applicable to the facts at issue. Plaintiffs' claims, therefore, are barred by the applicable six-year statute of limitations. Accordingly, the government's motion to dismiss is granted.

FACTS

At the conclusion of the Spanish-American War in 1898, Spain ceded the Philippine Islands to the United States. See Treaty of Paris, Dec. 10, 1898, U.S.-Spain, 30 Stat. 1754, 1759. On March 24, 1934, Congress passed the Philippine Independence Act, which provided that the Philippines would become a self-governing nation on July 4, 1946. See Pub.L. No. 73-127, 10(a), 48 Stat. 456, 463 (1934). In 1935, as permitted by the Act, the Philippines adopted a constitution, organized a new government, and created the Philippine Army. Section 2(a)(12) of the Independence Act, however, contained a provision that permitted the president of the United States "to call into the service of [United States] armed forces all military forces organized by the Philippine government." Philippine Independence Act of 1934, 2(a)(12).

Prior to American entry into World War II, then President Franklin D. Roosevelt exercised his authority under section 2(a)(12) of the Act. In July 1941, the President issued the following military order:

I hereby call and order into the service of the armed forces of the United States for the period of the existing emergency, and place under the command of a General Officer, United States Army, ... all of the organized military forces of the Government of the Commonwealth of the Philippines....

3 C.F.R. 1307 (1941). After the Japanese attack on Pearl Harbor, General Douglas MacArthur, commander of the United States Armed Forces in the Far East, was given authority over Philippine soldiers then under United States command. See Quiban v. Veterans Admin., 928 F.2d 1154, 1157 (D.C.Cir.1991).

Although Philippine and American soldiers fought alongside one another during the Japanese invasion of the Philippines, and although the United States paid the wages of both, their rate of pay was never the same. See Filipino Am. Veterans & Dependents Ass'n v. United States, 391 F.Supp. 1314, 1317 (N.D.Cal.1974). Apparently, General MacArthur and other members of the War Department initially supported pay equalization. See Quiban, 928 F.2d at 1157. The first of two significant attempts to effect such occurred in 1942. Legislation equalizing the pay of American and Philippine soldiers, supported by the War Department, passed the Senate and was reported upon favorably by a House committee. See S. 2387, 77th Cong. (1942); H.R.Rep. No. 77-2078 (1942). This legislation, however, never became law. According to plaintiffs, after the fall of Bataan and Corregidor, and the corresponding "decimation" of the Philippine Army, the United States decided that

---Fed.Cl.---   Page 2
(Cite as: 1997 WL 780913, *1 (Fed.Cl.))

pay equalization was no longer useful. The legislation was allowed to die in Congress. The second attempt occurred shortly after American reentry into the Philippines in October 1944, when the President of the Philippines issued an executive order raising the pay scale of soldiers in the Philippine Army to levels then prevailing for United States military personnel. See Quiban, 928 F.2d at 1157. The United States never implemented this change. See id.

*2 In 1946, the First Supplemental Surplus Appropriation Rescission Act became law. See Pub.L. No. 79-301, 60 Stat. 6 (1946). This Act restricted the availability of certain veteran benefits to Philippine soldiers who fought under United States command in World War II. As currently codified, the Act provides:

> Service before July 1, 1946, in the organized military forces of the Government of the Philippines, while such forces were in the service of the Armed Forces of the United States pursuant to the military order of the President dated July 26, 1941, including among such military forces organized guerrilla forces under commanders appointed, designated, or subsequently recognized by ... competent authority in the Army of the United States, shall not be deemed to have been active military, naval, or air service for the purposes of any law of the United States conferring rights, privileges, or benefits upon any person by reason of the service of such person or the service of any other person in the Armed Forces,

except with respect to certain benefits not at issue in this case. [FN1]   38 U.S.C. 107(a). The effect 107(a) was to deny veteran benefits to those who served under United States command while in the Philippine military, because eligibility for veteran benefits is dependent upon "veteran" status, and veteran status requires service "in the active military, naval, or air service." 38 U.S.C. 101(2); see Quiban, 928 F.2d at 1158 n. 7. In addition, 107(a) reduced by fifty percent those service-related benefits that Filipino veterans could receive. See 38 U.S.C. 107(a).

Plaintiffs here are Filipino World War II veterans or their survivors. Eleazar P. Andoque served initially with the Philippine Army and later with recognized guerrilla forces. Rev. Fr. Prisco E. Entines is the son of Enrique Hapa Entines, who died while serving with the Philippine Army guerrilla forces. Olympia A. Saarenas is the widow of Renato F. Saarenas, who also served with the Philippine Army guerrilla forces. Plaintiffs' suit, filed on November 22, 1996, is grounded in three theories: (1) claims for back pay based upon the difference between wages paid to American soldiers and those paid to Filipino soldiers during World War II; (2) takings claims based upon 38 U.S.C. 107(a) and its effective denial of veteran benefits to former members of the Philippine Army; and (3) claims for breach of express or implied-in-fact contracts for military services between the United States and members of the Philippine Army during World War II. Plaintiffs would like to represent all persons similarly situated, and accordingly have moved the Court to certify a class. Consideration of that motion has been stayed pending resolution of the issues raised in the instant motion.

DISCUSSION

The case is currently before the Court on the government's motion to dismiss plaintiffs' complaint pursuant to RCFC 12(b)(1). The government argues that plaintiffs' claims are untimely because their complaint was filed decades after the claims accrued. Plaintiffs respond that the facts here warrant tolling the statute of limitations such that all claims would be timely. In the alternative, plaintiffs argue that the continuing claims doctrine is applicable, which, if true, would rescue some claims from the government's motion. The Court concludes that each of plaintiffs' claims accrued more than six years before they filed this suit, that plaintiffs have not established that tolling the statute of limitations is appropriate, and that the continuing claims doctrine is not applicable to the facts at issue. Plaintiffs' claims, therefore, are barred by the applicable six-year statute of limitations. Accordingly, the government's motion to dismiss is granted.

I. The Statute of Limitations

*3 Plaintiffs allege that the Court has jurisdiction over the instant suit pursuant to the Tucker Act, 28 U.S.C. 1491(a)(1). The statute of limitations for suits brought under the Tucker Act is found in 28 U.S.C. 2501: "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." The case law provides, and the parties agree, that 2501 is applicable to plaintiffs' back pay claims, see Sanders v. United States, 34 Fed. Cl. 75, 80 (1996) (applying 2501 to a military back pay claim), aff'd, 104 F.3d 376 (Fed.Cir.1996), takings claims, see Catellus Dev. Corp. v. United States, 31 Fed. Cl. 399, 404 (1994) (applying 2501 to a takings claim), and implied-in-fact

Copr. © West 1997 No Claim to Orig. U.S. Govt. Works

contract claims, see Truckee- Carson Irrigation Dist. v. United States, 14 Cl.Ct. 361, 374 (applying 2501 to claim for breach of implied-in-fact contract), aff'd, 864 F.2d 149 (Fed.Cir.1988).

The Tucker Act's statute of limitations is a jurisdictional requirement, and as an express condition on the government's waiver of sovereign immunity, must be strictly construed. See Hart v. United States, 910 F.2d 815, 818-19 (Fed.Cir.1990); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed.Cir.1988). Plaintiff bears the burden of establishing all jurisdictional requirements, including compliance with the six-year statute of limitations, and must do so by a preponderance of the evidence. See Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed.Cir.1988) (interpreting the Federal Rules' counterpart to RCFC 12(b)(1)); Catellus Dev. Corp., 31 Fed. Cl. at 404-05; Mason v. United States, 27 Fed. Cl. 832, 836 (1993). A litigant's failure to comply with the statute of limitations will "placed the claim beyond the court's power to hear and decide." Catellus Dev. Corp., 31 Fed. Cl. at 404 (citing Soriano v. United States, 352 U.S. 270, 273 (1957)).

Defendant has moved, pursuant to RCFC 12(b)(1), to dismiss plaintiffs' complaint as untimely. When considering such a motion, the Court initially accepts as true all undisputed factual allegations found in the complaint, and construes all facts in the light most favorable to the plaintiff. See Reynolds, 846 F.2d at 747 (interpreting the Federal Rules' counterpart to RCFC 12(b)(1)); McDonald v. United States, 37 Fed. Cl. 110, 113 (1997); Catellus Dev. Corp., 31 Fed. Cl. at 405. The Court may, however, look to other relevant evidence if the motion to dismiss challenges the truth of the complaint's jurisdictional facts. See Rocovich v. United States, 933 F.2d 991, 993 (Fed.Cir.1991); Farmers Grain Co. v. United States, 29 Fed. Cl. 684, 686 (1993). Plaintiffs filed their complaint on November 22, 1996. Defendant's motion, therefore, must be granted unless plaintiffs can establish by a preponderance of the evidence that their claims first accrued on or after November 22, 1990, or that some time-bar saving doctrine is applicable.

II. Accrual of a Claim

*4 Generally, "[a] claim accrues 'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.' " Brighton Village Assocs. v. United States, 52 F.3d 1056, 1060 (Fed.Cir.1995) (quoting Kinsey v. United States, 852 F.2d 556, 557 (Fed.Cir.1988)). Claims for military back pay accrue upon discharge or separation from active duty status. See Sanders, 34 Fed. Cl. at 80. A takings claim under the Fifth Amendment accrues on the date that the United States takes a private property interest for a public use without just compensation. See Alliance of Descendants v. United States, 37 F.3d 1478, 1481 (Fed.Cir.1994). When the government action at issue occurs pursuant to legislation, a resulting takings claim accrues on the date the legislative act took effect. See Fallini v, United States, 56 F.3d 1378, 1382-83 (1995), cert. denied, 116 S.Ct. 2496 (1996); Alliance of Descendants, 37 F.3d at 1482. A breach of contract claim accrues when the breach occurs. See Brighton Village Assocs., 52 F.3d at 1060.

In order to determine when plaintiffs' claims for back pay accrued, the Court must determine when each plaintiff was discharged or otherwise separated from active duty status. See Sanders, 34 Fed. Cl. at 80. The only evidence before the Court in this regard is the Administrative Record filed by the government. [FN2] The Court finds, based on the evidence currently before it, that Eleazar Andoque was discharged in August 1945, that Enrique Entines became separated from active duty status upon his death in March 1945, and that Renato Saarenas was discharged in September 1945. Plaintiffs did not dispute these findings in their briefs or during oral argument. Accordingly, plaintiffs' back pay claims all accrued during 1945, more than six years before they filed their complaint. As such, these claims are barred by the statute of limitations.

When the government takes private property pursuant to legislative directive, any resulting takings claims accrue when the legislation becomes effective. See Fallini, 56 F.3d at 1382-83. Assuming, arguendo, that plaintiffs did in fact have a private property interest in veteran benefits, and that such property was "taken" by the enactment of 38 U.S.C. 107(a), Fallini teaches that all takings claims based thereon accrued in 1946 when 107(a) became law. Again, plaintiffs filed their complaint decades after these claims accrued, many years after the statute of limitations expired. Plaintiffs' takings claims, therefore, also are untimely.

Finally, a breach of contract claim accrues when the breach occurs. See Brighton Village Assocs., 52 F.3d at 1060. The alleged contracts here called for the provision of military services by plaintiffs in

---Fed.Cl.----  
(Cite as: 1997 WL 780913, *4 (Fed.Cl.))

Page 4

exchange for the government's payment of the same wages and benefits enjoyed by American soldiers. For purposes of this motion only, the Court assumes the existence of these contracts. With respect to any wage deficiencies, the government's breach could not have occurred later than discharge or other separation from service, as such events would signify the conclusion of the government's obligation to pay wages. Furthermore, passage of 38 U.S.C. 107(a), legislation that prevented the government from providing veteran benefits to Filipino soldiers, could be sufficient to constitute a breach of the alleged contractual obligation to provide such benefits. Hence, plaintiffs' breach of contract claims all accrued more than six years before they filed their complaint. Such claims, therefore, are barred by the statute of limitations.

*5 Plaintiffs do not dispute that each of their claims first accrued long before they instituted this action. Instead, they argue that the facts of this case warrant tolling the six-year statute of limitations.

III. Tolling the Statute of Limitations

In limited circumstances, the running of the statute of limitations may be tolled. A plaintiff, in order to avail himself of this benefit, "must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date." Japanese War Notes Claimants Ass'n v. United States, 178 Ct. Cl. 630, 634 (1967); see Mitchell v. United States, 13 Cl.Ct. 474, 477 (1987) (stating that tolling is appropriate "only where the facts underlying a wrong have been deliberately concealed or where the facts are inherently unknowable at the time the injury first occurs" (citations omitted)). The statute will remain tolled until a plaintiff discovers, or reasonably should have discovered, that he might have a claim. See Japanese War Notes Claimants Ass'n, 178 Ct. Cl. at 634. This is an objective standard, and a plaintiff's ignorance of his claim is not, without more, sufficient to justify tolling the statute. See Jakoby v. United States, 38 Fed. Cl. 192, 195 (1997). Furthermore, " '[w]here the actions of the government are open and notorious, we have pointed out that plaintiff is on inquiry as to its possible injury. Once plaintiff is on inquiry that it has a potential claim, the statute of limitations begins to run.' " Id. (quoting Catellus Dev. Corp., 31 Fed. Cl. at 405). Finally, because tolling is a judicially created exception to the statute of limitations, the plaintiff bears the burden of clearly demonstrating that either the "government concealment" or "inherently unknowable" exception is applicable. See Catellus Dev. Corp., 31 Fed. Cl. at 407-08.

Plaintiffs argue that tolling their back pay claims is appropriate because the government intentionally chose not to inform them that the military's primary basic pay statute, the Selective Training and Service Act of 1940, ch. 720, 54 Stat. 885, was applicable to Filipino soldiers, and because there was a "conscious and deliberate" decision by the government to conceal its abandonment of a legislative solution to the wage disparity. With respect to their breach of contract claims, plaintiffs contend that they were "completely unaware" of terms in their contracts that entitled them to the same compensation American soldiers received, and so could not possibly have been aware of the government's breach thereof. As to their takings claims, plaintiffs note that the government recently processed a claim by one of them for disability benefits, and that the government did not protest the timeliness of that claim. This same delay, they argue, should not now defeat plaintiffs' takings claim. Furthermore, plaintiffs argue that although the constitutionality of 107(a) has been challenged in the past, such challenges were never brought under the Takings Clause. The absence of takings litigation, plaintiffs assert, demonstrates the unknowability of such claims.

*6 Additionally, plaintiffs maintain that conditions on the Philippine Islands during and immediately after World War II rendered all of their claims unknowable. Filipinos in this era faced invasion and occupation of their homeland, guerrilla warfare against the invaders, and, after the defeat of the Japanese, a period of intense rebuilding. All this took place while the nation was taking its first tentative steps toward political independence. Claims for back pay, breach of contract, and just compensation were simply too far removed to be considered by soldiers. Compounding the situation was the fact that the claims had to be asserted in a foreign legal system, in a nation located on the other side of the world. According to plaintiffs, it was simply unimaginable to the average Filipino soldier that he had a claim against the United States.

It is important to remember that tolling is not appropriate for claims that are simply burdensome or inconvenient to discover. Instead, a claim must be "inherently unknowable" before it is proper to toll the statute of limitations. Cases have elaborated on the distinction: "When a claim is inherently unknowable

---Fed.Cl.---  
(Cite as: 1997 WL 780913, *6 (Fed.Cl.))

Page 5

it does not mean that the claim is 'somewhat difficult to discover,' or is 'not entirely obvious.' That which is inherently unknowable is that which is unknowable by its very essence, i.e., its existence at the critical moment simply cannot be ascertained." Catellus Dev. Corp., 31 Fed. Cl. at 407. This court's predecessor, the Court of Claims, offered the poignant example of a defendant who delivers the wrong type of fruit tree to an unsuspecting plaintiff. In such a case, the statute of limitations for plaintiff's claim will be tolled until the tree bears fruit, that is, until plaintiff is capable of discovering his injury. See Japanese War Notes Claimants, 178 Ct. Cl. at 634.

The Court need look only to plaintiffs' briefs to conclude that tolling the statute of limitations is not appropriate here. To avoid dismissal, plaintiffs must demonstrate that the facts underlying their claims were inherently unknowable, or that the government deliberately concealed such facts, not simply at the time the claims accrued, but for the entire period beginning at accrual and extending until six years before plaintiffs filed their complaint. See Mitchell, 13 Cl.Ct. at 477. This they cannot do. Plaintiffs state in their complaint that "the disparity in pay between these Filipino soldiers and the rest of the members of the United States Armed Forces ... did not go unnoticed" by Filipino soldiers and that "[t]he introduction of the [wage equalization] legislation was given much publicity" in the Philippines. (Compl.¶ 33.) With regard to 107(a), plaintiffs note that several bills have been introduced in Congress that attempted to restore the benefits taken by 107(a), and cite cases initially decided in 1974 and 1989 that considered constitutional challenges to 107(a). See Quiban, 928 F.2d at 1155-56; Filipino Am. Veterans & Dependents Ass'n, 391 F.Supp. at 1315-16. It is difficult to square these admissions about the public nature of the facts underlying plaintiffs' claims with the requirements for tolling the statute of limitations. Even if plaintiffs were unaware of these facts, they were matters of public record, and certainly were not "inherently unknowable" as the courts have defined that term. Ignorance of a claim, alone, is not sufficient to toll the statute of limitations. See Jakoby, 38 Fed. Cl. at 195.

*7 Furthermore, plaintiffs have presented no evidence that the government effectively concealed the facts underlying their claims. The only related evidence plaintiffs offered was declassified government documents that indicate that the United States made a conscious decision to allow wage equalization legislation to die in Congress, rather than officially withdraw it, so as to minimize any adverse impact on America's image in the Philippines. This evidence does not, however, provide any support to plaintiffs' assertion that the government concealed the fact that it paid American soldiers more than it paid Filipino soldiers, or that the Act containing 107(a) had been passed into law. The public nature of these government actions was sufficient to put plaintiffs on inquiry as to their possible injury, which in turn permitted the statute of limitations to run. See Coastal Petroleum Co. v. United States, 228 Ct. Cl. 864, 866 (1981).

Even assuming, arguendo, that the facts underlying plaintiffs' claims were "inherently unknowable" when they initially accrued, or that the government concealed these facts from plaintiffs, the Court concludes that plaintiffs knew, or should have known, of their claims prior to November 1990, six years before they filed their complaint. The fact that other Filipino World War II veterans challenged 107(a) in the 1970s and 1980s, regardless of the theory of those claims, fatally undermines plaintiffs' contention that the facts underlying their takings claims were inherently unknowable or effectively concealed by the government until November 1990. See Quiban, 928 F.2d at 1155-56; Filipino Am. Veterans & Dependents Ass'n, 391 F.Supp. at 1315-16. The plaintiffs in these earlier cases were sufficiently aware of 107(a) and its impact on their rights to veteran benefits to bring suit against the United States. Their claims, and the facts upon which they were based, therefore, were neither inherently unknowable nor effectively concealed by the government. Due to the fact that the requirements for tolling the statute of limitations are objective, plaintiffs' takings claims in the present suit were also knowable when 107(a) was first challenged, long before November 1990. [FN3] The Court also notes that the wage disparity at issue in the present case was discussed in both of these earlier cases. See Quiban, 928 F.2d at 1157; Filipino Am. Veterans & Dependents Ass'n, 391 F.Supp. at 1317. This fact necessitates the conclusion that back pay and breach of contract claims were knowable by those plaintiffs, and hence knowable by plaintiffs here, when these earlier cases were litigated.

Plaintiffs also argue that because the government recently processed one of their disability claims without protesting its timeliness, their takings claims should be permitted to proceed. The critical flaw in this analysis is that it fails to recognize that 107(a) does not apply to disability claims, and that Filipino veterans are entitled to disability benefits. See 38

—Fed.Cl.—— Page 6
(Cite as: 1997 WL 780913, *7 (Fed.Cl.))

U.S.C. 107(a); supra note 1. The government, therefore, was obligated to process this claim as it would for any United States veteran, and doing so has no impact on the takings claims plaintiffs raise in the instant suit.

*8 Finally, the Court recognizes that instituting suit against the United States for back pay, breach of contract, and just compensation may have been difficult for veterans living in the Philippines immediately following World War II. Even if the Court concluded that the situation in the Philippines initially rendered plaintiffs' claims unknowable, which the Court expressly declines to do, conditions in the 1940s and 1950s do not explain why plaintiffs have waited until the 1990s to bring suit.

Tolling the statute of limitations is, in effect, an expansion of the government's waiver of sovereign immunity. This Court, therefore, is permitted to do so only after a plaintiff has clearly established that the requirements for tolling have been satisfied. See Catellus Dev. Corp., 31 Fed. Cl. at 407-08. Because plaintiffs here have not done so, the Court may not toll the statute of limitations in this case.

IV. The Continuing Claims Doctrine

Plaintiffs contend that the continuing claims doctrine is applicable to their takings claims. If this is true, the statute of limitations would not bar suit for benefits that would have been paid during the six years prior to institution of this action. The government dismisses the doctrine, relying primarily on recent authority in the Federal Circuit and Court of Federal Claims that appears to question the continuing vitality of the doctrine.

Under the continuing claims doctrine, "periodic pay claims accruing within the six years prior to suit are not barred, although the administrative failure or refusal to pay the amount claimed and the enactment of the statute giving rise to the claim were prior to the six-year span. Where payments are to be made periodically .... each failure to make a proper payment gives rise to a new cause of action." Russell v. United States, 161 Ct. Cl. 183, 186 (1963). In other words, the continuing claims doctrine typically applies where a law or regulation instructs the government to make periodic payments to someone, but the government fails to do so. See Brown Park Estates-Fairfield Dev. Co. v. United States, 127 F.3d 1449, 1457 (1997). Each failure to make a required payment gives rise to an independent cause of action, one with its own limitations period. The effect of the doctrine is that claims based on missed payments during the six years prior to the filing of the complaint will always be timely.

Plaintiffs takings claims are not "continuing claims," and so that doctrine is not applicable to this case. The continuing claims doctrine applies where a law or regulation instructs the government to make periodic payments to someone, but the government fails to do so. See Brown Park Estates- Fairfield Dev. Co., 127 F.3d at 1457; Friedman v. United States, 159 Ct. Cl. 1, 6-7 (1963). Here, no such law or regulation exists; indeed, it is the absence of such a law that has prompted plaintiffs' claims. Their takings claims are based upon the passage of 107(a), not the government's failure to make periodic payments that were required by law. At the moment 107(a) became effective, Filipino veterans lost any rights they may have had to benefits covered by 107(a). Any takings claims that resulted from the passage of 107(a) accrued in their entirety when the legislation became effective, that is, when all events had occurred that fixed the government's liability and entitled plaintiffs to institute an action. See Fallini, 56 F.3d at 1382-83; see also Brown Park Estates-Fairfield Dev. Co., 127 F.3d at 1456 (stating that the continuing claims doctrine applies only to claims that are "inherently susceptible to being broken down into a series of independent and distinct events or wrongs" and that "a claim based upon a single distinct event, which may have continued ill effects later on, is not a continuing claim"). Such claims could not be based on the government's failure to provide plaintiffs with the benefits at issue, because 107(a) relieved the government of any obligation to do so. Plaintiffs' claims, properly characterized, are for just compensation for private property [FN4] allegedly taken by the passage of § 107(a), not by a failure to make payments required by law. [FN5]

CONCLUSION

*9 For the foregoing reasons, the Court concludes that each of plaintiffs' claims accrued more than six years before they filed their complaint, that plaintiffs have not demonstrated that tolling the statute of limitations is appropriate, and that the continuing claims doctrine is not applicable to the claims at issue. Plaintiffs' claims, therefore, are barred by the six-year statute of limitations applicable to suits before this Court. Accordingly, defendant's motion to dismiss is granted. The Clerk will dismiss the complaint.

The Court notes that its decision to dismiss plaintiffs' claims does not prevent them, or other Filipino World War II veterans, from seeking relief in the legislative branch of government.

>   FN1. The excepted service-related benefits include: (1) National Life Insurance benefits under pre-1946 contracts; (2) benefits paid to prisoners of war or persons missing in action; and (3) non-Social Security Act death or disability and burial benefits. See 38 U.S.C. 107(a).

>   FN2. Plaintiffs did not oppose the government's motion for leave to file the Administrative Record, and have not disputed the government's averments as to when the servicemen at issue were discharged or became separated from active duty status.

>   FN3. Plaintiffs argue that the absence of takings litigation based upon 107(a) supports the conclusion that such claims were inherently unknowable. A total absence of suits based upon 107(a) would be, at best, consistent with the conclusion that such claims were unknowable. However, the existence of any challenges to 107(a), even nontakings challenges, negates the argument that their takings claims were unknowable.

>   FN4. The "private property" that plaintiffs claim was taken is an entitlement to veteran benefits.

>   FN5. Because the claims at issue are not continuing claims, the Court does not address the government's contention that the continuing claims doctrine is no longer viable in this court.

END OF DOCUMENT

Copr. © West 1997 No Claim to Orig. U.S. Govt. Works