IN THE UNITED STATES FEDERAL CLAIMS COURT



Rev. Fr. PRISCO E. ENITNES, an individual, )
419 N. Mountain View Ave. #207     )
Los Angeles, California 90026      )
Tel. (213) 675-9092 / (323) 527-2071  )
Email: Frentines@hotmail.com      )
                                )
          Plaintiff      )
                                )
    V.                        )
                                )
THE UNITED STATES OF AMERICA,   )
                                )
          Defendant.     )

No. **06-193 C**

FILED MAR 1 0 2006

CIVIL ACTION COMPLAINT

TRIAL BY JURY DEMANDED

## COMPLAINT

Plaintiff Filipino Rev. Fr. PRISCO ESPERANZATE ENTINES, for his complaint

against Defendant United States of America, states as follows:

### JURISDICTION

1. *Jurisdiction is conferred upon this Court pursuant to 28 USC §1491.*

### THE PARTIES

2. Plaintiff is the seventh (7th) Child-Orphan of a **_U.S. National_-reduced Pilipino-**

**Veteran-Casualty** as World War II Conscriptee and a former member of the 1901 organized

*Philippine Constabulary (hereinafter "PC"). Plaintiff was a member of a Class Action suit No.*

*96-74OC (16 Dec. 1996) **erroneously** decided without the most crucial and decisive brief on*

*both the incontrovertible Selective Training and Service Act of September 17, 1940 and the*

Soldiers' and Sailors' Civil Relief Act (October 16, 1940), respectively. For they bear the

"deliberately- concealed" facts and issues that rationalized the cover up of the "grandiose fraud" and the "inherent unknowability" fully known or should have been known by both Congress and all the concerned government agencies, whereby, technically the "Statute of Limitations" made as basis of the capriciously biased dismissal-decision should have been tolled. More details will be presented at trial that must very strictly discover and scrutinize hard facts and issues with the assistance of an honest and competent lawyer, since the Plaintiff herein appears, *in pro per.*

3.  Defendant is the United States of America.

## FACTS OF THE CASE

4.  Pursuant to the Treaty of Paris, 30 Stat. 1754, 1759, dated December 10, 1898 Spain ceded the Philippines to the United States of America, for $20,000,000.00. It is pointed out and must be very importantly noted that when the Treaty took effect on 11 April 1899 and the Philippines was acquired by the United States as a colonial possession, by virtue of 31 Statute, 1881, Treaty Series 344, U.S. National status was imposed on Native-Filipinos. (See, also, Section 204, October 14, 1940 Act (54 Stat. 1168; U.S.C. Title 8) and 7 Foreign Affairs Manual 1146 - 49 (7 FAM 1146-49) of the State Department of the United States).

5.  On July 1902 a law was passed by Congress intentionally providing that Section 1891 of the 1874 Revised Statutes would not apply to the Philippines. That is the U.S. Constitution and U.S. laws would not apply to the Philippines, in a very particular, singular and unique way. Short of saying that the Native-Filipinos ONLY were singled out to be racially disqualified from the protection of the U.S. Constitution and the laws of the United States that should have applied as mandated by the mentioned Section 1891 of 1874 Revised Statutes. Thus the justified and judicially created U.S. National-non-Citizen status was imposed instead of Mass Naturalization that was done in almost all newly-acquired U.S. Territories like Alaska, Florida,

Mexico, Virgin Islands, New Orleans, Hawaii and Puerto Rico. To mention a few. Ironically and an appalling inconsistency, if not as inherent racial exclusion bias, by the same July 1902 Act the dual status of "Philippine" or "State" Citizenship was, also, imposed on all Filipinos. One and ONLY purpose – to racially disqualify them from Naturalized and Native-born U.S. Citizenship under the "English" Common law doctrine. And this was re-enacted twice in 1912 and 1916.

6. In June 29, 1906 Act in its Seventh subdivision of Section 4, the U. S. Naturalization right was conferred on the Natives. But this was not known. And very sarcastically, when "In Re Ayson et al." (D.C., N. D. Illinois (1936) 14 F. Supp. 488) the Pilipino U.S. Navy by the name of Baldomero Britanico Ayson filed his application for U.S. Citizenship, where it was made very clear that despite the 1906 Act, the ONE and ONLY way a Pilipino who by race is ineligible to U.S. Naturalized Citizenship – being a Non-white and not of African descent - was by Military Service. Although this was already provided for in Section 72.2 (k) of the same Act as the extension of the 1873 age-old federal policy of rewarding Aliens with Naturalized U.S. Citizenship if they serve in the U.S. Armed Forces even in time of peace.

7. On February 5, 1917 a law was passed (P. L. 301 (H.R. 10384) that clearly defined the meaning of the "United States" as " the United States, and any waters, territory, or other place subject to the jurisdiction thereof"... . (Op. Cit.). Specifically and among other things it defined what an "Alien" was lucidly qualifying Filipinos as NOT aliens with the specific provision that the law fully applied to the Philippines.

8. As a legal effect of the above-cited law, in 1918 United States Congress granted U.S. Citizenship to Puerto Ricans, who, were similarly imposed upon with U.S. Nationality status, like the Filipinos. It is, then, very important to point out that Filipinos ONLY were intentionally and racially excluded from U.S. Citizenship that was granted to other Natives of all Territories

-3-

acquired by the United States of America either from Russia, like Alaska; New Orleans from France; Virgin Islands from Denmark the Spanish colonies, like Puerto Rico, Guam. Cuba, Panama and Hawaii, to name a few.

9.  By virtue of the 1918 Selective Training and Service Act as amended, all 21 year old male – U.S. Citizens and even Alien Immigrants, were under compulsion to undergo Military Training. Refusal would be meted out with perpetual disqualification from public office for Native-born U.S. Citizens; probable denaturalization and deportation even of Naturalized U.S. Citizens; and disqualification from Naturalized U.S. Citizenship and deportation for Immigrants. On this legal compulsion at the age of 18 one is obliged to register. Then at age 21 a basic or cadre training with $21.00 monthly pay for the first four (4) months and $30.00 for the succeeding months. Then the reserved status and probable reserve officers training for those qualified.

10.  On January 26, 1918 a law was approved by U.S. Congress 65th Session – P. L. 97 (H.R. 7697) Chapter 11, Page 432 – providing among other things the authority to call "into the service of the United States the militia and other locally created forces in the Philippine Islands … providing further "that the pay ad allowances of officers and men of the Philippine Militia and other locally created armed forces in the Philippine Islands called into the service of the United States under the provision of this Act, when serving in the Philippine Islands shall in no way exceed the pay and allowances for corresponding grades of the Philippine Scouts. It is, hereby, noted and submitted that the Philippine Scouts pay from 1901period till October 1944 was $9.00 for a Private (Pvt.) till October 1944 when it was raised to $50.00. However, this was reduced to $25.00 for those who did not pass the screening or disqualifying test given by the U.S. Army. And those who were in the retirement age of more than 20 or 30 years were retired at that rate.

While those who passed enjoyed the higher pay and were retired on a higher rate. It is worth to note that sometime in 1987 no less than the former Congressman and President Clinton's Chief of Staff – the Honorable Leon Panetta – successfully filed a bill that obliged a research on the unequal pay and retirement benefits of the Old Philippine Scouts, who, were touted as regular members of the U.S. Army and are receiving full and equal Pay and Benefits like any regular Anglo-American soldier and/or War-Veteran. The survey-study revealed the great difference in pay and retirement benefits. A "sub-peona duces tecum", an honest, warranted and wider probe for the proper revelation of massive pay disparities, if not flagrant fraud in the Military Base Pay, Allowances, Retirement VA and Social Security benefits, definitely would eliminate the "Statute of Limitations" for a valid rationalization of any "Motion for Dismissal" that by a seeming judicial strategy was resorted to by both the Federal Claims Court and the Federal Circuit Court of Appeals illegally advising on the legislative action as proper, remedial solution.

11.   Because of the mentioned compulsory 1918 Military draft, Plaintiff's father – Private Enrique Hapa Entines (hereinafter "Enrique") reported for active cadre training on 17 July 1927 with the Europe-patterned and 1901 U.S. organized Insular Force known as Philippine Constabulary (hereinafter "PC"). As was already noted but here repeated as fraud-evidence that Pvt. Enrique, instead of the first four (4) months authorized Base Pay of $21.00 per month, his pay, being a Filipino, was $7.00 ONLY with a differential of $14.00. His fifth (5th) month authorized pay and in the succeeding months of $30.00 was still $7.00. Instead of $30.00 with differential of $23.00 monthly pay that dates back to November 1927 till his War-Conscripted death in line of active duty on 25 march 1945. Worst of all he was never informed of his right to Naturalization under both the June 29, 1906, the 1918 and 1940 Acts, respectively. Additionally, he was not informed of the Pension given, also, to Aliens who serve at lease three

(3) years in the U.S. Military even during time of peace as mentioned. So he should have been a VA pensioner with, at least, $30.00 per month for life from 1930 when he was honorably discharged from the Philippine Constabulary after a short sting with the alleged Muslim pacification campaign in Mindanao. Not to mention of the same pension that should have been enjoyed by his parents being still single and his parents as his dependents. And when he got married his wife and children should have enjoyed family subsistence allowance depending on the number of children-dependents as additional beneficiaries other than the late Veteran's Parents. This does not include his longevity pay and allowances. It can also be added to this the incentive pay due to his re-enlistment and integration into the Philippine Commonwealth Army still as a PC; his War-Conscripted Federal service both in the USAFFE from 26 July 1941 and his Guerrilla service with the liberation force from November 1944 till his War-service-connected death on March 25, 1945.

12.   On March 1934 the Philippines by Act of Congress known as "Tydings-McDuffie law elevated the Philippine-U.S. colonial and political status to a Commonwealth of the United States of America till July 4, 1946. Very inconsistently, if not egregiously, however, its specific Section 8, racially and with extreme discrimination, if not inherent nativism, divested all Filipinos of their U.S. Nationality status imposed since 11 April 1899 and made them ALIENS for purposes of Immigration. And extremely degrading and tyrannical is that they were ordered to emigrate and subjected to deportation under Sections 30.1 – 30.14 of Chapter 8. However the landmark 1937 Cincinnati Soap Co. v. U. S. saved them from deportation and instead granted them "Parity" rights in the indirect repeal of the mentioned 1934 Section 8 with SECTION 2(d) of August 7, 1939 Act. But all these remained deliberately concealed that rationalized the Section 204 U.S. National re-imposed status yet still with only a NATURALIZATION right to

-6-

U.S. Citizenship per SECTION 303 of October 14, 1940 Act. Even as U.S. Nationals and World War ll-conscripted with Articles of War #58 – Death Penalty. Hence, the grandiose FRAUD that must pass through a very strict, judicial and constitutional scrutiny as a very crucial, second (2nd) element (to the first (Ist) element of deliberate concealment of facts) that should have tolled the mentioned "Statute of Limitations" that rationalized with bias and deliberate intent the wrongful dismissal of the case. Not to mention of the third (3rd) important element of "inherent unknowability" since up to this time all U.S. National-reduced Filipinos, especially the War-Conscripted soldiers under penalty of death,  are misled to believe that they have no constitutional right to Native-born U.S. Citizenship despite the U.S. National status from 11 April 1899. Hence, the "sine qua non" on the judicial discovery on the issues of the enumerated elements of concealed facts, the grandiose fraud and inherent unknowability elements would demand is as very fundamental and substantive due process with the needed jury trial for every contentious fact and issue, that more likely should warrant it.

13.  July 26, 1941, then, when the President of the United States, Franklin Delano Roosevelt, issued Executive Order 6 Fed. Reg. 3825 (hereinafter "President Roosevelt's 1941 Executive Order"), which called into the FEDERAL service of the United States Armed Forces, all military forces of the commonwealth government of the Philippines. On December 7, 1941, the Japanese attacked Pearl Harbor; forcing the United States to declare War with Japan, putting under the "#58 Articles of War's Death Penalty - all enlisted and 21 year old U.S. National-Filipinos. Upon induction and taking the "Oath of Allegiance" to the U.S. flag under the USAFFE, all U.S. National-Filipinos, conscripted to World War II (hereinafter WW2) became technically, INSTANT or "Nunc pro Tunc" American Citizens. More than Child of Alien Parents born in Puerto Rico, who, granted  "automatic" Native-born U.S. Citizenship per Section

322 of the same October 14, 1940 Act. It is importantly noted as inconsistent that a U.S.

National-Filipino conscripted to World War ll would only be Naturalized per Section 303 of the

very same October 14, 1940 Act.

14. Sometime in August 1941 in accord with President Roosevelt's 1941 Executive

Order, the United States commenced to integrate the Insular Philippine military into its armed

forces in increments. Accordingly, after the Pearl Harbor bombing, when the United States,

officially, declared War with Japan, under the Articles of War #58's "Death Penalty" all

members of the Philippine military not in service were conscripted to War Federal Active duty

into the United States Armed Forces in the Far East (USAFFE) supra by virtue of the publication

of USAFFE GO 46, a copy of which is by reference incorporated herein and attached hereto as

"Annex A." Upon their induction into the USAFFE, the members of the Philippine military,

especially, the Philippine Constabulary automatically and mandatorily – became members of the

United States FEDERAL Armed Forces as War-conscripted U.S. Nationals.

15. During World War II, soldiers generally were subject to certain liabilities,

obligations and benefits including the Articles of War, foremost of which were the 58th and 61st

articles governing Desertion and Absence without Leave–the former being punishable by death;

and pay and allowances. At the time, the authorized pay and allowances due enlisted men

serving in the United States Armed Forces were defined in P. L. 76-783, 54 Stat. 885 (1940), as

amended by an Act of December 20, 1941, 55 Stat. 844, then, known as the Selective Training

and Service Act of 1940. No provision seems to exist which allow different pay scales for

soldiers depending on their race, color or creed. Rather, any difference in wage and allowance

was based on one factor: rank. never the place of service. Nor RACE or NATIONAL ORIGIN.

16. On October 18, 1944, then "de facto" Philippine Commonwealth President Sergio

Osmena, advised wrongly, if not maliciously, issued the Executive Orders Nos. 21 and 22. The former declared recognized guerilla units to be in the active service of the Philippine Army, as if it were an "Allied Army" and the latter raised the pay scale of the Philippine Army, including members of such duly recognized guerilla units, to a level that was equal to and on par with the other members of the United States military. *Said orders were published in Headquarters, United States Armed Forces in the Far East Circular No. 100 on November 17, 1944. Copies of the same are by reference herein incorporated and attached hereto as "Annex B."* There has been no indication by either the Philippine or United States governments that the aforementioned Executive Orders were anything other than valid regulations of an executive department which not only gave duly recognized resistance units official status in the Philippine army, but also mandated the raise and eventual equalization of the pay of all members thereof.

17. Additionally, the Secretary of War authorized percentage increases in Philippine Army pay that was proportionate to that received by other personnel in the United States Armed Forces during the war. (See *supra* OCMH Study, at 40.)

18. Furthermore, 38 U.S.C. §101(2) conferred to any and all persons who render(ed) *active military service for a minimum period of time and who were honorably discharged from the armed forces*, an array of comprehensive veterans benefits including , but not limited to, educational benefits under the 1944 GI Bill of Rights. *Entitlement to those benefits has but ONE legal criterion ONLY – "Active" service with ONE (1) day ONLY service in War.* And the law has recognized active military service during World War II as such. There has been no indication by the United States government that the aforementioned provision did not apply to members of the USAFFE such as Plaintiff's father – Enrique Hapa Entines, (hereinafter "Enrique") due to their Philippine descent. Especially that on July 17, 1927 he was originally

drafted into the 1901 U.S. organized Philippine Constabulary (PC) that co-existed with the Old

Philippine Scouts (hereinafter "OPS")

19. Plaintiff's father Enrique, as previously mentioned supra, was born in Gubat,

Sorsogon, Philippines, United States of America (hereinafter "U.S.A.") on July 17, 1905, during

which date and period that the Philippines were a United States Colony. As was said supra, on

July 14, 1927 in Sorsogon, Philippines, U. S. A., he was drafted into the (PC), As Constable

Private, he was assigned to Kingking, Davao, Mindanao, U.S.A. with the 88th PC Company

under a certain Alfonso Torillo, as his Commanding Officer. That was the time of U. S. A. 's

Muslim pacification campaign. The PC played a very significant role in this campaign. And this

can be fully documented. Before his honorable discharge on 13th of July 1930, he was operated

of appendicitis while on active duty. Upon his 1930 discharge he was assigned to Reserve active

till November 1935 when he was re-activated and integrated into the Philippine Commonwealth

Army (hereinafter "PCA") the insular militia of the United States in the Philippines as a

Commonwealth of U.S.A. From July 1927 till 25 March 1945 would constitute Eighteen (18)

years of Military service with a World War II Conscripted Federal service from 26 July 1941 till

his death on same 25 March 1945. And within this period of service he should have been, at the

very least, a Naturalized U.S. Citizen per 1863 age-old law, (if he were an Alien and not a U.S.

National) that was constitutionally guaranteed by SECTION 303 of October 14, 1940 Act as an

unforfeitable substantive, fundamental and constitutional right. It must be pointed out very

clearly that he was not properly promoted to just a mere Private First Class for a span of 18 years

of service with the Muslim War service in 1927 to 1930 and World War II conscripted Federal

service as a U.S. National. More appalling and racially-degrading

19.  Sometime in August 1941 in accord with President Roosevelt's 1941 Executive Order, the United States commenced to integrate the Insular Philippine military into its armed forces in increments.  Accordingly, after the Pearl Harbor bombing,  when the United States, officially, declared War with Japan, under the Articles of War #58's "Death Penalty" all members of the Philippine military not in service were conscripted to War Federal Active duty into the United States Armed Forces in the Far East (USAFFE) supra by virtue of the publication of USAFFE GO 46, a copy of which is by reference incorporated herein and attached hereto as "Annex A." Upon their induction into the USAFFE, the members of the Philippine military, especially, the Philippine Constabulary automatically and mandatorily – became members of the United States FEDERAL Armed Forces as War-conscripted U.S. Nationals.

20.  During World War II, soldiers generally were subject to certain liabilities, obligations and benefits including the Articles of War, foremost of which were the 58th and 61st articles governing Desertion and Absence without Leave–the former being punishable by death; and pay and allowances.  At the time, the authorized pay and allowances due enlisted men serving in the United States Armed Forces were defined in P. L. 76-783, 54 Stat. 885 (1940), as amended by an Act of December 20, 1941, 55 Stat. 844, then,  known as the Selective Training and Service Act of 1940.  No provision seems to exist which allow different pay scales for soldiers depending on their race, color or creed.  Rather, any difference in wage and allowance was based on one factor:  rank. See Section 4 (1) of said 17 September 1940 Act..

21.  On October 18, 1944, then "de facto" Philippine Commonwealth President Sergio Osmena, advised wrongly, if not maliciously, issued the Executive Orders Nos. 21 and 22.  The former declared recognized guerilla units to be in the active service of the Philippine Army, as if it were an "Allied Army" and the latter raised the pay scale of the Philippine Army, including

-11-

Despite his initial compulsory draft in 1927 and later his World War II Federal War service

conscription under "death penalty" per Articles of War #58 supra into the United States Armed

Forces in the Far East (USAFFE supra), Plaintiff's War-Hero father – Enrique - however, was

illegally and unjustly paid $7.00 00 in October 1944 when the Base Pay was raised to $50.00 as a

Private. A rate equivalent to twenty-three (23%) percent of what was earned by other personnel

serving in the United States Armed Forces, including but not limited to the 116,000 Aliens from

the 66 Allied countries, who, volunteered (not conscripted) in the U.S. WW2 Forces in Europe .

See Office for the Center of Military History, the Status of Members of Philippine Military

Forces During World War II (June 1973), Page 33 (an unpublished manuscript prepared for the

government's use in FAVADA v. United States, 391 F. Supp. 1314 (1974) Table II at 33,

hereinafter "OCMH Study" and the September 19, 1966 Congressional Records, pages 22205 –

22213). Not to mention of his family subsistence allowance and other allowances that were never

known and given.

    23.  Plaintiff's father - Enrique, who served as a soldier of the United States Armed

Forces in both the 1901 established PC and as a Conscripted U.S. National-Filipino in World

War II in the manner described previously, is entitled to back pay in an amount represented by

the difference in the pay he actually received and that pay which he should have received as a

member of the United States military, as mandated by the primary basic pay statute then in force.

## **COUNT II**

    24.  Plaintiff re-alleges and incorporates herein by this reference, Paragraphs 1 through

25, inclusive of its Complaint as if fully set forth herein.

25.    Also as a direct result of those Executive Orders Nos. 21 and 22 as described in Paragraph 8 herein-above, members of guerilla units which were duly recognized by the United States were entitled to pay equal to that received by other members of the United State military.

26.    During World War II, Plaintiff's father – Enrique, in fact, initially served as a PC member of the USAFEE and later in one such recognized guerilla unit during the entire period of War till his death in line of service on March 25, 1945, while the Philippines was a U.S. Commonwealth and under the full, military and emergency War powers of the U.S. President till its Independence on July 4, 1946.

27.    Accordingly, Plaintiff's father – Enrique - is entitled to back pay amounting to the difference between the actual pay and allowances he actually received, and the pay and allowances for his different ranks, equal to that received by members of the United States Armed Forces who were not of Philippine descent.

## COUNT III

28.    Plaintiff Prisco re-alleges and incorporates herein by this reference, Paragraphs 1 through 29, inclusive of its Complaint as if fully set forth herein.

29.    As a direct result of that authorization by the Secretary of War serving during World War II to pay percentage increases in Philippine Army pay that was proportionate to that received by other members of the United States Armed Forces during that time, Plaintiff's father – Enrique - being a member of the Philippine Constabulary-Army, USAFFE and Recognized Guerrilla during that period, was entitled to such percentage increases since 1927.

30.    Plaintiff's father – Enrique - was not paid any percentage increases during the War till his war-conscripted death on March 25, 1945 supra and without any promotion.

31.  Accordingly, Plaintiff's father – Enrique - is entitled to back pay representing the full equivalent of proportionate percentage increases since July 1927 till his death on 25 March 1945.

## COUNT IV

32.  Plaintiff Prisco re-alleges and incorporates herein by this reference, Paragraphs 1 through 33, inclusive of its Complaint as if fully set forth herein.

33.  As a direct result of the laws and policy concerning veterans' comprehensive benefits (see Paragraph 12 herein-above), Plaintiff's father – Enrique - being a U.S. National, conscripted PC, USAFFE soldier and a recognized Philippine Guerilla during the entire World War II, till his Service-connected death on 25 March 1945, (he) was then and remained entitled to those benefits available to any and all persons who rendered active military service during that period.

34.  Further, anyone who becomes a member of the United States Armed Forces, since 1873, even during "Peace time" has more than a unilateral expectation of veterans benefits – he or she has a legitimate claim of entitlement to them.  It follows that entitlement to government benefits arising from law or contract is property interest in the nature of private property, the taking of which for public use without just compensation is forbidden by the Takings Clause of the Fifth Amendment and also the 14th Amendment "Equal Protection" clause of the United States Constitution.

35.  On February 18, 1946, Congress, surreptitiously, inserted a rider-provision on a legislation passed as the First Supplement Surplus Appropriations Rescission Act, P. L. 79-301, 60 Stat. 14, which provided that "...service...in the organized military forces of the...Commonwealth of the Philippines while such forces were in the service of the Armed

Forces of the United States...shall not be deemed to have been active military, naval or air service for purposes of any law...conferring rights, privileges or benefits..." (Emphasis added). This rider is now codified in 38 U.S.C. §107, (a) and (b) which, likewise, provides for allowable compensation at a rate of $0.50 for each dollar. Yet, the same military service performed in the *Philippine Army while it was still part of the United States Armed Forces, is now considered to* be an honorable service in active-duty status in the military, air or naval forces of the United States for purposes of naturalization, Title 38 U.S.C. §1440, as amended by Section 405 of the Immigration Act of 1990, if they were Aliens NOT conscripted U.S. NATIONALS.

36.    The effect of this 1946 legislation was to deprive Plaintiff's father – Enrique - and all other Conscripted U.S. National-Filipino soldier-Veterans of the United States Armed Forces in the World War II, as well as all their dependents and survivors, of all veterans' benefits – save for certain "service-connected" deaths and disabilities. But still if the circumstances are right. It was as if the statement being made was that although Filipino solders were fit enough to be called into service and fight "under the American flag", they did not deserve to enjoy the same veterans' benefits as the American soldiers with whom they fought and shared a battlefield – side *by side and under one command – where all equally risked limbs, blood and lives. As mentioned* before there were 116,00 Non-American veterans from some sixty-six other nationalities who, volunteered service in the United States Armed Forces during World War II, all of whom enjoy full and equal veterans' benefits. And their checks are regularly sent them by VA anywhere they may be in the world. Only these U.S. National and Conscripted Filipino soldiers and veterans are defrauded of the same benefits. Ironically and sadly to enjoy whatever benefits due them, they, first, have to actually die or get maimed, and even then benefits are available only when the circumstances are again right. Plaintiff's father – Enrique, his widow and 7 children were

-15-

deprived of private property – in the form of their legitimate entitlements to Death Indemnity

Compensation, Educational and other veterans' benefits – for public use without just

compensation.

37.  Accordingly, Plaintiff's father – Enrique - is entitled to just compensation as

*mandated by the Takings Clause of the Fifth Amendment and the 14*[th] *Amendment "Equal*

*Protection clause"* of the United States Constitution, and as described in this

Count IV.

38.  More specifically, sometime in March 1947, still within the regulatory period for

filing claims, Plaintiff's mother – Cristeta Esperanzate Entines, as the legal widow of the late

Veteran, filed a Service-Connected Claim with the U.S. Veterans Administration in Manila,

Philippines. Very sadly and traumatically it was unduly delayed and granted without the accrued

arrears. Unilaterally and arbitrarily without any substantive due process, her DIC as a widow of

$112.00 ONLY. Her seven (7) children's DIC was $17.50 Only instead of

*$35.00. The Educational VA benefit was also $17.50, instead of $35.00 that was later raised to*

*$75.00.* Aggravating the enslaving policy, the college fees of more than seven (7) years of the

*plaintiff was denied with the alleged reason that the school is not VA-approved. It is submitted*

that the school institution predated the Philippine Independence not to be duly recognized. Or is

it a mere racially-biased and arbitrary policy. Besides, it is submitted that the vulgar desecration

of the 5th, 9th, 10th, and 14th Amendments of the U.S. Constitution and the "Ex Post Facto"

element of the cited Section 107, 38 U.S.C. supra. (See Carmel v. Texas 98-7540, May 1, 2000)

render the infamously-treacherous rider-provision, at its face, extremely illegal, unjust, if not

criminal, thus, patently UNCONSTITUTIONAL. See 16 American Jurisprudence, 2nd Edition,

Section 177 and 16A C.J.S. 320, respectively, for judicial guidance for the honest and competent

-16-

decision. It is made of official record and notice that the deliberate delay of the VA benefits claimed caused the late Veteran's widow to get married for the protective security and support of his war-orphaned family and VA unjust and illegal stoppage and forfeiture of her VA DIC benefits, being unilaterally arbitrary and grossly violative of the 5th and 14th Amendments without the needed substantive "due process" and the needed legal counsel assistance constitute a violation of Sections 241 and 242 of 42 U.S.C. Chapter 13, Part I. Hence, another demand for judicial strict scrutiny on grave and blatant abuse of authority by the VA employees on Claims filed by U.S. National-War-Conscripted Filipinos, technically INSTANT American War-Hero Veterans. Not to mention of the anomalous and erroneous determination of the Board of Veterans Appeals for the denial of accrued benefits and the non-payment of National Life Insurance of $5,000.00 since 1945 to this day.

39.  Plaintiff Prisco was forced to resign from his priestly assignment since July 1985 to pursue the claims for full and equal VA Benefits based on the Instant U.S. Citizenship of his U.S. National-reduced father due to inherent and rabid Racism that is the One and ONLY reason for their late Veteran-father's unequal pay and full and equal VA Benefits' degrading reduction/deprivation.

## COUNT V

40.  Plaintiff Prisco re-alleges and incorporates herein by this reference, Paragraphs 1 through 41, inclusive of its Complaint as if fully set forth herein.

41.  In a message dated February 22, 1942, General MacArthur duly recommended equalization of Philippine Army pay scales to the United States army, Radio RN-e, MacArthur to War Department, OPD WD File, OPD 240 (3-25-42), National Archives, copy thereof is likewise hereto attached as Annex "C." A similar recommendation is contained in a subsequent

-17-

message, Radio No. 453, MacArthur to AGO WD, March 9, 1942, OPD WD File 240, copy thereof is likewise attached as "Annex E." This resulted in an untitled memorandum from then Army Chief of Staff General Marshall dated March 10, 1942, referring to the latter message, to then President Roosevelt adopting the recommendations, copy of said memorandum is likewise attached as "Annex E." *Records show that the then Commander-in-Chief of the United States Armed Forces approved the same on March 11, 1942. As a result, the War Department sponsored legislation introduced as S.2387 equalizing the pay of these soldiers to that of all the rest in the United States Army (and Navy) which passed the Senate on March 30, 1942, and reported out favorably by the House Military Affairs Committee on May 7, 1942.* The introduction of this legislation was given much publicity, and Filipino soldiers of the United States Armed Forces took great heart and strength from such news that in the face of almost impossible odds, they were able to accomplish their mission for that war. From all these agency actions and conduct can be inferred the intent of Defendant United States of America to pay these soldiers at a rate equal to that of the other members of the United States Armed Forces who are not of Philippine descent.

42. *However, in the weeks following the loss of a great many lives in the falls of Bataan and Corregidor,* Defendant United States of America breached this contract when it determined, in a government memorandum dated July 30, 1942, that there was no longer a "...need...from a strategic or economic consideration...to equalize the pay and allowances of...the Philippine Army with that of the Army of the United States...," making a recommendation to Congress that the equalization of pay bill was not necessary anymore. A copy of the referred to government memorandum is by reference incorporated herein and attached hereto as "Annex F," No official act occurred, and government documents dated August 8, 1942, copies of which are by reference

herein incorporated and attached hereto as "Annex G," refer to a decision against any formal withdrawal of the bill because although request for such legislation was "...made at a time when the Philippine Army was in actual combat and this Army has since been destroyed, the bill was so thoroughly publicized that to withdraw it now would be blow to Philippine anticipations. *Enemy propaganda agencies would charge breach of faith after usefulness of Filipino troops have been utilized to destruction.*" The same official records elaborate further by explaining that "...*it dare not be withdrawn without a severe blow to all the hopes of the Filipinos to be regarded in equality with the white race.*" Thus, no further action was taken on the said bill which was simply left to die a natural death. These declassified government files show that as early as mid-1942–after Bataan and Corregidor had fallen and the Filipino component of the America armed forces had been rendered useless in the eyes of the military commanders because it was practically decimated–it was decided that Defendant United States of America would never given them their due. Yet, the Filipinos were never informed of this decision, and the bill merely lapsed into oblivion.

43. Defendant United States of America has failed to honor the terms of this contract, in fact, blatantly breached the terms thereof by continuing to deny these soldiers the prevailing wages of members of the United States Armed Forces mandated then by the primary basic pay statute as well as depriving them and their dependents/survivors of the veteran's benefits they should be entitled to.

44. As for the veteran's benefits that are due Plaintiff's father and his family, the defendant herein, in passing above-cited legislation now codified as Title 8 U.S.C. §107, unilaterally changed the term of this contract so flagrantly that it became an act of the nature prohibited by the non-impairment of contrasts clause in Article I, Section 10 of the United States

-19-

Constitution, made applicable to the federal government under the due process clause of the Fifth Amendment thereto. In the more than half a century that has gone past since the end of World War II, a number of bills intended to restore benefits denied to members of the Philippine military inducted into the United Sates Armed Forces have been sporadically introduced in the United States Congress, but none has ever borne fruit. Continued legislative inaction on the matter can be expected. It is submitted that legislation for such restoration of benefits is not necessary. The constitutional infirmity is fatal, rendering the denial by said statute of veterans' benefits to these Filipino soldiers without any force and effect.

45. The original terms of this contract should be enforced against Defendant United States of America so that Plaintiff's father - Enrique - being a soldier and veteran of the United States Armed Forces, who, along with his family, get their due and are paid full pay, allowances and benefits in accordance with the existing terms then applicable to all the other soldiers and veterans of the United States Armed Forces and their families.

<u>COUNT VI</u>

46. Plaintiff Prisco re-alleges and incorporates herein by this reference, Paragraphs 1 through 47, inclusive of its Complaint as if fully set forth herein.

47. That, as discussed in Paragraph 10 herein-above , the Philippine Islands were a United States possession from December 10, 1898 to July 4, 1946.

48. That, accordingly, any person born in the Philippine Islands between April 11, 1899 and July 4, 1946, and while those islands were United States possessions, should be deemed a United States Citizen by birth, pursuant to Section 107-38 of the U.S. Code of Federal Policy.

49. That Plaintiff's father – Enrique – was, many times,  <u>defrauded</u>, <u>first</u> of <u>Native-Born citizenship by virtue of his birth in the Philippines as a U.S. Colony.</u> <u>Definitely more than</u>

JACINTO A. SABANGAN, JR. et als v. COLIN POWELL (See July 2004 9th Circuit Court of Appeals decision – No. 03-16426, D.C. No. CV – 02-00039) and the October 14, 1940 Act's Section 322 Child born in Puerto Rico, of Alien Parents, who, the latter is granted Instant or "automatic" Native-born U.S. Citizenship. Second and, ironically, even of his 7th subdivision, Section 4, June 29 1906, previously mentioned, supposedly in 1930, in 1934, and in 1941 with the final chance on 9 November 1944 when inducted to the Masbate Guerrilla liberation force by virtue of Section 303, October 14, 1940 Act that guaranteed his unforfeitable Naturalized U.S. Citizenship right even if he were an Alien. But more so that he was a U.S. National –technically - an Instant American-World War II Hero Veteran, if not for inherent racism that has been perpetuated with heartlessness.

50. That Plaintiff Prisco, got a response from the Immigration Commissioner thru Congresswoman Norton of Washington, D.C. about his inquiry on his father's Native-born or "Posthumous" Citizenship. Supplemental "Annex A". Despite that he was misled to be Naturalized and sworn in alone by no less than the I.N.S. Director at Virginia. Later he filed for a Replacement of the N-400 Naturalization Certificate with an N-600 Certificate of Citizenship at the same Virginia I.N.S. Regional Office. It was declined as beyond the jurisdiction of the Director's authority. Hence this final and permanent judicial determination very crucial to the claimed War-earned benefits either inherently or derivatively.

WHEREFORE, Plaintiff Rev. Fr. PRISCO E. ENTINES, respectfully prays that:

1. Judgment be rendered ordering Defendant United States of America to pay Plaintiff's father – Enrique - his back pay in the amount representing the difference between the pay and allowances that he actually received as PC soldier since July 17, 1927 and during World War II, and the same as mandated by the primary basic pay statute in existence at the time of their

induction into the United States Armed Forces till his death. Plus his and his parents' pension till their respective deaths.

2. Judgment be otherwise rendered ordering Defendant United States of America to pay Plaintiff's father – Enrique's back pay representing the same differential by virtue of a valid regulation of an executive department, Executive Order No. 22 dated October 28, 1944 and issued b the then Philippine Commonwealth President Sergio Osmena according to his corresponding rank.

3. Judgment be rendered ordering defendant to implement the order of then Secretary of War authorizing percentage increases in the pay of the Philippine Commonwealth Army soldiers proportionate to those enjoyed by United States Army personnel during World War II and pay Plaintiff's father – Enrique - his back pay in the amount described by such proportionate percentage pay increases as ordered.

4. Further, that judgment be rendered ordering Defendant United States of America to pay Plaintiff's mother - CRISTETA and her SEVEN (7) children full and equal, dollar to dollar Death Indemnity Compensation (DIC) and other VA benefits for the taking of Plaintiff's mother and her children's private property for public use resulting from legislation, now codified as Title 8 USC §107, denying full veterans' benefits to plaintiff's mother till her death, at least, and her children. It is submitted that said Section 107, 38 U.S. Code is a direct contradiction of the "Ex Post Facto" constitutional provision as very clearly decided in CARMEL V. TEXAS case recently decided in May 2000 – a decision made after the 1999 dismissal of the Federal Claims Court Case No. 96-740C filed as a Class Action with the herein Plaintiff as a member. Hence, this amended and re-filed instant case for a "de novo" review of the case with a very extraordinary demand for determination on the instant U.S. Citizenship of the Plaintiff's father

-22-

and his whole family members as U.S. Nationals-reduced that is very vital and crucial in the determination of full and equal War Base Pay, Allowances, VA benefits and other privileges and immunities that were all deprived and divested the Plaintiff's father, mother and all the family members.

5.   *That judgment be rendered enforcing the terms of enlistment contracts, express or* implied-in-fact, and ordering the defendant herein to comply with the terms of such contacts entered into by Defendant with those Filipino soldiers and veterans for military services in World War II by paying Plaintiff full pay, allowances and benefits that any and all members of the United States Armed Forces in World War II were, and are, entitled to.

6. That Plaintiff's father – Enrique, his mother – Cristeta and all their seven (7) children be recognized as INSTANT or Native-born United States citizens by the inarguable fact that all of them were born "in U.S. soil" while the Philippines was a U.S. Colony and before July 4, 1946 under the English Common Law of "birth within the allegiance and dominion of the King" the common basis of Birthright U.S. Citizenship acquisition, very clearly explained in Petition for Sproule (D.C. Cal. 1937) 19 F. Supp. 995.

7.  *Further, that Defendant herein be ordered to pay Plaintiff's mother – Cristeta - the* corresponding VA Death Indemnity Compensation (DIC) benefits, its  differential with accrued interest, at least, from March 25, 1945 till her death on March 26, 1993; also the DIC and Educational Benefits' with its corresponding differentials and arrears with accrued interest for the seven (7) children, to their applicable and allowable period.

8.  That Defendant pay the $5,000.00 National Life Insurance and its Accrued interest arbitrarily denied by the VA Board of Veterans Appeals since 1956.

9.  Additionally, that Defendant pay Plaintiff's attorneys' fees, as well as, other costs and expenses of this suit, including but not limited to exemplary, punitive, and other damages that caused the great degree of PTSD caused by anguish, anxiety, mental and emotional torture in the delays and denials by Social Security, the former INS now B.C.I. S., the State Department, the *Courts but very especially the VA in its harassment and retaliatory tactics done to the plaintiff* since 1985 to present and very specifically in Manila Regional VA Office during the custodial interrogation sometime in 2001 whose report he has been denied access in the interest of fairness and equal justice under the law.

10.  Finally, that Plaintiff, herein, be awarded such other relief and remedies as the Honorable  Court deems proper.

Date: 7 March 2006

Respectfully submitted,

By:_____

Rev./Fr. PRISCO E. ENTINES
Appearing *in pro per*

Mailing Address:

419 N. Mountain View Ave. #207
Los Angeles, CA. 90026
Tel. (213) 675-9092 or (323) 527-2071
Email: Frentines@hotmail.com

HEADQUARTERS
United States Army Forces in the Far East
Manila, P. I.

GENERAL ORDERS )
       :        18 December, 1941.
No.  46 )

   1. Pursuant to provisions of the Proclamation of the President of the United States, dated July 26, 1941, all personnel of the Philippine Army on active duty and all active units of the Philippine Army, less personnel and units already accepted for service with the United States Army Forces, are hereby called into the service of the armed forces of the United States in the Philippines, effective on the date of acceptance for the period of the existing emergency, and will be accepted for such service by officers in the service of the United States Army Forces in the Philippines.

   2. Personnel of the Philippine Army which may hereafter be called to active duty and units thereof which may hereafter be activated are hereby called into the service of the armed forces of the United States in the Philippines, effective on the date of acceptance, and will be accepted for such service by officers in the service of the United States Army Force in the Philippines.

   By command of Lieutenant General MacARTHUR:


           R. K. SUTHERLAND,
           Brigadier General, GSC,
            Chief of Staff.

OFFICIAL:

   CARL H. SEALS,
   Colonel, A. G. D.
   Adjutant General .


A TRUE COPY:

    s/ William Barr, Jr.
    t/ WILLIAM BARR, JR.,
     Captain,  AGD.



Executive Order No. 21 by the President of
the Philippines...................................    I

Executive Order No. 22 by the President of
the Philippines...................................    II

I.  EXECUTIVE ORDER NO. 21 BY THE PRESIDENT OF THE PHILIPPINES.  The follow-
Executive Order No. 21 by the President of the Philippines is published for
information and guidance of all concerned:

Executive Order No. 21

## DECLARING TO BE ON ACTIVE SERVICE IN THE PHILIPPINE ARMY ALL PERSONS NOW ACTIVELY SERVING IN RECOGNIZED MILITARY FORCES IN THE PHILIPPINES

WHEREAS, many civilians residing in the Philippines of Filipino, American and
other foreign citizenships, and Officers and Enlisted Men of the Philippine Army,
of the armed forces of the United States and of Allied nations, have continued
armed resistance against the Imperial Japanese Government since the sixth of
May 1942;

WHEREAS, this action has written in blood an epic of courage, devotion and
loyalty to the Government and the people of the Philippines;

WHEREAS, these military forces have contributed in a large measure to the
Allied military effort and to the liberation of the Filipino people from the yoke
of the Japanese invader;

WHEREAS, it is the desire of the Government of the Philippines to recognize
this allegiance;

NOW, THEREFORE, I, SERGIO OSMENA, President of the Philippines, by virtue of
the authority vested in me by the Emergency Powers Law, Section 22 a and Section
27 of Commonwealth Act Numbered One notwithstanding, do hereby ordain and
promulgate the following:

1.  All persons, of any nationality or citizenship, who are actively serving
in recognized military forces in the Philippines, are hereby considered to be on
active service in the Philippine Army.

2.  The temporary grades of Enlisted Men, enlisted or promoted in the field
by Commanders of recognized military forces or by their delegated authority, are
hereby confirmed.

3.  The temporary ranks of all officers, appointed or promoted in the field
prior to this date by Commanders of recognized military forces, are hereby con-
firmed.

4.  The date of entry into active service in the Philippine Army will be
that of joining a recognized military force.

- 1 -

(CIR NO 100)                    RESTRICTED                    Annex "B"
                                                              (p. 2)

5. The effective date of rank for commissioned Officers and Enlisted Men will be the date on which they were appointed or promoted to such rank by the Commanders of recognized military forces.

6. A recognized military force, as used herein, is defined as a force under a commander who has been appointed, designated or recognized by the Commander-in-Chief Southwest Pacific Area.

Done at the seat of Government in the Field, this 28th day of October, in the year of our Lord, Nineteen Hundred and Forty-Four, and of the Commonwealth of the Philippines, the Ninth.


                                        SERGIO OSMENA
                                     President of the Philippines.

By the President:


        ARTURO B. ROTOR
     Secretary to the President

II.  EXECUTIVE ORDER NO. 22 BY THE PRESIDENT OF THE PHILIPPINES.  The following Executive Order No. 22 by the President of the Philippines is published for the information and guidance of all concerned:

                     Executive Order No. 22

                 FIXING THE SALARIES OF THE OFFICERS
               AND ENLISTED MEN OF THE PHILIPPINE ARMY

Pursuant to the provisions of Section No. 90 of the National Defense Act and of the Emergency Powers Law, I, Sergio Osmena, President of the Philippines, do hereby prescribe the following schedule of salary rates and quarters allowances for officers and enlisted men of the Philippine Army, effective on dates as indicated herein, and extending for the duration of the war and for six months thereafter unless sooner terminated by competent authority.

                              OFFICERS

| Rank | Annual Pay | Monthly Quarters Allowance |
|------|-----------|----------------------------|
| Major General | ₱16,000 | ₱200 |
| Brigadier General | 12,000 | 200 |
| Colonel | 8,000 | 200 |
| Lieutenant Colonel | 7,000 | 200 |
| Major | 6,000 | 160 |
| Captain | 4,800 | 140 |
| First Lieutenant | 4,000 | 100 |
| Second Lieutenant | 3,000 | 80 |
| | 2,400 | 60 |

3 1 1942

M O N T H L Y   R E P O R T

W973.
942136

WAR DEPARTMENT
SERVICES OF SUPPLY
OFFICE OF CHIEF OF FINANCE
WASHINGTON, D.C.

FINANCE BULLETIN)
NO.         136)                         NOVEMBER 25, 1942.

PAY - ARMY OF THE PHILIPPINES.--1.  SUPPLEMENTING
SEC. I, FINANCE BULLETIN NO. 104, SEPTEMBER 3, 1942,
THE FOLLOWING EXECUTIVE ORDER OF THE PRESIDENT OF
THE PHILIPPINE COMMONWEALTH, DATED MARCH 10, 1942,
EFFECTIVE MARCH 15, 1942, AND EXTENDING FOR THE
DURATION OF THE WAR AND SIX MONTHS THEREAFTER UNLESS
SOONER TERMINATED BY COMPETENT AUTHORITY, IS PUB-
LISHED FOR THE INFORMATION AND GUIDANCE OF ALL
FINANCE OFFICERS:

"BY THE PRESIDENT OF THE PHILIPPINES
EXECUTIVE ORDER.

"FIXING THE SALARIES OF THE OFFICERS AND
ENLISTED MEN OF THE PHILIPPINE ARMY.

"PURSUANT TO THE PROVISIONS OF SECTION NO. 90
OF THE NATIONAL DEFENSE ACT AND OF THE EMERGENCY
POWERS LAW, I, MANUEL L. QUEZON, PRESIDENT OF THE
PHILIPPINES, DO HEREBY PRESCRIBE THE FOLLOWING
SCHEDULE OF SALARY RATES AND QUARTERS ALLOWANCE
FOR OFFICERS OF THE PHILIPPINE ARMY, EFFECTIVE
MARCH 15, 1942 AND EXTENDING FOR THE DURATION
OF THE WAR AND SIX MONTHS THEREAFTER UNLESS
SOONER TERMINATED BY COMPETENT AUTHORITY.

| OFFICERS | ANNUAL PAY | MONTHLY QUARTERS ALLOWANCE |
|---|---|---|
| MAJOR GENERAL | 16,000 |  |
| BRIGADIER GENERAL | 12,000 | 200 |
| COLONEL | 8,000 | 200 |
| LIEUTENANT COLONEL | 7,000 | 200 |
| MAJOR | 6,000 | 200 |
| CAPTAIN | 4,800 | 160 |
| FIRST LIEUTENANT | 4,000 | 140 |
| SECOND LIEUTENANT | 3,000 | 100 |
| THIRD LIEUTENANT | 2,400 | 80 |
|  |  | 60 |

"DURING THE PERIOD THAT THE RATES OF PAY HEREIN
PRESCRIBED ARE EFFECTIVE THERE SHALL NOT BE PAID TO
ANY OFFICER AN INCREASE OF PAY BY REASON OF LENGTH
OF SERVICE, COMMONLY CALLED "LONGEVITY PAY."

Annex "C"
(p. 2)

F. B. No. 136

- 2 -

"DURING THE PERIOD THAT THE RATES OF PAY HEREIN PRESCRIBED ARE EFFECTIVE THERE SHALL NOT BE PAID TO ANY OFFICER AN INCREASE OF PAY FOR DUTY REQUIRING REGULAR AND FREQUENT AERIAL FLIGHTS.

ENLISTED MEN, LINE AND MEDICAL SERVICE

| | MONTHLY PAY | MONTHLY QUARTERS ALLOWANCE |
|---|---|---|
| MASTER SERGEANT | 86 | 16 |
| TECHNICAL SERGEANT AND FIRST SERGEANT | 70 | 16 |
| STAFF SERGEANT | 60 | 16 |
| SERGEANT | 51 | 12 |
| CORPORAL | 37 | 12 |
| PRIVATE FIRST CLASS | 22 | 8 |
| PRIVATE | 18 | 8 |

ENLISTED MEN - AIR CORPS

| | | |
|---|---|---|
| MASTER SERGEANT | 86 | 16 |
| TECHNICAL SERGEANT | 80 | 18 |
| STAFF SERGEANT | 75 | 16 |
| FIRST SERGEANT | 60 | 16 |
| SERGEANT | 51 | 12 |
| CORPORAL | 37 | 12 |
| PVT. 1ST CLASS | 22 | 8 |
| PVT. | 18 | 8 |

"PROVIDED THAT NO MAN SHALL SUFFER A REDUCTION IN PAY BY REASON OF THIS EXECUTIVE ORDER.

"DONE AT THE SEAT OF GOVERNMENT IN THE FIELD, THIS TENTH DAY OF MARCH, IN THE YEAR OF OUR LORD, NINETEEN HUNDRED AND FORTY-TWO, AND OF THE COMMONWEALTH OF THE PHILIPPINES, THE SEVENTH.

MANUEL L. QUEZON,
PRESIDENT OF THE PHILIPPINES."

THE ABOVE EXECUTIVE ORDER MAKES CERTAIN AMEND—

---

F. B. No. 136

- 3 -

"PAY SCALE FOR MEMBERS OF THE PHILIPPINE ARMY.

"OFFICERS ARE CREDITED WITH ACTUAL SERVICE IN THE ARMY BEGINNING THE EFFECTIVE DATE OF THEIR APPOINTMENT. IN CASES WHEN THE EFFECTIVE DATE IS NOT MENTIONED IN THE ORDER, THE EFFECTIVE DATE IS BASED ON THE DATE THE OATH OF OFFICE IS TAKEN. THE EFFECTIVE DATE OF SERVICE OF OFFICERS GRADUATING FROM THE UNITED STATES MILITARY ACADEMY AT WEST POINT AND FROM THE UNITED STATES NAVAL ACADEMY AT ANNAPOLIS BEGIN FROM THE DATE OF ADMISSION TO THE SERVICE WITH THE PHILIPPINE CONSTABULARY FOR PURPOSES OF RETIREMENT.

"PAY AND ALLOWANCES OF TRAINEES.

"WHEN A TRAINEE OR AN ENLISTED RESERVE WHILE ON ACTIVE DUTY DIES AS A RESULT OF INJURY OR DISEASE CONTRACTED IN THE SERVICE FOR REASONS OTHER THAN HIS OWN MISCONDUCT, WILLFUL FAILURE, THE INTEMPERATE USE OF DRUGS OR ALCOHOLIC LIQUOR, OR THROUGH VICIOUS OR IMMORAL HABITS, THE PRESIDENT MAY AUTHORIZE THE PAYMENT OF BURIAL EXPENSES NOT EXCEEDING THIRTY-FIVE PESOS AND A SUM NOT EXCEEDING ONE HUNDRED PESOS TO THE WIDOW OR DEPENDENT CHILD OR CHILDREN, OR IN THE ABSENCE OF WIDOW OR DEPENDENT CHILD, TO THE PARENTS OF THE DECEASED TRAINEE OR ENLISTED RESERVE; PROVIDED, THAT INJURY OR DISEASE ACQUIRED WHILE EN ROUTE TO OR FROM THE TRAINING STATION OR MOBILIZATION CENTER SHALL BE CONSIDERED AS CONTRACTED IN THE SERVICE FOR THE PURPOSE OF THIS SECTION. (AS INSERTED BY COM. ACT NO. 385, SEC. 91-A).

"THE TABLES ARE STATED IN PESOS. VALUE OF

Annex "C"
(p. 3)

F. B. No. 136

- 5 -

"IN DETERMINING THE PAY AND RIGHTS OF RETIREMENT OF A COMMISSIONED OFFICER OF THE REGULAR FORCE OF THE ARMY OF THE PHILIPPINES, ACTIVE DUTY PERFORMED AS A COMMISSIONED OFFICER OR AS AN ENLISTED MAN IN THE UNITED STATES, AND/OR AS A CADET IN THE UNITED STATES MILITARY ACADEMY OR UNITED STATES NAVAL ACADEMY, PRIOR TO JANUARY 1, 1933 SHALL BE CREDITED TO THE SAME EXTENT AS SERVICE UNDER A REGULAR COMMISSION OR OTHER ACTIVE DUTY WITH THE ARMY OF THE PHILIPPINES. (SEC. 2, COM. ACT 150)

".........NO OFFICER SHALL BE PAID LESS THAN THE BASIC RATE OF PAY CORRESPONDING TO THE RANK HELD BY HIM AS AN OFFICER OF THE PHILIPPINE CONSTABULARY PRIOR TO THE TAKING EFFECT OF THE 15% SALARY REDUCTION PROVIDED IN ACT NO. 4032, INCLUDING LONGEVITY PAY EARNED UNDER SECTION 846 OF THE ADMINISTRATIVE CODE PRIOR TO JANUARY 1, 1933,....." (E.O. 155, s. 1938.)

".......OFFICERS WHOSE DUTY REQUIRES REGULAR AND FREQUENT AERIAL FLIGHTS, SHALL RECEIVE AN ADDITIONAL COMPENSATION EQUIVALENT TO TWENTY-FIVE PER CENTUM OF THE MONTHLY PAY RECEIVED BY NON-FLYING PERSONNEL OF THE SAME RANK AND GRADE." (SEC. 2, ACT No. 71.)

"PROBATIONARY THIRD LIEUTENANTS ARE ENTITLED TO: SUBSISTENCE ALLOWANCE OF P MONTHLY PLUS P0.05 DAILY; PAY P5 ANCE P50. CADETS ARE ENTITLED TO INITIAL ALLOWANCE P56. MONTHLY MAINTENANCE ALLOWANCE P80, RESERVE OFFICERS ON EXTENDED ACTIVE DUTY WITH THE REGULAR FORCE SHALL RECEIVE PAY AND ALLOWANCES AS PRESCRIBED BY LAW OR REGULATION FOR REGULAR OFFICERS OF THEIR RESPECTIVE GRADES. (SEC. 95, COM. ACT No. 1)"

---

. B. No. 136    - 4 -

## PAY AND ALLOWANCES OF OFFICERS OF THE PHILIPPINE ARMY

| RANK | ANNUAL BASE PAY (E.O. 155, s. 1936) | INITIAL MONTHLY PAY | Monthly Rates OVER 5 YRS. SER. | OVER 10 YEARS | OVER 15 YEARS |
|---|---|---|---|---|---|
| MAJOR GENERAL C OF S........ | 8,500.00 | 708.33 | 779.16 | 857.07 | 942.78 |
| MAJOR GENERAL............ | 7,800.00 | 650.00 | 715.00 | 786.50 | 865.15 |
| BRIGADIER GENERAL........ | 6,600.00 | 550.00 | 605.00 | 665.50 | 732.05 |
| COLONEL................. | 5,400.00 | 450.00 | 495.00 | 544.50 | 598.95 |
| LIEUTENANT COLONEL...... | 4,200.00 | 350.00 | 385.00 | 423.50 | 465.85 |
| MAJOR................... | 3,300.00 | 275.00 | 302.50 | 332.75 | 366.02 |
| CAPTAIN................. | 2,700.00 | 225.00 | 247.50 | 272.25 | 299.47 |
| FIRST LIEUTENANT........ | 2,220.00 | 185.00 | 203.50 | 223.85 | 246.23 |
| SECOND LIEUTENANT....... | 1,920.00 | 160.00 | 176.00 | 193.60 | 212.96 |
| THIRD LIEUTENANT........ | 1,800.00 | 150.00 | 165.00 | 181.50 | 199.65 |

| (CONT'D.) RANK | OVER 20 YEARS | OVER 25 YEARS | ALLOWANCES QUARTERS CITY | PROVINCE |
|---|---|---|---|---|
| MAJOR GENERAL C OF S..... | 1,037.06 | 1,062.50 | 200.00 | ......... |
| MAJOR GENERAL........... | 951.66 | 975.00 | 110.00 | ......... |
| BRIGADIER GENERAL....... | 805.25 | 825.00 | 100.00 | ......... |
| COLONEL................. | 658.84 | 675.00 | 90.00 | 60.00 |
| LIEUTENANT COLONEL...... | 512.43 | 525.00 | 80.00 | 50.00 |
| MAJOR................... | 402.62 | 412.50 | 70.00 | 50.00 |
| CAPTAIN................. | 329.42 | 337.50 | 50.00 | 40.00 |
| FIRST LIEUTENANT........ | 270.85 | 277.50 | 50.00 | 30.00 |
| SECOND LIEUTENANT....... | 234.26 | 240.00 | 40.00 | 25.00 |
| THIRD LIEUTENANT........ | 219.61 | 225.00 | 40.00 | 25.00 |

NOTES:-  THE OPERATION OF LAW WITH REFERENCE TO LONGEVITY PAY WAS SUSPENDED ON JANUARY 1, 1933. (ACT - 3032)

"IN COMPUTING PAY OF COMMISSIONED OFFICERS, THE LONGEVITY PAY EARNED FOR SERVICES RENDERED PRIOR TO JANUARY 1, 1933, SHALL BE BASED ON AN INCREASE OF TEN PER CENTUM FOR EVERY FIVE YEARS OF SERVICE COMPOUNDED EVERY FIVE YEARS, PROVIDED THAT THE INCREASE IN LONGEVITY PAY SHALL NOT EXCEED FIFTY PER CENTUM OF......" (SEC. 846, ADM. CODE.)

F. B. No. 136  - 6 -

## PAY AND ALLOWANCES OF ENLISTED MEN OF THE LINE

| GRADE | ANNUAL RATES | MONTHLY RATES 1 | REENLISTMENT BONUS 2 | QUARTERS CITY MONTHLY | QUARTERS PROVINCE MONTHLY 3 |
|---|---|---|---|---|---|
| MASTER SERGEANT | 540.00 | 45.00 | 45.00 | 16.00 | 12.00 |
| FIRST SERGEANT | 510.00 | 42.50 | 42.50 | 16.00 | 12.00 |
| TECHNICAL SERGEANT | 486.00 | 40.50 | 40.50 | 16.00 | 12.00 |
| STAFF-SERGEANT | 432.00 | 36.00 | 36.00 | 16.00 | 12.00 |
| SERGEANT | 360.00 | 30.00 | 30.00 | 16.00 | 12.00 |
| CORPORAL | 264.00 | 22.00 | 22.00 | 12.00 | 8.00 |
| FIRST CLASS PVT | 204.00 | 17.00 | 17.00 | 8.00 | 8.00 |
| PRIVATE | 168.00 | 14.00 | 14.00 | 8.00 | 8.00 |

(CONT'D.)

| GRADE | INITIAL CLOTHING ALLOWANCE UPON REENLISTMENT | ADDITIONAL CLOTHING ALLOWANCE UPON REENLISTMENT | DAILY CLOTHING ALLOWANCE | DAILY RATION ALLOWANCE |
|---|---|---|---|---|
| MASTER SERGEANT | 38.40 | 16.00 | .16 | .30 |
| FIRST SERGEANT | 38.40 | 16.00 | .16 | .30 |
| TECHNICAL SERGEANT | 38.40 | 16.00 | .16 | .30 |
| STAFF-SERGEANT | 38.40 | 16.00 | .16 | .30 |
| SERGEANT | 38.40 | 16.00 | .16 | .30 |
| CORPORAL | 38.40 | 16.00 | .16 | .30 |
| FIRST CLASS PVT | 38.40 | 16.00 | .16 | .30 |
| PRIVATE | 38.40 | 16.00 | .16 | .30 |

"1. EFFECTIVE SEPTEMBER 5, 1938, SECTION 89 (A) COM. ACT NO. 1 AS AMENDED BY SECTION 11, COM. ACT No. 385.

"2. AN ENLISTED MAN WHO REENLISTS WITHIN TWO MONTHS AFTER HIS DISCHARGE BY REASON OF THE EXPIRATION OF HIS TERM OF ENLISTMENT SHALL RECEIVE A REENLISTMENT BONUS EQUIVALENT TO ONE MONTH'S PAY OF THE GRADE HELD AT THE TIME OF HIS DISCHARGE. (SEC. 89 (A) COM. ACT. NO. 1)

ENLISTED MEN WHO ARE NOT FURNISHED GOVERNMENT QUARTERS

---

Annex "C"
(p. 4)

F. B. No. 136

- 7 -

'GRADES AND PAY OF ENLISTED MEN OF THE RESERVES SHALL BE THE SAME AS THE REGULAR FORCE, EXCEPT THAT ENLISTED MEN SHALL RECEIVE NO PAY WHILE ON INACTIVE STATUS, OR WHILE UNDERGOING ANNUAL ACTIVE DUTY TRAINING.' (Sec. 89 (B) Com. Act. No. 1)

## PAY AND ALLOWANCES OF ENLISTED MEN AIR CORPS

| GRADE | BASE PAY 1. ANNUAL RATES | MONTHLY RATES | REENLISTMENT BONUS 2. | QUARTERS CITY 3. | QUARTERS PROVINCE INC. |
|---|---|---|---|---|---|
| MASTER SERGEANTS | 1,020.00 | 85.00 | 85.00 | 16.00 | 12.00 |
| TECHNICAL SERGEANTS | 960.00 | 80.00 | 80.00 | 16.00 | 12.00 |
| STAFF SERGEANTS | 900.00 | 75.00 | 75.00 | 16.00 | 12.00 |
| FIRST SERGEANT | 510.00 | 42.50 | 42.50 | 16.00 | 12.00 |
| SERGEANTS | 432.00 | 36.00 | 36.00 | 12.00 | 8.00 |
| CORPORALS | 324.00 | 27.00 | 27.00 | 12.00 | 8.00 |
| FIRST CLASS PVT | 264.00 | 22.00 | 22.00 | 8.00 | 8.00 |
| PRIVATES | 204.00 | 17.00 | 17.00 | 8.00 | 8.00 |

(CONT'D.)

| GRADE | INITIAL CLOTHING ALLOWANCE | ADDITIONAL CLOTHING ALLOWANCE UPON REENLISTMENT | DAILY CLOTHING ALLOWANCE | DAILY RATION ALLOWANCE |
|---|---|---|---|---|
| MASTER SERGEANTS | 38.40 | 16.00 | .16 | .30 |
| TECHNICAL SERGEANTS | 38.40 | 16.00 | .16 | .30 |
| STAFF SERGEANTS | 38.40 | 16.00 | .16 | .30 |
| FIRST SERGEANT | 38.40 | 16.00 | .16 | .30 |
| SERGEANTS | 38.40 | 16.00 | .16 | .30 |
| CORPORALS | 38.40 | 16.00 | .16 | .30 |
| FIRST CLASS PVT | 38.40 | 16.00 | .16 | .30 |
| PRIVATES | 38.40 | 16.00 | .16 | .30 |

"1. EFFECTIVE SEPTEMBER 5, 1938, SECTION 89 (A), COM. ACT NO. 1 AS AMENDED BY SECTION 11, COM. ACT No. 385.

"2. AN ENLISTED MAN WHO REENLISTS WITHIN TWO MONTHS AFTER HIS DISCHARGE BY REASON OF THE EXPIRATION OF HIS TERM OF ENLISTMENT SHALL RECEIVE

Annex "C"
(p. 5)

- 9 -

F. B. No. 89

"1. Effective September 5, 1938, Section No. 89 (A) Com. Act. No. 1 as amended by Section 11, Com. Act No. 385.

"2. An enlisted man who reenlists within two months after his discharge by reason of the expiration of his term of enlistment shall receive a reenlistment bonus equivalent to one month's pay of the grade held at the time of his discharge. (Sec. 89 (A) Com. Act No. 1)

"3. Enlisted men who are not furnished government quarters shall be allowed commutation for quarters at the rates prescribed above for their grades.

H. K. Loughry,
Major General,
Chief of Finance.

300.5/325326 F.B. #136/1942.

---

A reenlistment bonus equivalent to one month's pay of the grade held at the time of his discharge. (Sec. 89 (A) Com. Act No. 1)

"3. Enlisted men who are not furnished government quarters shall be allowed commutation for quarters at the rates prescribed above for their grades.

"Enlisted men who qualify as air mechanics, first, second, and third class, shall receive a monthly pay of seventy-five pesos, fifty pesos, and twenty-five pesos, respectively. (Sec. 89 (A) Com. Act No. 71)

"PAY AND ALLOWANCES OF ENLISTED MEN MEDICAL SERVICE AND PHILIPPINE MILITARY BAND

| Grade | Base Pay 1. Annual Rates | Month-ly Rates | Reen-list-ment Bonus | Quarters City | Quarters Province 3. | Daily Cloth- & Ration Allowance |
|---|---|---|---|---|---|---|
| MEDICAL SERVICE | | | | | | |
| Master Sergeant..... | 540.00 | 45.00 | 45.00 | 16.00 | 12.00 | .30 |
| First Sergeant...... | 510.00 | 42.50 | 42.50 | 16.00 | 12.00 | .30 |
| Technical Sergeant.. | 486.00 | 40.50 | 40.50 | 16.00 | 12.00 | .30 |
| Sergeant............ | 432.00 | 36.00 | 36.00 | 12.00 | 8.00 | .30 |
| Corporal............ | 336.00 | 28.00 | 28.00 | 12.00 | 8.00 | .30 |
| Private............. | 264.00 | 22.00 | 22.00 | 8.00 | 8.00 | .30 |
| PHILIPPINE MILITARY BAND | | | | | | |
| Assistant Conductor | 1440.00 | 120.00 | 120.00 | ..... | ..... | |
| Soloist, Professor | 960.00 | 80.00 | 80.00 | ..... | ..... | |
| First Class Musician | 768.00 | 64.00 | 64.00 | ..... | ..... | |
| Second Class Musician | 672.00 | 56.00 | 56.00 | ..... | ..... | |

| (Cont'd.) Grade | Initial Clo. Allow | Allowances Additional Upon Reenlistment | Daily Cloth- & Ration Allowance |
|---|---|---|---|
| MEDICAL SERVICE | | | |
| Master Sergeant..... | 38.40 | 16.00 | .16 |
| First Sergeant...... | 38.40 | 16.00 | .16 |
| Technical Sergeant.. | 38.40 | 16.00 | .16 |
| Sergeant............ | 38.40 | 16.00 | .16 |
| Corporal............ | 38.40 | 16.00 | .16 |

SECRET

DECLASSIFIED

Authority NND 740112

By RAD NARA Date 10/24

...NICATION SERVICE

NAVY DEPARTMENT

NPM 3558 RIO FT MILLS CK 91 GOV'T WP 22ND 123 GOVT WD AG WAR WASHN

      The scale of pay of American and Philippine Army Officers and the scale of pay of non commissioned officers and soldiers of the American, the Scout and the Philippine Army all differ.  I recommend the enactment of legislation to the effect that all officers and soldiers inducted into the American Service received for the duration of the war the same pay received by the American Army.  The equalization of battle on soldiering needs no further elaboration of argument to support such action.

                           MACARTHUR

CXMX 22 Feb  545/5385

SECRET

PRODUCED AT THE NATIONAL ARCHIVES

DECLASSIFIED
Authority NND 740112
By KAD NARA Date 10/24

AG 240 (3-9-42)

# CONFIDENTIAL

March 9, 1942
9:55 am

FROM: Ft. Mills, P.I.

TO: AGO

No. 453 from Ft. Mills March 9th

043.1 (3-9-42)

(3-6-42)

  The President of the Commonwealth has this date
issued an Executive Order fixing the rates of pay of offi-
cers of the Philippine Army equal to that of the United
States Army, and fixing the pay of enlisted men at the
rates provided for the Philippine Scouts. He is desirous
of fixing pay of soldiers at the rates prescribed for the
United States Army but yielded on this point in order not
to exceed the pay of Scouts. I urge that the War Depart-
ment endeavor to secure immediate action on the recommend-
ations contained in my radio RN number 3 February 22d to
the effect that the pay of all officers and soldiers fight-
ing in this theatre be fixed at that prescribed for the
United States Army. The question is one of intense interest
to the troops here and directly affect their morale and
fighting spirit. Can you not let me know without delay so
that I may tell them that the War Department is endeavoring
to accomplish this end.

             MACARTHUR

# CONFIDENTIAL

EXACT COPY

Annex "F"

**CONFIDENTIAL**

March 10, 1942

DECLASSIFIED
Authority NND 740112
By RAD NARA Date 1/1/24

MEMORANDUM:

The attached message from General MacArthur brings up the issue of whether or not, at least for this emergency, we should pay the Filipino soldier the same amount that is paid to the U. S. soldier who is fighting alongside him in the Philippines. Heretofore, the view has been that the difference between the living requirements of the U.S. soldier and the native in the Philippines, especially in view of the U.S. soldier's higher standard of living, made it appropriate to pay the Filipino in Mex pesos what was paid to the U.S. soldier in U.S. currency — in other words, 50 per cent less than our schedule. At the present time there is no question of different standards of living as they are fighting together on a common basis of rations and equipment and everything else. It would therefore, appear in the interests of morale that General MacArthur's request should be granted, that is, we should endeavor to secure the necessary authority — I presume legislative — to permit the payment of the Filipino soldier on a U.S. standard.

There are these involvements:

The number of soldiers involved will be somewhat indeterminate because it will be difficult to state just how many of those in the provinces continue to perform the duties of soldiers. Also there will be the irregular status of those engaged in guerrilla warfare.

There will also be the possible issue of the continued payment, on a U.S. standard, to Filipino prisoners of war.

Finally we might by this action become involved in the question of the rate of pay of Chinese soldiers.

My recommendation is that we meet General MacArthur's request by wiring him that the War Department will immediately institute measures to bring about the pay standards he has recommended.

(Dictated over the telephone by General Marshall.)

G. C. MARSHALL,
Chief of Staff.

FEB. 3/10

Per

DWIGHT D. EISENHOWER,
Brigadier General,
Assistant Chief of Staff.

1 Incl:
Message No. 453 from
Gen. MacArthur, 3-9-42.

**CONFIDENTIAL**

(COPY)

Authority _NND 740112_

By _RAD_ NARA Date _10/24_

WDGAP/240 (6-10-42)

July 30, 1942.

MEMORANDUM FOR THE LEGISLATIVE AND LIAISON BRANCH (Thru Office, Chief

of Staff):

Subject: Status of S. 2387 - An act to equalize the pay
of all personnel in the United States Army, the
Navy, the Philippine Scouts, and the Philippine
Commonwealth Army.

I. __Discussion.__

1. S. 2387 authorizes the Secretary of War to fix the
pay and allowances of personnel of the Philippine Army not to exceed
that of the officers and enlisted men of the Army of the United States.
The Secretary of War is authorized, by Section 11 of the Pay Readjust-
ment Act of 1942, to take similar action with respect to the enlisted
men of the Philippine Scouts. Officers of the Philippine Scouts receive
the pay and allowances of officers of the Regular Army.

2. This proposed legislation was sponsored by the War
Department at the urgent request, made from Bataan, of General MacArthur
(3-8-42).

3. S. 2387 passed the Senate March 30, 1942, and was
reported out favorably by the House Military Affairs Committee on
May 7, 1942. It is on the consent calendar of the House, and was passed
over without prejudice on June 1, June 15 and July 21, 1942, respectively.

4. The appointment and enlistment in the Army of the
United States of officers and enlisted men of the Philippine Common-
wealth Army and enlisted men of the Philippine Scouts who are serving
outside the Philippine Islands were recently authorized. Personnel of
the Philippine Scouts and the Philippine Army so appointed or enlisted
will thus receive the pay and allowances of the Army of the United States.

5. Personnel of the Philippine Scouts and the Philippine
Army who are prisoners of war or serving in the Philippine Islands,
beyond the control of the United States, would alone be affected by the
enactment of S. 2387. No need now exists from a strategic or economic
consideration for the Secretary of War to equalize the pay and allow-
ances of the Philippine Scouts or the Philippine ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶
Army of the United States, as provided by the present ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶ ̶. The
Chief of Finance (Colonel Webber) estimates that such equalization would

COPY TO ACCOMPANY ORIGINAL

DECLASSIFIED
Authority NND 745712
By RAD NARA Date 10/24

annually cost about $100,000,000 which payments would take the form of credits payable at the termination of the war.

II.  Action recommended.
That necessary action be taken by the War Department to inform the Congress that no need now exists for the enactment into law of S. 2387.

III.  Concurrence.
Assistant Chief of Staff, OPD (      ).


DONALD WILSON,
Brigadier General,
Assistant Chief of Staff.

- 2 -

DECLASSIFIED
Authority NND 740112
By RAD NARA Date 1/24

Information-Filing Form
Division

War Department Dec                                           10 (7-30-42)                                          8-6/457
                                                                                                               (7-31/2153)

Returned action radio to:
OPD Classified Message Center

RNM1                8-9
(initials)          (Date)

COPY OF ROUTING FORM TO BE
FILED ONLY BY OFFICE OF RECORD

**Subject:** Status of S 2367 – An Act to Equalize     7-30-42 Origin O-1
the Pay of all Personnel in the United States Army, Navy
Philippine Scouts, and the Philippine Commonwealth Army.

**Digest:** Radio SWPA 8-6-42 No. C-212 (CM-IN-2218). Radio was sent to MacArthur 8-3-42
informing him of status of bill and asking his recommendations as to whether or not
bill should be enacted. In radio 8-7-42, MacArthur states that although request was
made at a time when the Philippine Army was in actual combat and this Army has since
been destroyed, the bill was so thoroughly publicized that to withdraw it now would
be a blow to Philippine anticipations. Enemy propaganda agencies would charge breach
of faith after usefulness of Filipino troops had been utilized to their destruction. Sug-
gest President Quezon be consulted before negative action is taken.

**Action:** Noted. No action necessary.    See OPD 320.2 Aus (7-22-42) in which action
was taken.

Section    SWP

| | Comments: |
|---|---|
| ☐ African-Middle Eastern | |
| ☐ Asiatic | |
| ☐ European | Recommendation: File in OPD. |
| ☐ Latin American | |
| ☐ North American | Section Chief    WE    Date |
| ☐ Pacific | Group Chief    Date |
| ☒ Southwest Pacific | ☐ Theaters    Concurrence: |
| ☐ Troop Movements | |
| ☐ | |
| ☐ Current | |
| ☐ Resources & Require. | ☐ Logistics    ☐ |
| ☐ | ☑ Executive, OPD |
| ☐ Combined Subjects | ☐ |
| ☐ Future Operations | ☐ Strategy &    ☐ Deputy A.C. of Staff |
| ☐ Strategy | Policy    ☐ A.C. of Staff |
| ☐ | ☐ |
| Action by Col. Remaley | ☐    ☑ Dispatch Desk    ☐ Dispatch |
| Signed _____    Date 8-8-42 | ☐ File |
| 1942 | |

DECLASSIFIED
Authority _NND 74 0112_
By _RDD_ NARA Date _1/74_

**Annex "H"**
**(p. 2)**

## II. Recommendation.

That the pay bill remain on the calendar in the House until a substitute bill can be drawn which will equalize compensation as well as provide in some measure for the tremendous economic readjustments that will be necessary at the close of this war.



AUG -9  12 PM

OPD  WDGS

THOS. T. HANDY,
Major General,
Assistant Chief of Staff.

rln

MEMORANDUM FOR RECORD:

1. Gen. MacArthur was informed by radio No. 378, July 10, 1942, of the proposed action of G-1, and his recommendations were requested.

2. In C-12, August 6, MacArthur recommended that the bill not be withdrawn; that its administration could be equitably handled through boards of officers. He suggested that Pres. Quezon should be consulted before any negative action is taken.

3. In a non-concurrence in the proposed memo of G-1, a recommendation is made that the pay bill remain on the calendar in the House until a substitute bill can be drawn which will equalize compensation as well as provide in some measure for the tremendous economic readjustments that will be necessary at the close of this war.

4. Gen. MacArthur's reply has been discussed with Col. Nowland, G-1, and he agrees with the recommendations here proposed.

Authority NND 740112
By KAD NARA Date 1/24

OPD 240 (7-30-42)
Status of S. 2387 - An Act to Equalize the Pay of all Personnel
in the U.S.Army, the Navy, and the Philippine Scouts, and the
Philippine Commonwealth Army.                    August 8, 1942.

X 0-1

X Disapproved

I.    Discussion.
    1.    The problem as it appeared here centered around the possibility
of administering this act in equity to all.

    2.    It was felt that to take positive steps to withdraw this bill
from the calendar would be simply handing the enemy a propaganda tool to
further create discontent among the Far Eastern people and be interpreted by
the Japanese as outward evidence of our lack of faith.

    3.    A monetary value cannot be placed on good will. Such is
particularly true in this case in that the ultimate costs of the act cannot
be foreseen.

    4.    The recommendations of General MacArthur in this connection
were requested. He replied in substance that his original recommendation for
pay equalization was designed to strengthen morale. He admits that the
Filipino force is no longer extant and that its records were probably des-
troyed upon the capture of Corregidor, but maintains that boards of officers
in the Philippines could unquestionably administer the act. He further states
that the pay bill was so thoroughly publicized that it dare not be withdrawn
without a severe blow to all the hopes of the Filipinos to be regarded in
equality with the white race. The Japanese would most certainly charge breach
of faith and capitalize through propaganda agencies. He further suggests
that President Queson should be consulted before any negative action is taken.

OPERATIONS DIVISION

CONFIDENTIAL

Immigration and Naturalization Service

Supplemental Annex "A"

Office of the Commissioner

425 Eye Street N W
Washington, D C 20536          CO 705.1893

The Honorable Eleanor Holmes Norton
Member of Congress
815 15th Street, NW, Suite 100
Washington, DC 20005-2201          APR 2 8 1993

Dear Congresswoman Norton:

Thank you for your letter of March 25, with enclosures regarding your constituent, Father Prisco E. Entines, who is interested in ascertaining if he obtained any rights of American citizenship, as he was born in the Philippines during the time that the Philippines were American territory.

When the Philippines voted for independence in 1946, all former American nationals of the Philippines lost their status as American nationals, and became nationals of the Philippines only. Therefore, Father Entines can obtain no immigration benefits as a result of being born in the Philippines while those islands were United States territory.

Father Entines also mentions that his father, Mr. Enrique Hapa Entines, was denied posthumous citizenship. He failed to enclose a copy of that denial, so we cannot comment. However, though the Posthumous Citizenship for Active-Duty Service Act did provide for the posthumous granting of citizenship to certain aliens who died while serving with United States armed forces during certain periods of hostilities, that Act also provided that no immigration benefits could be accrued by survivors of the deceased so naturalized.

Father Entines may wish to file an application to apply for naturalization, so we have enclosed a copy of Form N-400.

We appreciate your interest in this matter. If we may be of assistance in the future, please do not hesitate to communicate with this office.

Sincerely,

FOR THE COMMISSIONER

Ralph B. Thomas
Acting Director
Congressional & Public Affairs