Exhibit "2-1"

# UCLA
# ASIAN PACIFIC AMERICAN
# LAW JOURNAL

UCLA SCHOOL OF LAW

CITIZENS DENIED:
A CRITICAL EXAMINATION OF THE *RABANG* DECISION
REJECTING UNITED STATES CITIZENSHIP CLAIMS
BY PERSONS BORN IN THE PHILIPPINES
DURING THE TERRITORIAL PERIOD

*Avelino J. Halagao, Jr.*

VOLUME 5  •  NUMBER 1  •  SPRING 1998

Exhibit "2-2"

# CITIZENS DENIED: A CRITICAL EXAMINATION OF THE *RABANG* DECISION REJECTING UNITED STATES CITIZENSHIP CLAIMS BY PERSONS BORN IN THE PHILIPPINES DURING THE TERRITORIAL PERIOD

### Avelino J. Halagao, Jr.[†]

## I. INTRODUCTION

A citizen is defined as a "member of a state or nation who owes allegiance to its government and is entitled to its protection."[1] Citizenship has long been held to "[imply] membership in a political society, the relation of allegiance and protection, identification with the state, and a participation in its functions."[2] There is probably no "right more fundamental, or more jealously guarded, than the right of citizenship."[3] In *Rabang v. I.N.S.*,[4] seven plaintiffs, all natives of the Philippines, attempt—not to *guard*—but rather to *attain* their right to citizenship. The plaintiffs, or their parents, were born in the Philippines during the period from December 10, 1898[5] to July 4, 1946,[6] at which time the Philippines was a United States territory.[7] Inhabitants of the Philippines during the territorial period "were 'wards'

---

    † Editor, UCLA Law Review; J.D., UCLA School of Law, 1995; B.S., University of Virginia, 1988. I would like to thank Professor Susanna Kim for suggesting this topic; Kevin Chung and Jim Fehrman for improving this Comment; Weng Ramos, number one research assistant; and my close friends and family for their love and unconditional support. I dedicate my work to the memory of two special people—to Anna Maria, my beautiful baby sister, and to Joyce Chiang, a respected attorney with the Immigration and Naturalization Service and my beloved friend. Finally, I thank God for His gifts, especially Gabriel, Joshua and Anna Maria *II*—collectively, my Pride and Joy.
    1. THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE—THE UNABRIDGED EDITION 270 (1967).
    2. Pannill v. Roanoke Times Co., 252 F. 910, 914 (W.D. Va. 1918).
    3. Rabang v. I.N.S., 35 F.3d 1449, 1465 (9th Cir. 1994), (quoting Afroyim v. Rusk, 387 U.S. 253, 267-68 (1967)(Harlan, J., dissenting) ("Citizenship is no light trifle to be jeopardized any moment Congress decides to do so under the name of one of its general or implied grants of power . . . . Our holding does no more than [recognize each citizen's] constitutional right to remain a citizen in a free country unless he voluntarily relinquishes that citizenship."), *cert. denied*, Sanidad v. I.N.S., 515 U.S. 1130 (1995) (Pregerson, J., dissenting).
    4. 35 F.3d 1449.
    5. At the close of the Spanish-American War, Spain ceded the Philippines to the United States. Treaty of Peace between the United States of America and the Kingdom of Spain, Dec. 10, 1898, U.S.-Spain, art. III, 30 Stat. 1754, 1755.
    6. The United States granted the Philippines its independence. Proclamation No. 2695, 60 Stat. 1352, 11 Fed. Reg. 7517 (1946).
    7. The term "territory" means any geographic area over which the United States exercises sovereignty. RUTH G. VAN CLEVE, THE OFFICE OF TERRITORIAL AFFAIRS 14 (1974). Specifically, the Philippines was an "organized, unincorporated" territory. *Id.* at 15–17.
    An "organized" territory is one for which the United States Congress has provided an organic act, which is a statute establishing the system and powers of government. Generally, three separate branches of government are created: executive, legislative and judicial. *Id.* at 15. *See also* Harrison Loesch, *The American Territories of Today and Tomorrow, in* THE AMERICAN TERRITORIAL SYSTEM 238, 239 (John P. Bloom ed., 1973) ("Whether or not a territory is organized is determined by whether the United States Congress has enacted organic legislation defining the form of the territorial government").
    The term "unincorporated," is antithetical to "incorporated," which applies to a territory when Congress extends to it the provisions of the Constitution. VAN CLEVE, *supra* note 5, at 16. *See also* Loesch, *supra*

Exhibit 42-2

of the United States and were called 'nationals,' they were neither aliens nor citizens."[8]

Plaintiffs base their claim on the Citizenship Clause of the Fourteenth Amendment, which provides, in relevant part: "All persons born . . . in the United States and subject to the jurisdiction thereof, are citizens of the United States."[9] Plaintiffs seek declaratory judgments that they are United States citizens, contending that their birth, or their parents' birth,[10] in the Philippines during the territorial period, constitutes birth "in the United States" under the Citizenship Clause, and thus gives rise to United States citizenship.[11] The district court dismissed their complaints for failure to state a claim for relief.[12] The Ninth Circuit affirmed the lower court's decision,[13] and the Supreme Court denied plaintiffs' petition for a writ of certiorari.[14]

This Comment addresses the issue of whether birth in the Philippines during the United States territorial period constitutes birth "in the United States" for purposes of the Citizenship Clause. I examine the arguments of the majority and dissenting opinions in *Rabang*, and offer a few of my own. Given the United States' vast territorial reach, the issue presented in this Comment carries with it major ramifications, affecting not only the inhabitants of the Philippine territory,[15] but also inhabitants of past and present United States territories.

By 1925 the United States had acquired all of the geographic areas later known as the insular possessions or territories of the United States. The territories lying beyond the continental limits were acquired by purchase, conquest, or cession. The Virgin Islands were purchased, and American Samoa was ceded to the United

---

note 7 at 239 ("Incorporation means that the territory is under the umbrella of the Constitution of the United States . . . "). The distinction between incorporated and unincorporated territories was created in the Insular Cases, a series of cases decided by the Supreme Court in the early 1900's. VAN CLEVE, *supra* note 7, at 16. Puerto Rico, in the Caribbean Sea, and the Northern Mariana Islands, in the Pacific Ocean, are the only United States incorporated territories. II THE EUROPA WORLD YEAR BOOK 1994, K-Z 3218 (35th ed. 1994) [hereinafter "EUROPA"]. The term "incorporated" as it pertains to territories is a judicially created concept and one in disrepute. VAN CLEVE, *supra* note 7, at 16.

8. SUCHENG CHAN, ASIAN AMERICANS: AN INTERPRETIVE HISTORY 55 (1991). The term "national" was commonly used to classify inhabitants of territories acquired by the United States beyond its continental limits. *See* 7 CHARLES GORDON et al., IMMIGRATION LAW AND PROCEDURE, § 91.01[3][b], at 91-95 (1998). Today the term "national" is defined as a person who, though not a citizen of the United States, owes permanent allegiance to the United States. 8 U.S.C. § 1101(a)(22)(B) (1994).

9. U.S. CONST. amend. IV, § 1.

10. Immigration and Nationality Act, 8 U.S.C. § 1401 (3) (1994) (citizenship by descent). Plaintiffs asserting their parents were born in the Philippines during the territorial period, allege that they meet the applicable statutory requirements for acquisition of United States citizenship by descent. Because the Ninth Circuit in *Rabang v. I.N.S.* concluded that birth in the Philippines during the territorial period did not confer United States citizenship, the court did not address the issues pertaining to citizenship by descent. 35 F.3d 1449 at 1451 n.3. Likewise, this Comment will not address whether children of parents born in the territorial Philippines gives rise to citizenship.

11. *Rabang*, 35 F.3d at 1450.

12. *Id.* at 1451.

13. *Id.* at 1450. A petition for a rehearing en banc was subsequently denied. The Ninth Circuit, relying on its decision in *Rabang*, has recently rejected similar claims asserted by other Pilipino plaintiffs. *See* Sangalang v. I.N.S., 46 F.3d 1145 (9th Cir. 1995) (unpublished table decision); Summerfield v. I.N.S., 37 F.3d 1506 (9th Cir. 1994) (unpublished table decision).

14. *See* Sanidad v. I.N.S., 515 U.S. 1130 (1995).

15. The estimated Philippine population in 1946 exceeded 18 million. YEARBOOK OF PHILIPPINE STATISTICS: 1946; 1991 PHILIPPINE HEALTH STATISTICS (Table 1). Of those 18 million-plus Pilipino inhabitants, approximately 7 million are alive today. 1991 PHILIPPINE HEALTH STATISTICS; 1989 PHILIPPINE STATISTICAL YEARBOOK 1–16. I do not suggest that all Pilipinos eligible for United States citizenship necessarily desire it; I argue only that United States citizenship is a right to which they are entitled.

States.[16] Cuba, Puerto Rico, and Guam, like the Philippines, were ceded to the United States as a result of the Spanish-American War resolved by the Treaty of Paris.[17] Immediately after World War II, pursuant to a trusteeship agreement with the United Nations Security Council, the United States assumed "full responsibility for and complete jurisdiction" over a vast area in the western Pacific called the Trust Territory of the Pacific Islands.[18]

Today, the islands that fly the U.S. flag are the Territory of Guam, the Territory of American Samoa, the Territory of the U.S. Virgin Islands, the Commonwealth of Puerto Rico, and the Commonwealth of the Northern Mariana Islands (CNMI).[19] The United States, through Congressional legislation, has already conferred citizenship on those born in Puerto Rico,[20] Guam,[21] and the U.S. Virgin Islands.[22] The inhabitants of American Samoa and the CNMI, on the other hand, potentially would be affected by a judiciary resolution of whether birth in the Philippines constitutes birth "in the United States" for purposes of the Citizenship Clause. The other United States possessions—Baker, Howland, Jarvis, Johnston, Kingman Reef, Midway, Palmyra and Wake Islands—do not have permanent populations,[23] and thus, would be unaffected by the issue presented in this Comment.

Part I of this Comment examines the main arguments in the majority opinion. I argue that the majority violated a basic canon in constitutional construction, resulting in an incorrect ruling. Part II discusses how the judiciary has historically deferred to Congress' plenary power in matters involving territorial and immigration law. I contend that this traditional courtesy influenced the majority in *Rabang*, based on the majority's references to past Congressional legislation affecting the citizenship status of the Philippine inhabitants. Part III summarizes Circuit Judge Pregerson's primary arguments in his dissenting opinion, and discusses why Judge Pregerson's approach reaches the appropriate legal framework. Part IV offers a brief historical account of the United States' acquisition and dominion over the Philippine Islands as well as the Pilipinos' allegiance to the United States. Assessing this relationship against the legal framework examined in Part III, I conclude that those born in the Philippines during the territorial period are entitled to United States citizenship.

## II. A LESSON IN CONSTITUTIONAL CONSTRUCTION

The majority in *Rabang* violated a basic rule in constitutional interpretation, and as a result, reached an erroneous outcome. The majority concluded "that birth in the Philippines during the territorial period does not constitute birth 'in the United States' under the Citizenship Clause," and therefore, "does not give rise to

---

16. *See* Loesch, *supra* note 7, at 238.

17. *See id.*

18. *See id.* Most of the Trust Territory of the Pacific are now "free associated states," distinct political entities known as the Federated States of Micronesia and the Republic of the Marshall Islands. The Republic of Palau is still deciding its future relationship with the United States. *See* Jon M. Van Dyke, *The Evolving Legal Relationships Between the United States and Its Affiliated U.S.-Flag Islands*, 14 U. HAW. L. REV. 445, 447 (1992). The Northern Mariana Islands, originally part of the Trust Territory, is now a self-governing commonwealth of the United States. *See id.* at 462.

19. *See id.*, *supra* note 18, at 447.

20. 8 U.S.C. § 1402 (1994).

21. 8 U.S.C. § 1407 (1994).

22. 8 U.S.C. § 1406 (1994).

23. Van Dyke, *supra* note 18, at 447.

United States citizenship."[24] This conclusion rests on a simplistic argument which the majority sums up in one sentence: "In the Insular Cases the Supreme Court [already] decided that the territorial scope of the phrase 'the United States' as used in the Constitution is limited to the states of the Union."[25]

However, the majority opinion draws support from only *one* of the Insular Cases[26]—*Downes v. Bidwell.*[27] *Downes* addressed challenges to the imposition of duties on goods shipped from Puerto Rico to the continental United States. The Court held that Puerto Rico was not part of the United States within the meaning of the Revenue Clauses of the Constitution.[28] The *Rabang* court likens the Revenue Clauses of Article 1 to the Citizenship Clause of the Fourteenth Amendment based on the concept that each provision contains a territorial limitation "in the United States."[29] Using this simplistic analogy, the majority reasons that it is incorrect to extend citizenship to persons living in United States territories . . . because those persons are not born "in the United States" as that phrase is interpreted in *Downes*.[30] That is the essence of the majority's argument.

The *Rabang* court hangs its hat only on the decision in *Downes,* which was concerned solely with whether the Revenue Clauses applied to the territory of Puerto Rico. *Downes* extensively discusses the history and meaning of the Revenue Clause, but does not interpret the Citizenship Clause. Thus, the majority attempts to interpret a clause in the Fourteenth Amendment by using a definition explicitly limited to interpreting a clause in Article 1. The Supreme Court in *Downes* did not define the term "in the United States" so broadly so as to be applied throughout the Constitution. Indeed, the *Downes* Court, throughout its opinion, took great pains to qualify and limit the scope of its definition of the term "in the United States." Moreover, the Supreme Court expressly stated in the final sentence of the *Downes* opinion: "We are therefore of opinion that the island of Porto [sic] Rico is a territory appurtenant and belonging to the United States, but not a part of the United States *within the revenue clauses of the Constitution* . . . ."[31]

---

24. Rabang v. I.N.S., 35 F.3d 1449, 1452 (9th Cir. 1994).

25. *Id.* Before this Comment was published, the issue of whether birth in the Philippines during the territorial period constitutes birth in the United States under the Citizenship Clause was again raised in Valmonte v. I.N.S., 136 F.3d 914 (2d. Cir. 1998), *cert. denied,* Valmonte v. I.N.S., 119 S. Ct. 556 (1998). Similar to the Ninth Circuit in *Rabang,* the Second Circuit relied on the Insular Cases as "authoritative guidance on the territorial scope of the term 'in the United States' in the Fourteenth Amendment." *Valmonte,* 136 F.3d at 918.

26. *See* De Lima v. Bidwell, 182 U.S. 1 (1901); Dooley v. United States, 182 U.S. 222 (1901); Armstrong v. United States, 182 U.S. 243 (1901); and Downes v. Bidwell, 182 U.S. 244 (1901).

In the *Insular Cases,* the Supreme Court decided various questions ranging from issues of statutory interpretation to the applicability of the protections of the Constitution to the territorial inhabitants. Deborah D. Herrera, *Unincorporated and Exploited: Differential Treatment for Trust Territory Claimants—Why Doesn't the Constitution Follow the Flag?,* 2 SETON HALL CONST. L.J. 593, 597 (1992).

The *Insular Cases,* which consume almost an entire volume of the United States Supreme Court Reports (specifically 391 pages) are "models of prolixity and opaque prose," and were recognized at the time as "shedding more darkness than light upon the status of U.S. territories." VAN CLEVE, *supra* note 5, at 18. "Indeed, it is hard to read the 1901 Insular Cases that gave rise to the doctrine [of territorial incorporation] without experiencing amazement as to what they were later construed to mean." *Id.* at 17.

27. 182 U.S. 244 (1901).

28. *Id.* at 287. *See* U.S. Const. art. I, § 8 ("all duties, imposts, and excises shall be uniform throughout the United States").

29. *Rabang,* 35 F.3d at 1452–53.

30. *Id.*

31. *Downes,* 182 U.S. at 287 (emphasis added).

Despite the *Downes* Court's repeated attempts to *limit* the scope of its definition of "in the United States", the *Rabang* majority takes the exact opposite approach. The majority repeatedly attempts to *broaden* the *Downes* holding by replacing the phrase "within the revenue clauses" with its own phrase—"as used in the Constitution."[32] Given the limited language of the *Downes* holding, is there a rational basis for why the majority in *Rabang* felt they had carte blanche to apply the Court's definition of the phrase "in the United States" to other constitutional provisions?

To be fair, the majority in all likelihood was following a common principle in constitutional construction: In construing the meaning of a particular term in a constitution, the court may refer to other sections of the same instrument where a term is used for a term repeatedly used in a constitution generally mean the same throughout the instrument.[33] The majority applied the meaning of the phrase "in the United States" to the Citizenship Clause as the phrase was applied in another provision of the Constitution. On the surface, it looks as if the majority did reach the correct outcome in light of this basic rule of constitutional interpretation.

However, this basic rule is "subject to the obvious limitation that the same words may not necessarily have the same meaning attached to them where found in different parts of the same instrument, since their meaning is actually controlled by the context."[34] In the Constitution, the same term has been accorded different constructions depending on the connections in which it has been employed.[35] As one commentator suggested, "Courts should be cautious about giving the same meaning to a word or phrase when used in different parts of a constitution, as the context and the purpose may be very different."[36] Chief Justice Marshall stated in *Cherokee Nation v. Georgia*:[37]

> It has been also said, that the same words have not necessarily the same meaning attached to them, when found in different parts of the same instrument. Their meaning is controlled by the context. This is undoubtedly true. In common language, the same word has different and various meanings, and the peculiar sense, in which it is used in any sentence, is to be determined by the context.[38]

Justice Sutherland echoed the Chief Justice's sentiment a century later in *Atlantic Cleaners & Dyers, Inc. v. United States*:[39]

> There is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning. But the presumption is not rigid and readily yields whenever there is such variation in the connection in which the

---

32. *Rabang*, 35 F.3d at 1453.
33. 16 AMERICAN JURISPRUDENCE 2d, Constitutional Law § 75 (Tim A. Thomas et al. eds., 1998); *see also* Hepburn & Dundas v. Ellzey, 6 U.S. (2 Cranch) 445, 453 (1805) (A word which has been plainly used in a limited sense in articles of the Constitution relating to the legislative and executive departments must be understood as retaining the same sense when employed in an article relating to the judicial department).
34. 16 AMERICAN JURISPRUDENCE 2d § 115; *see also* National Mutual Ins. Co. v. Tidewater Transfer Co. Inc., 337 U.S. 582, 613 (1949) (Rutledge, J., concurring) ("'[T]he substantial identity of the words' in the *constitutional* and *statutory* grants of federal-question jurisdiction, 'does not, of course, require, on that score alone, an identical interpretation.'") (citation omitted).
35. *See* Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433–34 (1932); Smiley v. Holm, 285 U.S. 355 (1932) ("[T]he meaning of the word 'legislature,' used several times in the Federal Constitution, differs according to the connection in which it is employed, depending upon the character of the function which that body in each instance is called upon to exercise.").
36. CHESTER JAMES ANTIEAU, CONSTITUTIONAL CONSTRUCTION 21 (1982).
37. 30 U.S. (5 Pet.) 1 (1831).
38. *Id.* at 19.
39. 286 U.S. 427 (1932).

82                UCLA ASIAN PACIFIC AMERICAN LAW JOURNAL                [Vol. 5:77

words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent.[40]

Plaintiffs relied on Justice Sutherland's opinion in successfully arguing their case in *National Mutual Insurance Co. v. Tidewater Transfer Co.*[41] In *Tidewater*, the Supreme Court had to determine the constitutionality of a congressional statute which made the District of Columbia and the territories a "state" for purposes of federal diversity jurisdiction.[42] The framers had imposed a territorial limitation on the extent of diversity jurisdiction. Article III, section 2 states, in relevant part: "The judicial Power shall extend . . . to Controversies . . . between Citizens of different States."[43] Thus, the case presented the question of what constitutes the term "states" for purposes of Article III, section 2 of the Constitution.

The Court sustained the constitutionality of the legislation, rendering two separate opinions. The plurality opinion side-stepped the issue of what constitutes a state for purposes of Article III. Instead, the plurality declared that Congress had the constitutional authority to pass legislation enlarging the federal court's jurisdiction to include actions between a citizen of the District of Columbia or a territory against a citizen of one of the states.[44] The other six justices disagreed with the plurality's premise, stating that Congress had no such power.

The concurring opinion confronted the issue of the meaning of the term "state" for purposes of federal diversity jurisdiction. Writing on behalf of the concurring opinion, Justice Rutledge explained that there was "no real escape from deciding what the word 'State' as used in Article III, § 2 of the Constitution means,"[45] and argued that "[k]ey words like 'state' [and] 'citizen' do not always and invariably mean the same thing."[46] He stated further, "I cannot believe that the Framers intended to impose so purposeless and indefensible a discrimination, although they may have been guilty of understandable oversight in not providing explicitly against it."[47] Consequently, the legislation was sustained, thereby including the District of Columbia and the territories as within the meaning of the term "states" as used in Article III. Today, the word "states" for purposes of federal diversity jurisdiction includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.[48]

I do not argue now that the phrase "in the United States" should include United States territories *based* on the holding in *Tidewater* or 28 U.S.C. § 1332. To do so would make me guilty of violating the same fundamental principle in constitutional construction that I accuse the majority of breaching. I do assert, however, that the view espoused by the Supreme Court in *Cherokee Nation, Atlantic Cleaners,* and *Tidewater* cannot and should not be ignored. These opinions of the High

---

40. *Id.* at 433.

41. 337 U.S. 582 (1949).

42. Act of April 20, 1940, ch. 117, 54 Stat. 143 (1940). The effect of the Act was to amend 28 U.S.C. § 41 (1) so that it read in pertinent part: "The district courts shall have original jurisdiction . . . in controvers[ies] . . . between citizens of different States, or citizens of the District of Columbia, the Territory of Hawaii, or Alaska, and any State or Territory."

   This code section has been codified at 28 U.S.C. § 1332(d). As amended, section 1332 defines "[t]he word 'States,' as used in this section, [to] include[s] the Territories, the District of Columbia, and the Commonwealth of Puerto Rico." 28 U.S.C. § 1332(d) (1994).

43. U.S. CONST. art. III, § 2.

44. National Mutual Ins. Co. v. Tidewater Transfer Co., Inc., 337 U.S. 582, 589.

45. *Id.* at 605.

46. *Id.* at 623.

47. *Id.* at 625.

48. 28 U.S.C. § 1332(d) (1994).

Court recognize that a term used in one provision of the Constitution is not necessarily defined the same way as used in another provision. Stated another way, a definition which has been attached to a particular phrase cannot be applied to the same phrase found elsewhere in the Constitution without analyzing the context, character, and aim of the provision in which the latter phrase is used. Unfortunately, that is exactly what the majority did in *Rabang*. They violated a basic canon in constitutional construction by importing a definition of a term in the Constitution from one provision to another. The majority assumed that the definition of the phrase "in the United States" did not include the territories, without analyzing the history or purpose underlying the Citizenship Clause.

In sum, the *Rabang* majority either *mischaracterized* or *misapplied* the holding in *Downes*, the lone case that it discusses at length. Its interpretation of the *Downes* holding is inaccurate. The majority broadened the holding despite the Supreme Court's explicit language to narrow it. Alternatively, the majority's application of the *Downes* holding is improper. The majority misapplied the *Downes* Court's definition of the phrase "in the United States" to interpret a separate Constitutional provision without regard to the aim or text of the latter provision. As the *Downes* case is the cornerstone of the majority's decision, the opinion is essentially baseless and unsupported. The majority, however, does mention three Congressional acts which affected the citizenship status of the inhabitants of the Philippines: the Philippine Government Act,[49] the Philippine Autonomy Act,[50] and the Philippine Independence Act.[51] Basing its ruling on these Congressional acts alone, however, would also be questionable.

## III.   THE JUDICIARY'S DEFERENCE TO CONGRESS' PLENARY POWER

### A.   *Congressional Legislation Classifying Pilipinos*

The majority refers to a series of Congressional acts which affected the status of individuals born in the Philippines during the territorial period. Enacted in 1902, the Philippine Government Act, which established the terms of the United States' rule over the Philippines, declared that inhabitants of the Philippines and their children were "citizens of the Philippine Islands and as such entitled to the protection of the United States."[52] Through the Philippine Autonomy Act of 1916, Congress reiterated that inhabitants of the Philippines were citizens of the Philippine Islands.[53] In 1934, amid pressures from racist and white nativist groups, such as the Native Sons of the Golden West and the Commonwealth Club, Congress passed the Philippine Independence Act, popularly referred to as the Tydings-McDuffie Act.[54] The 1934 Act established the Philippines as a commonwealth and provided for the withdrawal of United States sovereignty within ten years.[55] Most importantly to nativist groups and other exclusionists, the Tydings-McDuffie Act classified Pilipinos as "aliens" under the immigration laws of the United States, effectualizing the real

---

49.  Philippine Government Act, ch. 1369, 32 Stat. 691 (1902).
50.  Philippine Autonomy Act, ch. 416, 39 Stat. 545 (1916).
51.  Philippine Independence Act, ch. 84, 48 Stat. 456 (1934) (current version at 22 U.S.C. § 1394 (1994)).
52.  Philippine Government Act, § 4, 32 Stat. at 692.
53.  Philippine Autonomy Act, § 2, 39 Stat. at 546.
54.  RONALD TAKAKI, STRANGERS FROM A DIFFERENT SHORE: A HISTORY OF ASIAN AMERICANS 329-31 (1989).
55.  Philippine Independence Act, ch. 84, § 10(a), 48 Stat. at 463.

purpose of the Act, which was Pilipino exclusion.[56] Senator Millard Tydings argued, "It is absolutely illogical to have an immigration policy to exclude Japanese and Chinese and permit Filipinos en masse to come into the country . . . . If they continue to settle in certain areas they will come in conflict with white labor."[57]

Given the judiciary's long history of recognizing the plenary power of Congress in matters involving territorial as well as immigration law, the Ninth Circuit may have followed suit, and was therefore, unwilling to disturb Congress' decision not to grant citizenship to the Philippine inhabitants. The majority implies that Congress had already decided the citizenship status of the Philippine inhabitants through these congressional acts. This assumes that Congress is free to *withhold* citizenship.

Although Congress may *grant* citizenship, it is indisputable that it does not have the power to take it away.[58] My position is that the Constitution conferred citizenship to Pilipinos at birth. These Congressional acts function to deny a right to which Philippine inhabitants were already entitled under the Constitution. As such, portions of the legislation revoking the right to citizenship by birth is beyond Congressional authority.

Historically, the judiciary has observed that Congress has plenary powers in immigration as well as territorial matters.[59] It is arguable that the majority was driven by this traditional courtesy of deferring to Congress on these issues. I devote the following sections to examining cases that illustrate the judiciary's deference to Congress' plenary power. Courts acknowledge, however, that even the plenary power of Congress in territorial and immigration matters is not absolute.

B. *Deference to Congress in Decisions Involving Pilipino Claimants Seeking United States Nationality or Citizenship*

The courts have not been too sympathetic towards Pilipino claimants seeking either to keep their status as a "national" of the United States or to attain their United States "citizenship." The Supreme Court and the Ninth Circuit have routinely rejected claims that individuals born in the Philippines during the territorial period were still United States "nationals" after the Philippine Islands gained their independence.

In *Cabebe v. Acheson*,[60] the Ninth Circuit rejected a claim by a native Pilipino[61] who was seeking status as a United States national in order to obtain a United States

56. Exclusionists were still unhappy and pressured Congress, which passed a bill in 1935 to repatriate Pilipinos, offering them free transportation to the Philippines "on the condition that they forfeit their right to reentry to the United States." TAKAKI, *supra* note 54, at 332-33.

57. TAKAKI, *supra* note 54, at 331-32. The immigration policy that Senator Tydings was referring to was principally reflected in the Chinese Exclusion Act of 1882 and the Immigration Act of 1924. The Chinese Exclusion Act barred Chinese laborers from entering the United States. *Id.* at 111. The Immigration Act of 1924, also known as the National Origins Act, prohibited the entry of aliens ineligible for citizenship. "The 1924 Act provided for immigration based on nationality quotas: the number of immigrants to be admitted annually was limited to two percent of the foreign-born individuals of each nationality residing in the United States in 1890." *Id.* at 209. This immigration law could not be applied to Filipinos because the Philippines was a United States territory. *Id.* at 331.

58. *See Afroyim v. Rusk*, 387 U.S. 253, 257 (1967).

59. For a complete and thorough discussion of the plenary power of Congress in immigration law and in territorial law, see Hiroshi Motomura, *Immigration Law After a Century of Plenary Power: Phantom Constitutional Norms and Statutory Interpretation*, 100 YALE L.J. 545 (1990) [hereinafter Motomura, *A Century of Plenary Power*], and Jon M. Van Dyke, *supra* note 18, respectively. Both articles are excellent works which I cite heavily in the following sections.

60. 183 F.2d 795 (9th Cir. 1950).

passport.[62] Cabebe entered the Territory of Hawaii in 1930 and resided there for nineteen years.[63] The court's decision resting primarily on two Congressional acts, the Tydings-McDuffie Act of 1934[64] and the Nationality Act of 1940,[65] manifested the court's deference to Congress on territorial and immigration matters. The court reasoned that the 1934 Act deemed Pilipinos as aliens and that if Congress wanted Pilipinos permanently residing in the United States not to lose their status as nationals, it would have provided for it in the 1934 Act.[66] This reasoning showed the court's naivete. Although the 1934 Act granted the Philippines its independence, the real thrust behind the passage of the Act was to take away the Pilipinos' status as United States nationals, and as such, prevent anymore Pilipinos from entering the United States.[67] Citing the 1940 Nationality Act, the court determined that a national is a "person who . . . owes permanent allegiance to the United States [but] does not include an alien."[68] The court did not consider relevant the fact that Cabebe was a permanent resident, having lived in the United States for almost two decades.

In *Rabang v. Boyd*,[69] a native Pilipino who entered the United States in 1930 and was a permanent resident for twenty-one years, was deported under a 1931 Act which provided for the deportation of any alien convicted of violating a narcotics law.[70] Rabang claimed that he was still a United States national, and thus, not within the purview of the 1931 Act.[71] The Court reasoned that Congress had the power to determine the status of the inhabitants of a territory, and that Rabang, being a Pilipino, was deemed an alien when the Philippines became an independent nation, thereby subjecting him to the 1931 Act.[72] Citing the Supreme Court decision in *Rabang v. Boyd*, the Ninth Circuit in *Manguerra v. I.N.S.*[73] summarily dismissed a native Pilipino's claim that her status as a national could not be taken away without her consent.[74] As in *Cabebe* and *Rabang v. Boyd*, the court was unwilling to disturb Congress' decision to revoke native Pilipinos' status as United States nationals, once again revealing the judiciary's deference to Congress.

The courts have also deferred to Congress when Pilipinos have raised the claim that they are entitled to citizenship by virtue of their birth in the Philippines during the territorial period. Although this claim routinely has been rejected, the courts have repeatedly failed to confront the specific issue of whether birth in the Philippines during the territorial period constitutes birth in the United States. In *Gancy v. United States*,[75] a native Pilipino residing in the United States was charged for failing to register during a four-month period as mandated by the Alien Registration Act of

61. For simplicity, I use the term "native Pilipino" in this section to describe those persons who were born in the Philippines while it was *still* a United States territory.
62. *Id.* at 796.
63. *Id.*
64. *Id.* at 798.
65. *Id.*
66. *Id.* at 801.
67. *See supra* text accompanying notes 54–57.
68. *Id.* at 798.
69. 353 U.S. 427 (1957).
70. *Id.* at 428.
71. *Id.* at 431.
72. *Id.* at 430–31.
73. 390 F.2d 358, 360 (1968).
74. The Ninth Circuit, throughout its opinion, misspelled "Philippine," preferring instead to spell the adjective form of the country as "Phillipine." *See id.* at 358.
75. 149 F.2d 788 (8th Cir. 1945).

1940.[76] The Eighth Circuit rejected appellant's contention that he was a citizen because of his allegiance to the United States from the time the Philippines were ceded from Spain.[77] In rejecting Gancy's claim, the court relied again on the 1934 Tydings-McDuffie Act, where Congress declared all Pilipinos aliens.[78] The court reasoned that those residing in the United States also became aliens, thereby requiring Gancy to register as an alien pursuant to the Alien Registration Act.[79]

In *Resurreccion-Talavera v. Barber*,[80] appellant claimed he was entitled to citizenship based on the Fourteenth Amendment of the Citizenship Clause, the very issue in *Rabang v. INS*. Resurreccion-Talavera, a native Pilipino, entered the United States in 1934, was convicted of burglary in 1942, visited Mexico in 1952, and returned to the United States shortly thereafter.[81] The district court ordered his deportation pursuant to the provisions of Section 19 of the Immigration Act of 1917 on the ground that he was an alien who had been convicted of a felony involving moral turpitude prior to his latest *entry* in the United States.[82] The Ninth Circuit affirmed the lower court's decision, but failed to address appellant's Fourteenth Amendment claim.[83] Instead, the Ninth Circuit ordered Resurreccion-Talavera deported based on its earlier decision in *Cabebe*,[84] where it relied heavily on the Tydings-McDuffie Act of 1934 which proclaimed all Pilipinos as aliens. In effect, the court again deferred to Congress rather than confront the issue of whether birth in the Philippines during the territorial period constitutes birth "in the United States" under the Fourteenth Amendment.

Forty years later, the Ninth Circuit in *Rabang v. I.N.S.* had an opportunity to address the claim identical to that in *Resurreccion-Talavera*. As in *Resurreccion-Talavera* and other cases involving native Pilipinos claiming status as a United States citizen or national, the majority in *Rabang v. INS* was driven, at least in part, by the judiciary's customary practice of deferring to Congress. The majority cited a series of Congressional legislation classifying Pilipinos born during the territorial period as citizens of the Philippines, then later as aliens of the United States. However, as the Supreme Court stated in *Downes v. Bidwell*, the same case on which the majority so heavily relied, legislation involving a territorial inhabitant's fundamental constitutional rights is reviewable by the judiciary branch.[85] I argue that a territorial inhabitant's rights to citizenship is within the panoply of protected fundamental rights.

## C. Limitations on Congress's Plenary Power over Territorial Law

The scope of Congress's power over United States territories has been a subject of debate for most of the nation's history.[86] The only language in the Constitution dealing with the question of territories is the "Territory Clause," which provides:

76. *Id.* at 789.
77. *Id.*
78. *Id.* at 790.
79. *Id.* at 790–91.
80. 231 F.2d 524 (9th Cir. 1956).
81. *Id.* at 525.
82. *Id.*
83. *Id.* at 526.
84. *Id.* at 525.
85. 182 U.S. 244, 283 (1901).
86. Van Dyke, *supra* note 18, at 453.

The Congress shall have Power to dispose of and make all needful rules and regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.[87]

One of the earliest Supreme Court cases involving the extent of Congress' power over the territories was *National Bank v. County of Yankton*.[88] The issue in *National Bank* was whether Congress could nullify a law passed by the Territory of Dakota. The Supreme Court held that Congress' power over the territories was plenary, stating that Congress has "full and complete legislative authority over the Territories and all the departments of the territorial governments."[89] Congress' broad powers, however, are restricted when the constitutional rights of the territorial of the inhabitants are implicated.[90] Five years later, the issue of Congress' broad power to administer the territories was raised again in *Murphy v. Ramsey*.[91] The dispute originated in the Territory of Utah, and at issue was whether Congress could prohibit bigamists and polygamists from registering to vote. The Court justified Congress' authority to adopt such a law, and again recognized Congress's supreme power over the territories.[92] As in *National Bank*, the Court defines this power, determining that it is "subject only to such restrictions as are expressed in the Constitution."[93]

The strongest declaration of Congress' plenary power over United States territories was made in 1901 in a series of Supreme Court decisions[94] now commonly referred to as the *Insular Cases*.[95] These powers were examined in great detail in *Downes v. Bidwell*.[96] The *Downes* court stated, "The power of Congress over the territories of the United States is general and plenary. . . . Doubtless Congress, in legislating for the territories would be subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments."[97] In the *Insular Cases* as well as in major decisions that preceded them, the Supreme Court consistently held that "Congress has general and plenary power over

---

87. U.S. CONST., art. IV, § 3.

88. 101 U.S. 129 (1880).

89. 101 U.S. at 133. The Court added:

All territory within the jurisdiction of the United States not included in any State must necessarily be governed by or under the authority of Congress. The Territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective States, and Congress may legislate for them as a State does for its municipal organizations. *Id.*

90. The Court said, "Congress is supreme, and for the purposes of this department of its governmental authority has all the powers of the people of the United States, except such as have been expressly or by implication reserved in the prohibitions of the Constitution." *Id.*

91. 114 U.S. 15 (1885).

92. *Id.* at 44–45. The Court said,

The people of the United States, as sovereign owners of the National Territories, have supreme power over them and their inhabitants. In the exercise of this sovereign dominion, they are represented by the government of the United States, to whom all powers of government over that subject have been delegated . . . . *Id.* at 44.

93. *Id.*

94. *See* Van Dyke, *supra* note 18, at 455.

95. *See* De Lima v. Bidwell, 182 U.S. 1 (1901); Dooley v. United States, 182 U.S. 222 (1901); Armstrong v. United States, 182 U.S. 243 (1901); Downes v. Bidwell, 182 U.S. 244 (1901). These cases dealt with application of tariff laws to the Territory of Puerto Rico, an off-shore island (i.e. "insular"), which had been acquired by the United States in 1898.

96. 182 U.S. at 244. *Downes* is the same case that the Ninth Circuit heavily relies in the *Rabang* opinion. The majority cites this case for its interpretation of the phrase "in the United States" which the *Downes* court defined for purposes of the Revenue Clauses.

97. *Id.* at 268 (quoting Mormon Church v. United States, 136 U.S. 1, 42, 44 (1889)).

88                    UCLA ASIAN PACIFIC AMERICAN LAW JOURNAL                    [Vol. 5:??

the territories, but that these powers are limited by certain fundamental constitutional rights of the territorial inhabitants."[98] The question remains: Which constitutional rights of the territorial inhabitants are protected, and therefore, unfettered from Congress's plenary power? Specifically, is the right of citizenship one of those fundamental rights that the judiciary should endeavor to protect against unconstitutional Congressional legislation?

The federal courts have yet to settle upon a single test for determining which specific constitutional provisions apply to the inhabitants of United States territories.[99] Currently, there is a split among the federal circuit courts. The D.C. Circuit, which has jurisdiction over American Samoa, has held that all of the individual rights protected by the Constitution applies to the territories of the United States, except those whose implementation proves to be "impractical and anomalous" in a given setting.[100] On the other hand, the Ninth Circuit, which has jurisdiction over the Northern Mariana Islands and Guam, holds that only those constitutional provisions that protect the "fundamental" rights must apply to these territories.[101] As suggested by Judge Pregerson, "right to citizenship by birth is among those 'fundamental constitutional rights [that] apply by their own force' . . . throughout the dominion of the United States."[102] In *Trop v. Dulles*,[103] the Supreme Court pronounced that citizenship is indeed a "fundamental right."[104] In fact, Chief Justice Warren called United States citizenship the American people's "most basic right."[105]

Citizenship is unquestionably a fundamental right. Therefore, under either view espoused by the D.C. Circuit or by the Ninth Circuit, citizenship is a right that is beyond the Congress' plenary power in territorial matters. Any congressional legislation affecting citizenship of territorial inhabitants is reviewable by the judiciary and must pass constitutional muster. Similarly, Congress' plenary power over immigration law also has its limitations, namely when the legislation involves constitutional claims of aliens inside the United States or inhabitants of a United States territory.

---

98.  Van Dyke, *supra* note 18, at 459.

99.  *See* Robert A. Katz, Comment, *The Jurisprudence of Legitimacy: Applying the Constitution to U.S. Territories*, 59 U. CHI. L. REV. 779 (1992).

100.  King v. Morton, 520 F.2d 1140, 1147 (D.C. Cir. 1975). In *King v. Morton*, the D.C. Circuit examined the constitutionality of American Samoa's refusal to provide jury trials to persons prosecuted under territorial law. The circuit court remanded the case to the district court, instructing the court to determine whether 'circumstances [in American Samoa] are such that trial by jury would be impractical and anomalous.'" *Id.* at 1147–48 (citing Reid v. Covert, 354 U.S. 1, 175 (1957) (Harlan, J., concurring in result)).

101.  *See* Northern Mariana Islands v. Atalig, 723 F.2d 682, 690 (9th Cir. 1984). At issue was the constitutionality of a law which authorized the Northern Mariana Islands to limit trial by jury in criminal prosecutions. Relying on the *Insular Cases*, the Ninth Circuit held that the "right to trial by jury [is a] nonfundamental right[ ] that do[es] not apply in unincorporated territories." *Id.* at 688 (citing Balzac v. Porto Rico, 258 U.S. 298, 309 (1922); Dorr v. United States, 195 U.S. 138, 149 (1904); Mankichi, 190 U.S. 197, 216–18 (1903).

102.  Rabang v. I.N.S., 35 F.3d 1449, 1464 (9th Cir. 1994) (Pregerson, J., dissenting) (citing Examining Bd. v. Flores de Otero, 426 U.S. 572, 599 n.30 (1976)).

103.  356 U.S. 86 (1958).

104.  *Id.* at 93.

105.  Perez v. Brownell, 356 U.S. 44, 64 (1958) (Warren, C.J., dissenting).

### D.   *Resurgence of Interest in Constitutional Immigration Law*

Generally, courts have been reluctant to apply constitutional principles in immigration law.[106] Immigration law is commonly known as the federal law governing the admission and expulsion of aliens.[107] The courts instead have deferred to Congress and the executive agencies to interpret immigration statutes and regulations. The primary reason for this deference has been the judicially created plenary power doctrine under which "Congress and the executive branch have broad and often exclusive authority in immigration matters."[108]

Recently, however, the Supreme Court and other lower federal courts have decided several immigration cases, marking a resurgence of interest in constitutional immigration law.[109] One reason for this shift is the "widespread belief that the development of immigration law has finally reached a stage in which courts can no longer simply recite the plenary power doctrine and reject aliens' constitutional claims out of hand."[110] Many of the immigration cases of the past decade reflect a broad effort by aggrieved aliens to change the tide of the past century by compelling the courts to place under judicial scrutiny immigration legislation enacted by the political branches—a process customary in other areas of law.[111]

The use of the plenary power doctrine in constitutional immigration law originated in a Supreme Court decision articulated in *Chae Chan Ping v. United States*,[112] popularly known as the Chinese Exclusion Case. Chae Chan Ping immigrated to the United States in 1875 as a laborer. Interested in obtaining cheap Chinese labor[113] and improving trade relations with China, the United States negotiated the Burlingame Treaty of 1868, which seemed to guarantee unrestricted immigration from China. The economic rivalry between Chinese immigrants and white labor provoked racial tension between the two groups, and as a result, racist and nativist anti-Chinese sentiment became widespread in California. The strong resentment of Chinese immigrants ultimately functioned as the catalyst for the Chinese Exclusion Act of 1882[114] which suspended immigration of Chinese laborers for

---

106.  *See* Hiroshi Motomura, *The Curious Evolution of Immigration Law: Procedural Surrogates for Substantive Constitutional Rights*, 92 COLUM. L. REV. 1625, 1626 (1992) [hereinafter Motomura, *Evolution of Immigration Law*].

107.  *See, e.g.* Stephen H. Legomsky, *Immigration Law and the Principle of Plenary Congressional Power*, 1984 SUP. CT. REV. 255, 256.

108.  Motomura, *Evolution of Immigration Law*, *supra* note 106, at 1626.

109.  *See* Motomura, *A Century of Plenary Power*, *supra* note 59, at 546.

110.  Motomura, *Evolution of Immigration Law*, *supra* note 106, at 1627. *See, e.g.* T. Alexander Aleinikoff, *Federal Regulation of Aliens and the Constitution*, 83 AM. J. INT'L L. 862, 870 (1989); Louis Henkin, *The Constitution and United States Sovereignty: A Century of Chinese Exclusion and Its Progeny*, 100 HARV. L. REV. 853, 863 (1987); Legomsky, *supra* note 107, at 255.

111.  *See* Motomura, *Evolution of Immigration Law*, *supra* note 106, at 1627.

112.  130 U.S. 581 (1889).

113.  There was a constant demand for Chinese workers in railroads, agriculture, and manufacturing all over the Pacific coast because "white labor was not available at wages capital could afford to pay." Takaki, *supra* note, 54, at 28. One California farmer stated frankly that he "could not get white labor to do stoop labor in the fields." *Id.* "[T]he Chinese could also be pitted against and used to discipline white workers . . . . [T]he importation of Chinese labor would become a favorite method of resisting white workers' strikes now that American capital had within its reach millions of Chinese ready to 'work for small wages' . . . . Labor was a major cost of production, and employers saw how the importation of Chinese workers could boost the supply of labor and drive down the wages of both Chinese and white workers." *Id.* at 28–29.

114.  *See* TAKAKI, *supra* note 54, at 111. The passage of the Chinese Exclusion Act marked the first time the United States enacted a racist immigration policy. The Act made it unlawful for Chinese laborers to enter the United States. The prohibition was broadened in 1888 to include "all persons of the Chinese race"; only Chinese officials, teachers, students, tourists, and merchants were exempted. *Id.*

ten years. The Act was renewed in 1892, and extended indefinitely in 1902.[115] The Chinese Exclusion Act did allow Chinese already in the United States to obtain certificates that would enable them to leave and return. Chae Chan Ping obtained one of these certificates in 1887.[116]

In 1888, while Chae Chan Ping was in his native China, Congress barred the return of Chinese laborers, including those with certificates. Upon his return, Chae Chan Ping was held on a ship in San Francisco Bay. In a petition for habeas corpus, he asserted that the 1888 statute was beyond the competency of Congress to pass it.[117] This was the first opportunity the Supreme Court had to confront directly the federal government's power to exclude aliens, which the Constitution does not address explicitly.[118] The Court held that the federal government has the power to regulate immigration, and that the political branches could exercise this power without being subject to judicial review.[119] Judicial scrutiny was not warranted despite the absurdity of Congress's interest: "If [Congress] considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be dangerous to its peace and security . . . its determination is conclusive upon the judiciary."[120] The Court established what has become the conceptual framework for classical immigration law by focusing on the federal government's power under the Constitution[121] rather than considering whether the rights of an individual alien might somehow limit Congress's immigration power.[122]

The Supreme Court reaffirmeded Congress's plenary power over immigration matters in *Nishimura Ekiu v. United States*.[123] A Japanese immigrant challenged the constitutionality of an immigration law that forbade certain classes of alien immigrants from landing in the United States. As in the Chinese Exclusion Case, the Court held that the immigration power "belong[ed] to the political departments," immune from judicial review.[124] The Court further extended Congress's plenary power in *Fong Yue Ting v. United States*,[125] defending Congress's authority to deport resident aliens in the United States.[126] In 1892, the Chinese Exclusion Act of 1882 had been extended for another ten years. Chinese residents were permitted to stay in the United States, provided they could prove pre-1892 residency through an affidavit prepared by a white witness.[127] Although they claimed they had resided in the United States prior to 1892, Fong Yue Ting and the two other Chinese laborers could not produce the mandated affidavits. Relying on earlier Supreme Court decisions reached in *Chae Chan Ping* and *Nishimura Ekiu*, Justice Gray concluded that the political branches had the authority to regulate immigration, and were exempt from judicial review.[128]

---

115. *Id.*
116. 130 U.S. at 582.
117. *Id.* at 603.
118. *See* Motomura, *Century of Plenary Power, supra* note 59, at 551.
119. *See id.* at 609.
120. *Id.* at 606.
121. *See id.* at 603.
122. Motomura, *Century of Plenary Power, supra* note 59, at 551.
123. 142 U.S. 651 (1892).
124. *Id.* at 659.
125. 149 U.S. 698 (1893).
126. *See id.* at 707.
127. *See id.* at 699 n.1 (citing statute and regulations).
128. *See id.* at 715.

The early modern era saw a continuation of judicial deference to the political branches in immigration matters. This was most evident in a series of cases decided in the McCarthy Era: *Knauff v. Shaughnessy*,[129] *Shaughnessy v. United States ex rel. Mezei*,[130] and *Harisiades v. Shaughnessy*.[131] Despite the fact that the constitutional challenges in these cases were all rejected, the decisions, taken together, provided some hope to aliens raising a constitutional challenge. Aliens "inside" the United States could expect some success with respect to procedural claims; those "outside" the United States would still have problems raising any constitutional challenges.[132] Additionally, vigorous dissents were written in each of the cases regarding the denial of judicial review. The dissenters found troubling the harsh treatment of a returning permanent resident in *Mezei*, the deportation of a resident alien without constitutional protections in *Harisiades*, and the denial of the most rudimentary procedural due process in *Knauff* and *Mezei*. Eventually, the concerns expressed in these dissents found sympathetic ears, resulting in an expansion in the number and range of constitutional immigration cases.[133]

### E. *Advances in Alien Rights Law*

As stated above, classical immigration law is defined narrowly as the admission and expulsion of aliens. Related to immigration law is the more general law of aliens' rights, where historically, more sympathetic results have been reached. The Supreme Court has traditionally provided aggrieved individuals in this broader field of aliens' rights a measure of protection that much more closely resembles the substantive and procedural rights afforded to persons in other areas of the law. In contrast to classical immigration law, the plenary power doctrine does not play a major role in these cases.[134]

*Yick Wo v. Hopkins*[135] is the progenitor of aliens' rights cases. At issue was a San Francisco ordinance that was facially race-neutral, but enforced in a manner that made it impossible for aliens of Chinese descent to operate laundries in the city. The Supreme Court held that the Constitution protects all individuals "inside" the United States, including aliens, from invidious discrimination.[136] The Court focused on the notion that aliens lawfully present in the United States were entitled to the safeguards of the constitution.[137] This view is in sharp contrast to the one espoused by the Court in the Chinese Exclusion Case, *Chae Chan Ping*.[138]

129. 338 U.S. 537, 543 (1950). In *Knauff*, the Court held that the power to exclude aliens, even the wife of a United States citizen, is fundamental to sovereignty, and is beyond judicial review.

130. 345 U.S. 206 (1953). *Mezei*, a permanent resident in the United States for 25 years, had to spend two years in detention at Ellis Island after returning from Eastern Europe to visit his dying mother. The United States government did not provide him with a hearing, "on the 'basis of information of a confidential nature, the disclosure of which would be prejudicial to the public interest.'" *Id.* at 208.

131. 342 U.S. 580 (1952). The Court upheld the deportations of Harisiades and two other resident aliens for having once belonged to the United States Communist Party. *See id.* at 595–96. The Court said, "Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Id.* at 589.

132. *See* Motomura, *Century of Plenary Power, supra* note 59, at 560.

133. *See id.*

134. *See id.* at 565.

135. 118 U.S. 356 (1886).

136. *See id.* at 369.

137. *See id.*

138. 130 U.S. 581 (1889).

Exhibit 2-17

Another influential case is *Wong Wing v. United States*.[139] Relying on *Yick Wo*, the Court held that an alien is entitled to the full range of protections afforded by the Fifth and Sixth Amendments.[140] At issue was a statute which provided that any Chinese national who was in the United States illegally "shall be imprisoned at hard labor."[141] The Court stated that before the alien was sentenced to such an infamous punishment, "a judicial trial to establish [his] guilt" was mandated.[142] In *Russian Volunteer Fleet v. United States*,[143] the Court relied heavily on *Yick Wo* and *Wong Wing* to establish that the takings clause of the Fifth Amendment applied to non-enemy aliens present within a *United States territory*.[144]

*Yick Wo* and its progeny established that the Constitution protects all individuals "inside" the United States, including aliens. Moreover, the Court in *Russian Volunteer Fleet*, which relied heavily on *Yick Wo* and *Wong Wing*, upheld the constitutional challenge by an alien in a "United States territory" specifically. Thus, the Court has been somewhat more sympathetic when the alien is inside the United States, including its territories.[145] The legacy of *Yick Wo* and its progeny represent a different model based on "a notion of fundamental human rights that protects individuals regardless of their status."[146] In contrast to the casual, nonchalant treatment of constitutional claims in immigration law, *Yick Wo* and the line of cases that followed it considered the aliens' constitutional claims seriously. In sum, the *Yick Wo* model, together with other developments in the law of individual rights and liberties, such as the 1954 landmark decision in *Brown v. Board of Education*,[147] have provided the requisite foundation to undermine the plenary power doctrine in immigration law.[148]

## F.  *Summary*

Generally, Congress has plenary power in matters involving territorial and immigration law. However, this authority of Congress is limited. Any congressional legislation involving a territorial inhabitant's fundamental rights are reviewable by the judiciary and must pass constitutional muster. Since citizenship is a recognized fundamental right, I argue that legislation involving citizenship status of territorial inhabitants should be reviewable by the judiciary.

In the area of immigration and alien rights law, the Court has been somewhat more sympathetic to constitutional claims of aliens inside the United States and its territories. Pilipino claimants generally fall within one of these geographic areas: either as an alien in a state of the union or as a native inhabitant in a former United States territory. More importantly, United States citizenship can be conferred either by the Federal Constitution or by the laws enacted by Congress. The claim of plaintiffs in *Rabang* as well as my position in this Comment is based on the theory that native Pilipinos born during the territorial period are entitled to citizenship based on

139.  163 U.S. 228 (1896).

140.  *See id.* at 237.

141.  Act of May 5, 1892, ch. 60, § 4, 27 Stat. 25 (1892).

142.  163 U.S. at 237.

143.  282 U.S. 481 (1931).

144.  *See id.* at 489 (emphasis added).

145.  *See* Shaughnessy v. United States ex. rel. Mezei, 345 U.S. 206 (1953); Harisiades v. Shaughnessy, 342 U.S. 580 (1952).

146.  Motomura, *Century of Plenary Power, supra* note 59 at 566 (quoting T. Alexander Aleinikoff, *Citizens, Aliens, Membership, and the Constitution,* 7 CONST. COMMENTARY 9, 19 (1990).

147.  347 U.S. 483 (1954).

148.  Motomura, *Century of Plenary Power, supra* note 59, at 567.

Chinese parents, could not be excluded from the United States under the Chinese Exclusion Acts after a temporary visit to China.[152] Admittedly, the holding in *Wong Kim Ark* is not relevant in deciding the issue of whether a territory is considered "*in the United States*" for purposes of the Citizenship Clause. What is significant about *Wong Kim Ark* was the Supreme Court's *approach* in reaching that landmark decision.

The words of the Fourteenth Amendment do not explain on their face the meaning of the phrase "in the United States" when determining the right to citizenship by birth. Thus, the Court in *Wong Kim Ark*, in reaching its decision, carefully examined the history underlying the passage of the Fourteenth Amendment and the common law familiarly known to the framers of the Constitution. As Judge Pregerson points out, *Wong Kim Ark* discussed at length the importance and status of the common law rule of citizenship by birth in determining the meaning and scope of the Citizenship Clause. Thus, the Ninth Circuit should be guided by *Wong Kim Ark*, not *Downes*, to determine whether persons born in the Philippines during the territorial period are entitled to United States citizenship.

The Court in *Wong Kim Ark* quoted from *Minor v. Happersett*[153] which examined the very provision of the Fourteenth Amendment now in question: "The constitution does not, in words, say who shall be natural-born citizens. Resort must be had elsewhere to ascertain that." The court in *Wong Kim Ark* turned to the common law as a guide in the construction of this provision.[154] The dissent's reliance on *Wong Kim Ark* advances two rules of constitutional construction, which the courts regard as among the most important principles.

*Wong Kim Ark* stressed the importance of the framers' intent. Accordingly, the United States Supreme Court and other American courts have customarily stated that one fundamental principle of constitutional construction is that effect must be given to the intent of the framers and the people adopting it.[155] This is the "polestar in the construction of constitutions."[156] This principle is perhaps the most basic of all the rules of constitutional construction since it is the rule which all other rules may be said to be designed to implement.[157]

Another important canon of constitutional construction furthered by the dissent by its reliance on *Wong Kim Ark* is that constitutions must be construed with reference to common law. It has been said that without reference to the common law the language of the Federal Constitution could not be understood.[158] As stated by one commentator: "On literally dozens of occasions the United States Supreme Court has construed the original Constitution according to the common law existing in this country in 1789, and amendments according to the common law as of the date of their ratification."[159] It is the common law that the courts must look for legal definitions and judicial ideas in interpreting the federal Constitution.[160]

---

152. *See id.* at 704.

153. 88 U.S. (21 Wall.) 162, 167 (1874).

154. 169 U.S. at 655.

155. *See* Whitman v. Oxford Nat'l Bank, 176 U.S. 559, 563 (1900); Lake County v. Rollins, 130 U.S. 662, 671 (1889); M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 324 (1819).

156. 16 AMERICAN JURISPRUDENCE 418.

157. *See* Carey v. Morton, 79 N.E. 2d 442, 443 (N.Y. 1948); Judd v. Board of Educ., 15 N.E. 2d 576, 582 (N.Y. 1938).

158. *See* Kansas v. Colorado, 206 U.S. 46, 94 (1907); Moore v. United States, 91 U.S. 270, 274 (1876).

159. ANTIEAU, *supra* note 35, at 83.

160. Tumey v. State, 25 Ohio N.P. (n.s.) 580, (Ohio Com. Pl.); *rev'd*, 4 Ohio Law Abs. 109 (Ohio Ct. App. 1925), *error dismissed*, 155 N.E. 698 (Ohio 1926), *rev'd*, 273 U.S. 510 (1927).

Exhibit "2-20"

After recognizing the importance of these rules of constitutional construction, the dissent, like the Court in *Wong Kim Ark*, examined the common law rule of citizenship by birth, whose origins can be traced back to *Calvin's Case*.[161] That case established that a "person's status as a natural-born subject requires that (1) the person's birth occur within the bounds of the King's dominion and (2) that the parents owe obedience to the King at the time of the child's birth."[162] This common law rule was recognized by the United States Supreme Court in *Inglis v. Sailor's Snug Harbour*,[163] not long before the adoption of the Fourteenth Amendment. This leaves little doubt that the rule of "jus soli"—recognizing as citizens those born within the allegiance of the country and subject to its protection—was well known to the framers. The Supreme Court in *Wong Kim Ark* similarly concluded that the Citizenship Clause "affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country . . . ."[164] Thus, following the same rules in constitutional construction as did the Supreme Court in *Wong Kim Ark* and *Inglis*, the *Rabang* dissent appropriately concluded that the phrase "in the United States," for purposes of the Citizenship Clause, means "within the dominion or territory of the United States."[165]

## V.    UNITED STATES' SOVEREIGNTY OVER THE PHILIPPINES

Against this legal framework, the next task is to determine whether the Philippines were subject to the complete sovereignty of the United States during the period, December 10, 1899 to July 4, 1946, thereby making birth in the Philippines during the territorial period equivalent to birth in the United States. This part recounts significant events in the relationship between the United States and the Philippines. These events depict the United States' dominion and control over the Philippines and the Pilipinos' allegiance to the United States during the territorial period.

Near the end of the 16th Century, the Spaniards took over the Philippines. The colony was named after King Philip II of Spain. After 350 years of Spanish rule, the Pilipinos revolted against their oppressors in 1896. How the United States became involved in this archipelago half way around the globe can best be described by this excerpt as told by Philippine historians:

> By the summer of 1898, Pilipino rebels had driven the Spanish colonialists out of the countryside and into the capital city of Manila, where they held their former rulers under siege. In April 1898, a simmering feud over U.S. support of the Cuban revolution against Spain erupted into the Spanish-American War. Just six days later, U.S. forces sailed into Manila Bay and sank seven decrepit Spanish

---

161.  77 Eng. Rep. 377, 399 (Exch. Ch. 1608).

162.  United States v. Wong Kim Ark, 169 U.S. 649, 655 (1898).

163.  The dissent also quoted from Inglis v. Sailors' Snug Harbour:
   Two things usually concur to create citizenship [by birth]: first, *birth locally within the dominions of the sovereign*; and, second, birth within the protection and obedience, or in other words, within the ligeance of sovereign. That is, the party must be born within a place where the sovereign is at the time in full possession and exercise of his power, and the party must also at his birth derive protection from, and, consequently, owe obedience or allegiance to, the sovereign. (quoting *Inglis*, 28 U.S. (3 Pet.) 99, 155 (1830) (Story, J., concurring)). *Rabang v. I.N.S.*, 35 F.3d 1449, 1459 (9th Cir. 1994) (Pregerson, J., dissenting).

164.  *Id.* at 693. The Court in *Wong Kim Ark* Court stated: The fundamental principle of the common law with regard to English nationality was birth within the allegiance, also called "ligealty," "obedience," "faith," or "power," of the King. The principle embraced all persons born within the King's allegiance, and subject to this protection. *Id.* at 655.

165.  *Rabang*, 35 F.3d at 1459 (Pregerson, J., dissenting).

vessels. After this one-sided battle, Admiral George Dewey arranged to have the Spanish surrender. American forces subsequently took over Manila and did not allow Pilipinos to enter their own capital city. And so, after over 300 years of harsh Spanish occupation and repression, the Pilipino rebels were denied their hard-won triumph. But they were not willing to accept another invading army without a fight. It took more than 120,000 U.S. troops nearly eight years to subdue the Pilipino struggle for independence. During that time an estimated one-sixth of the Philippines' seven million inhabitants were killed. Many historians describe this conflict as America's first Vietnam. With the signing of the Treaty of Paris in December 1898, the Philippines became America's possession, "purchased" from Spain for $20 million.[166]

For the first time, the United States acquired a territory beyond its shores. The former colony had become a colonialist.[167] Anti-imperialists drew support from former President Grover Cleveland and Mark Twain.[168] Twain, in his essay "The Philippine Incident" written in 1900, criticized U.S. policy toward the Philippines:

> [P]resently came the Philippine temptation. It was strong; it was too strong . . . It was a pity; it was a great pity, that error; that one grievous error, that irrevocable error . . . There must be two Americas: one that sets the captive free, and one that takes a once-captive's new freedom away from him, and picks a quarrel with him with nothing to found it on; then kills him to get his land.[169]

The United States maintained military rule over the Philippines until 1902.[170] Congressional enactments during the territorial period made clear that the United States both maintained and exercised sovereignty over the Philippines during the territorial period. In 1902, Congress created a tripartite system of government in the Philippines, apparently modeled after the United States.[171] Ironically, governments of the states of the union were far less restricted than the territorial government instituted in the Philippines. Except as to relatively insignificant matters, the United States retained and exercised substantial control over the executive, legislative and judiciary branches.

For example, in 1916, Congress created the office of the Governor General, which was vested with "supreme executive power."[172] However, the President of the United States was authorized to appoint the Governor General, and to "modify or vacate the action" of the Governor General.[173] Congress also reserved and exercised substantial control over the Philippine legislature. Congress mandated that the Philippine legislature report all laws to Congress, who reserved the right to annul those laws.[174] Moreover, all enactments of the Philippine legislature are required to contain a clause that provided: "By authority of the United States be it enacted by the Philippine Commission."[175] Finally, Congress restricted eligibility for legislators to those "owing allegiance to the United States."[176] The U.S. government also exercised significant control over the Philippine judiciary. The U.S. President appointed

---

166. JAIME ANTONIO JACINTO & LUIS MALAY SYQUIA, LAKBAY: JOURNEY OF THE PEOPLE OF THE PHIL-IPPINES 4 (1995).

167. STANLEY KARNOW, IN OUR IMAGE: AMERICA'S EMPIRE IN THE PHILIPPINES 79 (1989).

168. *Id.* at 82.

169. JACINTO & SYQUIA, *supra* note 166, at 4.

170. RICHARD HOFSTADTER ET.AL, THE AMERICAN REPUBLIC 340 (1959).

171. Philippine Government Act, ch. 1369, 32 Stat. 691 (1902); Philippine Autonomy Act, ch. 416, 39 Stat. 545 (1916); Philippine Independence Act, ch. 84, 48 Stat. 456 (1934).

172. § 21, 39 Stat. at 552.

173. § 21, 39 Stat. at 552–53.

174. § 19, 39 Stat. at 551; § 2(a)(11), Stat. at 457.

175. § 1, 32 Stat. at 692.

176. § 7, 32 Stat. at 694.

Case 1:06-cv-00477-RMC     Document 11-3     Filed 05/07/2007     Page 21 of 23

the chief and associate justices of the Philippine Supreme Court.[177] This court's decisions were, with minor exceptions, reviewable by the United States Supreme Court.[178]

Despite the creation of a constitutional government in the Philippines in 1934, the United States retained ultimate control over the Philippines "Common-wealth."[179] Provisions in the Philippine constitution manifested the United States' complete control over the Philippines:

(1) recognition of the United States' right to intervene in the governance of the Philippines;[180]

(2) recognition of the United States' right to expropriate Philippine lands and command the Philippine armed forces;[181]

(3) continuing review by the United States Supreme Court of decisions by the courts of the Philippines;[182]

(4) continuing reports of all acts passed by the legislature to be reported to Congress.[183]

These statutes, the *Rabang* dissent recognizes, confirms that the United States maintained and exercised sovereignty and control over the Philippines during the territorial period.

The final issue to resolve is whether the Philippine inhabitants owed allegiance to the United States government. The Pilipinos' allegiance to the United States was most evident during World War II. Seven hours after the infamous attack on Pearl Harbor, Japanese forces attacked the Philippines. In the battle of Bataan, Pilipinos fought alongside American soldiers.[184] Correspondent Frank Hewlett described the fall of Bataan:

The gallant United States and Philippine forces in Bataan peninsula surrendered today after enduring the tortures of hell. . . . They were beaten, but it was a fight that ought to make every American bow his head in tribute. . . . The Americans fought for everything they loved, as did the Filipinos, WITH THEIR FIERCE LOVE OF LIBERTY.[185]

Meanwhile, Pilipinos residing in the United States rushed to the recruiting offices to volunteer; some to defend their motherland, others to show their loyalty to the United States. Because they were classified as nationals, Pilipinos were initially ineligible for military service. Pilipinos, however, were eager to serve. They protested, persuading President Franklin Roosevelt to change the draft laws to allow Pilipinos to fight in the war. Two all-Pilipino infantry regiments were formed. Pilipinos also assisted in intelligence operations. They made valuable contributions to the war effort. Lieutenant General R.K. Sutherland commented: "By their loyalty, daring, and skillful performance of duty under hazardous conditions, they materially accelerated the campaign for the recapture of the Philippine Islands."[186]

Based on these historic events affecting the relationship between the United States and the Philippines, it is clear the Philippines owed allegiance and was under

177. Phil. Gov't Act, ch. 1369, § 9, 32 Stat. 691, 695 (1902).
178. § 10, 32 Stat. at 695; Phil. Autonomy Act, ch. 416, § 27, 39 Stat. 545, 555 (1916); Phil. Indep. Act, ch. 84, § 7(6), 48 Stat. 456, 462 (1934).
179. *See* 48 Stat. 456.
180. § 2(a)(14), 48 Stat. at 457.
181. § 2(a)(12), 48 Stat. at 457.
182. § 2(a)(13), 48 Stat. at 457.
183. Phil. Indep. Act, ch. 84, § 2(a)(11), 48 Stat. 456, 457 (1934).
184. *See* TAKAKI, *supra* note 54, at 358–59.
185. *Id.* at 358.
186. *Id.* at 360.

the protection of the United States. Judge Pregerson fittingly concludes that "the Philippine[s] were sufficiently under the dominion and control of the United States such that persons born in the Philippines between December 10, 1898 and July 4, 1946 were born 'in the United States' within the meaning of the Citizenship Clause,"[187] and thus, are entitled to United States citizenship.

## VI.   CONCLUSION

The Supreme Court recognizing the importance of the right to citizenship stated: "Citizenship is no light trifle to be jeopardized any moment Congress decides to do so under the name of one of its general or implied grants of power." Consequently, limitations in Congress's plenary power in territorial and immigration law matters have been recognized. Specifically, legislation affecting the fundamental rights of territorial inhabitants are reviewable by the judiciary to determine its constitutionality. Judges have also become more sympathetic towards aliens residing in the United States or a United States territory, seriously considering their constitutional claims.

Despite the positive strides territorial inhabitants and aliens have made in having their constitutional claims addressed by the judiciary, individuals born in the Philippines during the United States territorial period have consistently had their claims rejected. The courts have repeatedly deferred to Congress, citing legislation which abridged their citizenship rights as conferred upon them by the federal Constitution. In *Rabang v. I.N.S.*, the Ninth Circuit's references to a series of Congressional legislation manifested its continued deference to Congress, and its unwillingness to disturb Congress's decision classifying Pilipinos as aliens. Although the Ninth Circuit purported to address plaintiffs' constitutional claim that their birth in the Philippines during the United States occupation constituted "birth in the United States" for purposes of the Citizenship Clause, the court did not examine the text, purpose or history underlying the Citizenship Clause. Instead, the Ninth Circuit used a definition explicitly limited to interpreting the Revenue Clauses, thereby violating a fundamental principle in constitutional construction.

On the other hand, Judge Pregerson, in a vigorous dissent, was guided by the most basic canons of constitutional construction, interpreting the Citizenship Clause by examining the common law familiarly known to the framers of the Fourteenth Amendment. The common law established that citizens are those born within the allegiance of the country and subject to its protection. During the United States' half-century of dominion and control over the Philippine Islands, the Pilipinos owed allegiance to and were under the protection of the United States. Based on the common law known to the framers, birth in the Philippine territory constituted "birth in the United States" for purposes of the Citizenship Clause. Consequently, to those persons born in the Philippines between December 10, 1898 and July 4, 1946, the Constitution confers United States citizenship, "our most fundamental right."

---

187.  Rabang v. I.N.S., 35 F.3d 1449, 1462 (9th Cir. 1994) (Pregerson, J., dissenting).

Exhibit 3

ENTINES, Enrique, H.

XC-06-380-570

**840**

PUBLIC LAWS—CH. 593—DEC. 18, 1941

[55 Stat.

by any person, or with respect to any property, subject to the jurisdiction of the United States, and any property or interest of any foreign country or national thereof shall vest, when, as, and upon the terms, directed by the President, in such agency or person as may be designated from time to time by the President, and upon such terms and conditions as the President may prescribe such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes; and the President shall, in the manner hereinabove provided, require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in this subdivision either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of this subdivision, and in any case in which a report could be required, the President may, in the manner hereinabove provided, require the production, or if necessary to the national security or defense, the seizure of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person; and the President may, in the manner hereinabove provided, take other and further measures not inconsistent herewith for the enforcement of this subdivision.

"(2) Any payment, conveyance, transfer, assignment, or delivery of property or interest therein, made to or for the account of the United States, or as otherwise directed, pursuant to this subdivision or any rule, regulation, instruction, or direction issued hereunder shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same; and no person shall be held liable in any court for or in respect to anything done or omitted in good faith in connection with the administration of, or in pursuance of and in reliance on, this subdivision, or any rule, regulation, instruction, or direction issued hereunder.

"(3) As used in this subdivision the term 'United States' means the United States and any place subject to the jurisdiction thereof: *Provided, however,* That the foregoing shall not be construed as a limitation upon the power of the President, which is hereby conferred, to prescribe from time to time, definitions, not inconsistent with the purposes of this subdivision, for any or all of the terms used in this subdivision."

SEC. 302. All acts, actions, regulations, rules, orders, and proclamations heretofore taken, promulgated, made, or issued by, or pursuant to the direction of, the President or the Secretary of the Treasury under the Trading With the Enemy Act of October 6, 1917 (40 Stat. 411), as amended, which would have been authorized if the provisions of this Act and the amendments made by it had been in effect, are hereby approved, ratified, and confirmed.

The courts of first instance of the Commonwealth of the Philippine Islands shall have jurisdiction in all cases, civil or criminal, arising under this subdivision in the Philippine Islands and concurrent jurisdiction with the district courts of the United States of all such cases arising in the United States; and the several courts of first instance of the Commonwealth of the Philippine Islands shall likewise have jurisdiction over all cases arising under the Trading with the Enemy Act of October 6, 1917, as amended.

56 Stat.]    77th CONG., 1st SESS.—CHS. 593, 594—DEC. 18, 19, 1941

**841**

he may from time to time specify, or which may be carried by any vessel or other means of transportation touching at any port, place, or Territory of the United States and bound to or from any country. Any person who willfully evades or attempts to evade the submission of any such communications to such censorship or willfully uses or attempts to use any code or other device for the purpose of concealing from such censorship the intended meaning of such communication shall, upon conviction, be fined not more than $10,000, or, if a natural person, be imprisoned for not more than ten years, or both; and the officer, director, or agent of any corporation who knowingly participates in such violation shall be punished by a like fine, imprisonment, or both, and any property, funds, securities, papers, or other articles or documents, or any vessel, together with her tackle, apparel, furniture, and equipment, concerned in such violation shall be forfeited to the United States.

## TITLE IV—TIME LIMIT AND SHORT TITLE

SEC. 401. Titles I and II of this Act shall remain in force during the continuance of the present war and for six months after the termination of the war, or until such earlier time as the Congress by concurrent resolution or the President may designate.

SEC. 402. This Act may be cited as the "First War Powers Act, 1941."

Approved, December 18, 1941.

[CHAPTER 594]

## JOINT RESOLUTION

Creating a commission to investigate ways and means for improving economic conditions in the anthracite coal producing regions of the United States.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That there is hereby created a commission to be composed of two Members of the Senate to be appointed by the President of the Senate; two Members of the House of Representatives, to be appointed by the Speaker of the House of Representatives; and three individuals to be appointed by the President, one of whom shall be a natural person, who shall be chairman of the commission; one of whom shall be an officer or employee of the Bureau of Mines, one of whom shall be an officer or employee of the National Resources Planning Board, and one of whom shall be an officer or employee of the Interstate Commerce Commission. Any vacancy in the commission shall be filled in the same manner in which the original appointment was made. No member of the commission shall receive compensation for his services as such member.

SEC. 2. It shall be the duty of the commission to conduct an investigation for the purpose of determining the facts relating to, and ways and means for improving, economic conditions in the anthracite coal producing regions of the United States, and in the conduct of such investigation the commission shall take into consideration, among other relevant factors, (a) the availability in such regions, for national-defense activities, of skilled and unskilled workers, factories, and housing and other facilities, and (b) possible new and extended uses for anthracite coal and the byproducts thereof.

SEC. 3. The commission shall report to the President and to the Congress the results of its investigation, together with its recommendations, at the earliest practicable date. The commission shall cease to exist upon the submission of the report to the President and the Congress of its final report.